1                    UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF GEORGIA
2                        ATLANTA DIVISION

3

4
TONY SMITH,                  ) DOCKET NO. 1:13-CV-2658-RGV
5                            )
          PLAINTIFF,         ) ATLANTA, GEORGIA
6                            ) JUNE 8, 2015
          V.                 )
7                            )
E-BACKGROUNDCHECKS.COM, INC., )
8                            )
          DEFENDANT.         )
9

10                          VOLUME 1
                   TRANSCRIPT OF JURY TRIAL
11         BEFORE THE HONORABLE RUSSELL G. VINEYARD
                UNITED STATES MAGISTRATE JUDGE
12

13  APPEARANCES OF COUNSEL:

14  FOR THE PLAINTIFF:          GREGORY J. GORSKI

15  FOR THE DEFENDANT:          CINDY D. HANSON
                                ROSS D. ANDRE
16

17
    COURT REPORTER:            ANDY ASHLEY
18                             1949 U. S. COURTHOUSE
                               ATLANTA, GEORGIA  30303-3361
19                             (404) 215-1478

20

21
    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
22  PRODUCED BY COMPUTER.

23

24

25

```
 1                    P R O C E E D I N G S

 2  (ATLANTA, FULTON COUNTY, GEORGIA; JUNE 8, 2015

 3  IN OPEN COURT.  A JURY WAS SELECTED.)

 4          THE COURT:  MEMBERS OF THE JURY HAVING BEEN SELECTED

 5  YOU WILL NOW BE ADMINISTERED AN OATH BY MS. MONTGOMERY.

 6          (JURY SWORN)

 7          THE COURT:  LADIES AND GENTLEMEN, I'M GOING TO GIVE

 8  YOU SOME PRELIMINARY INSTRUCTIONS TO HELP YOU AND GUIDE YOU IN

 9  THE PROCESS THAT WE'RE ABOUT TO ENTER WITH REGARD TO THIS

10  TRIAL.  AFTER I GIVE YOU THESE PRELIMINARY INSTRUCTIONS, WE'RE

11  GOING TO TAKE A BRIEF BREAK TO ALLOW THE ATTORNEYS TO SET UP

12  SOME TECHNOLOGY, AND THEN WE'LL ALLOW THEM TO MAKE THEIR

13  OPENING STATEMENTS.  AFTER OPENING STATEMENTS, I ANTICIPATE

14  THAT WE'LL BREAK FOR LUNCH AT THAT TIME.  SO IF YOU'LL GIVE

15  YOUR ATTENTION TO ME RIGHT NOW.

16          NOW THAT YOU'VE BEEN SWORN, I JUST NEED TO EXPLAIN

17  SOME BASIC PRINCIPLES TO YOU ABOUT THE TRIAL AND YOUR DUTY AS

18  JURORS IN THIS CASE.  THESE ARE PRELIMINARY INSTRUCTIONS, AND I

19  WILL BE GIVING YOU MORE DETAILED INSTRUCTIONS AT THE END OF THE

20  TRIAL.

21          IT'S YOUR DUTY TO LISTEN TO THE EVIDENCE, DECIDE THE

22  DISPUTED ISSUES OF FACT, AND APPLY THE LAW TO THOSE FACTS.  I

23  WILL DECIDE ALL QUESTIONS OF LAW AND PROCEDURE THAT ARISE

24  DURING THE TRIAL, AND BEFORE YOU RETIRE TO THE JURY ROOM, I

25  WILL INSTRUCT YOU ON THOSE RULES OF LAW WHICH YOU MUST FOLLOW
```

1  AND HOW YOU WILL DELIBERATE UPON YOUR VERDICT AND DECIDE THE

2  CASE.  YOU MUST FOLLOW THOSE IN APPLYING THE FACTS THAT YOU

3  FIND IN MAKING YOUR DECISION.

4       YOU MUST DECIDE THE CASE ON ONLY THE EVIDENCE

5  PRESENTED IN THE COURTROOM.  THE EVIDENCE PRESENTED TO YOU

6  DURING THE TRIAL WILL PRIMARILY CONSIST OF AGREED UPON FACTS OR

7  WHAT WE CALL STIPULATIONS, THE TESTIMONY OF WITNESSES AND

8  TANGIBLE ITEMS INCLUDING PAPER AND DOCUMENTS WHICH WE CALL

9  EXHIBITS.

10      DURING THE TRIAL YOU WILL HEAR CERTAIN THINGS THAT

11 ARE NOT EVIDENCE, AND YOU MUST NOT CONSIDER THEM.  FIRST, THE

12 LAWYERS' STATEMENTS AND ARGUMENTS ARE NOT EVIDENCE.  IN THEIR

13 OPENING STATEMENTS AND CLOSING ARGUMENTS, THE LAWYERS WILL

14 DISCUSS THE CASE.  THEIR REMARKS MAY HELP YOU FOLLOW EACH

15 SIDE'S ARGUMENT AND PRESENTATION OF EVIDENCE, BUT THE REMARKS

16 THEMSELVES ARE NOT EVIDENCE AND SHOULDN'T PLAY A ROLE IN YOUR

17 DELIBERATIONS.

18      SECOND, THE LAWYERS' QUESTIONS AND OBJECTIONS ARE NOT

19 EVIDENCE.  ONLY THE WITNESSES' ANSWERS ARE EVIDENCE.  DON'T

20 DECIDE THAT SOMETHING IS TRUE JUST BECAUSE A LAWYER'S QUESTION

21 SUGGESTS THAT IT IS.  A QUESTION IS NOT EVIDENCE OF WHAT A

22 WITNESS SAW OR DID UNLESS THE WITNESS AGREES WITH THE

23 QUESTION.

24      THERE ARE RULES OF EVIDENCE THAT CONTROL WHAT THE

25 COURT CAN RECEIVE INTO EVIDENCE.  WHEN A LAWYER ASKS A WITNESS

1    A QUESTION OR PRESENTS AN EXHIBIT, THE OPPOSING LAWYER MAY

2    OBJECT IF HE THINKS THE RULES OF EVIDENCE DO NOT PERMIT IT.  IF

3    I OVERRULE THE OBJECTION, THEN THE WITNESS MAY ANSWER THE

4    QUESTION OR THE COURT MAY RECEIVE THE EXHIBIT.  IF I SUSTAIN

5    THE OBJECTION, THEN THE WITNESS CANNOT ANSWER THE QUESTION, AND

6    THE COURT CANNOT RECEIVE THE EXHIBIT.  WHEN I SUSTAIN AN

7    OBJECTION TO A QUESTION OR TO AN EXHIBIT, YOU MUST IGNORE THE

8    QUESTION, NOT GUESS WHAT THE ANSWER MIGHT HAVE BEEN OR WHAT THE

9    EXHIBIT MAY HAVE BEEN.

10          SOMETIMES I MAY DISALLOW OR STRIKE EVIDENCE AND ORDER

11    YOU TO DISREGARD OR IGNORE IT.  THAT MEANS YOU MUST NOT

12    CONSIDER THAT EVIDENCE WHEN YOU'RE DECIDING THE CASE.  I MAY

13    ALLOW SOME EVIDENCE FOR ONLY A LIMITED PURPOSES.  WHEN I

14    INSTRUCT YOU THAT I'VE ADMITTED AN ITEM OF EVIDENCE FOR A

15    LIMITED PURPOSE, YOU MAY CONSIDER IT FOR THAT PURPOSE ONLY.

16          TO REACH A VERDICT YOU MAY HAVE TO DECIDE WHICH

17    TESTIMONY TO BELIEVE AND WHICH TESTIMONY NOT TO BELIEVE.  YOU

18    MAY BELIEVE EVERYTHING A WITNESS SAYS, PART OF IT, OR NONE OF

19    IT.  WHEN CONSIDERING A WITNESS' TESTIMONY, YOU MAY TAKE INTO

20    ACCOUNT SOME OF THE FOLLOWING FACTORS.

21          THE WITNESS' OPPORTUNITY AND ABILITY TO SEE, HEAR OR

22    KNOW THE THINGS THE WITNESS IS TESTIFYING ABOUT, THE WITNESS'

23    MEMORY, THE WITNESS' MANNER WHILE TESTIFYING, ANY INTEREST THE

24    WITNESS HAS IN THE OUTCOME OF THE CASE, ANY BIAS OR PREJUDICE

25    THE WITNESS MAY HAVE, ANY OTHER EVIDENCE THAT CONTRADICTS THE

1  WITNESS' TESTIMONY, THE REASONABLENESS OF THE WITNESS'

2  TESTIMONY IN LIGHT OF ALL OF THE EVIDENCE, AND ANY OTHER

3  FACTORS AFFECTING BELIEVABILITY.  AT THE END OF THE TRIAL, I'LL

4  GIVE YOU ADDITIONAL GUIDELINES FOR DETERMINING WITNESS

5  CREDIBILITY.

6            WHILE SERVING ON THE JURY, YOU MAY NOT TALK WITH

7  ANYONE ABOUT ANYTHING RELATED TO THE CASE.  YOU MAY TELL PEOPLE

8  THAT YOU'RE A JUROR AND GIVE THEM INFORMATION ABOUT WHEN YOU

9  MUST BE IN COURT, BUT YOU MUST NOT DISCUSS ANYTHING ABOUT THE

10  CASE ITSELF WITH ANYONE, AND THAT WOULD INCLUDE EVEN YOUR

11  FELLOW JURORS UNTIL THE CASE IS SUBMITTED TO YOU FOR YOUR

12  DELIBERATIONS.

13            YOU WANT TO MAKE SURE THAT YOU'VE HEARD EVERYTHING,

14  AND THAT ALL THE EVIDENCE, THE LAWYERS' CLOSING ARGUMENTS AND

15  MY INSTRUCTIONS ON THE LAW BEFORE YOU BEGIN DELIBERATING.  YOU

16  SHOULD KEEP AN OPEN MIND UNTIL THE END OF THE TRIAL.  PREMATURE

17  DISCUSSION AMONG YOURSELVES MAY LEAD TO A PREMATURE DECISION.

18            I WANT TO EMPHASIZE IN ADDITION TO NOT TALKING FACE

19  TO FACE WITH ANYONE ABOUT THE CASE, YOU MUST NOT COMMUNICATE

20  WITH ANYONE ABOUT THE CASE BY ANY OTHER MEANS, AND THAT

21  INCLUDES EMAILS, TEXT MESSAGES, THE INTERNET, SOCIAL NETWORKING

22  SITES.  YOU ALSO SHOULD NOT CONDUCT ANY INDEPENDENT RESEARCH OR

23  SEARCH ONLINE FOR ANY INFORMATION ABOUT THE CASE, THE PARTIES

24  OR THE LAW.  DON'T READ OR LISTEN TO THE NEWS ABOUT THIS CASE

25  SHOULD ANY BE REPORTED, VISIT ANY PLACES RELATED TO THIS CASE

1   OR RESEARCH ANY FACT, ISSUE OR LAW RELATED TO THE CASE.  YOU

2   MUST BASE YOUR DECISION ONLY ON THE TESTIMONY AND OTHER

3   EVIDENCE PRESENTED IN THIS COURTROOM.

4          IF YOU WISH YOU MAY TAKE NOTES TO HELP YOU REMEMBER

5   WHAT WITNESSES SAID.  IF YOU DO TAKE NOTES, PLEASE DON'T SHARE

6   THEM WITH ANYONE UNTIL YOU GO TO THE JURY ROOM TO DECIDE THE

7   CASE.  DON'T LET NOTETAKING DISTRACT YOU FROM CAREFULLY

8   LISTENING TO THE EVIDENCE AS IT IS PRESENTED AND WHAT YOU MAY

9   OBSERVE HERE IN THE COURTROOM FROM WITNESSES.  WHEN YOU LEAVE

10  THE COURTROOM, YOU SHOULD LEAVE YOUR NOTES HIDDEN FROM VIEW IN

11  THE JURY ROOM FROM OTHERS.

12         WHETHER OR NOT YOU TAKE NOTES, YOU SHOULD RELY ON

13  YOUR OWN MEMORY OF THE TESTIMONY.  YOUR NOTES ARE THERE ONLY TO

14  HELP YOUR MEMORY.  THEY ARE NOT ENTITLED TO GREATER WEIGHT THAN

15  YOUR MEMORY OR IMPRESSIONS ABOUT THE TESTIMONY OR THE MEMORY OR

16  IMPRESSIONS OF OTHER JURORS.

17         THE ORDER OF THE TRIAL PROCEEDINGS WILL BE AS

18  FOLLOWS:  AFTER WE TAKE OUR BREAK, I'LL RECOGNIZE THE ATTORNEYS

19  TO ALLOW THEM TO PROVIDE THEIR OPENING STATEMENTS.  THE

20  PLAINTIFF WILL GO FORWARD THEN WITH CALLING WITNESSES AND

21  PRESENTATION OF EVIDENCE AND WHAT WE CALL THE PLAINTIFF'S CASE

22  IN CHIEF, AND WE'LL DO THAT AFTER LUNCH.

23         WHEN THE PLAINTIFF FINISHES BY ANNOUNCING THAT HE

24  RESTS, THE DEFENDANT WILL PROCEED WITH WITNESSES AND EVIDENCE

25  AFTER WHICH WITHIN CERTAIN LIMITATIONS THE PLAINTIFF MAY BE

1    PERMITTED TO AGAIN CALL WITNESSES OR PRESENT EVIDENCE DURING

2    WHAT WE CALL THE REBUTTAL PHASE OF THE TRIAL.  THE PLAINTIFF

3    PRESENTS FIRST AND MAY REBUT AT THE END BECAUSE THE LAW PLACES

4    THE BURDEN OF PROOF OR BURDEN OF PERSUASION UPON THE PLAINTIFF,

5    AND I'LL BE EXPLAINING TO YOU IN MY LATER INSTRUCTIONS IN

6    DETAIL HOW THE BURDEN OF PROOF APPLIES IN THIS CASE.

7            WHEN THE EVIDENCE PORTION OF THE TRIAL IS COMPLETED,

8    THE LAWYERS WILL THEN GIVE THEIR CLOSING STATEMENTS OR

9    SUMMATIONS TO YOU, AND I WILL INSTRUCT YOU ON THE APPLICABLE

10   LAW THAT YOU ARE TO APPLY, AND YOU WILL THEN RETIRE TO BEGIN

11   YOUR DELIBERATIONS ON YOUR VERDICT.

12           AS I INDICATED TO YOU AT THIS TIME I'M GOING TO TAKE

13   A BRIEF RECESS TO ALLOW THE ATTORNEYS TO SET UP SOME TECHNOLOGY

14   THAT THEY NEED TO AID IN THEIR PRESENTATION OF OPENING

15   STATEMENTS.  THIS WILL BE A BRIEF RECESS I ANTICIPATE.  WE'LL

16   HEAR THEIR OPENING STATEMENTS, AND THEN WE'LL BE READY TO BREAK

17   FOR LUNCH TODAY.

18           SO JUST REMEMBER MY ADMONITION, DO NOT BEGIN TO

19   DISCUSS ANYTHING ABOUT THE CASE.  YOU'LL HAVE PLENTY OF

20   OPPORTUNITY TO DO THAT AT THE CONCLUSION OF THE CASE.  YOU ALL

21   ARE EXCUSED TO THE JURY ROOM.  THE CSO WILL ESCORT YOU TO YOUR

22   JURY ROOM.

23           (JURY RETIRED)

24           THE COURT:  COUNSEL, I'M GOING TO TAKE A BREAK TO

25   ALLOW YOU ALL TO SET UP THE TECHNOLOGY.  I UNDERSTAND THEY'LL

1   BE ANOTHER LITTLE ADJUSTMENT IN THE TECHNOLOGY BETWEEN TIME,

2   BUT IF YOU ALL CAN DO AS MUCH AS YOU CAN RIGHT NOW, AND JUST

3   LET MS. MONTGOMERY WHEN YOU'RE PREPARED.  I ASSUME IT'S GOING

4   TO TAKE TEN MINUTES OR LESS TO DO SO?

5           MR. ANDRE:  YES, YOUR HONOR.  ONE QUICK QUESTION.

6   WILL THE JURORS BE PROVIDED PEN AND PAPER FOR NOTE TAKING?

7           THE COURT:  YES, WE HAVE LITTLE NOTE PADS.  MS.

8   MONTGOMERY HAS THOSE HERE.  ANYTHING FURTHER?

9           MR. GORSKI:  NOTHING FROM PLAINTIFF.  THANK YOU.

10          MR. ANDRE:  NO, YOUR HONOR.  THANK YOU.

11          (RECESS)

12          THE COURT:  COUNSEL, ARE YOU ALL READY TO DO YOUR

13  OPENING STATEMENTS AT THIS TIME, MR. GORSKI?

14          MR. GORSKI:  YES, YOUR HONOR.

15          THE COURT:  MR. ANDRE?

16          MR. ANDRE:  YES, YOUR HONOR.

17          THE COURT:  SIR, IF YOU WOULD BRING OUR JURORS IN.

18  THANK YOU.

19          (JURY PRESENT)

20          THE COURT:  MEMBERS OF THE JURY, IT'S NOW TIME TO

21  BEGIN BY AFFORDING THE LAWYERS FOR EACH SIDE THE OPPORTUNITY TO

22  MAKE THEIR OPENING STATEMENT TO YOU IN WHICH THEY MAY EXPLAIN

23  THE ISSUES IN THE CASE AND SUMMARIZE THE FACTS THAT THEY EXPECT

24  THE EVIDENCE WILL SHOW.

25          I REMIND YOU THAT THE STATEMENTS THAT THEY'RE ABOUT

1   TO MAKE TO YOU AS WELL AS THE CLOSING ARGUMENTS OR SUMMATIONS

2   ARE NOT EVIDENCE IN THE CASE, AND YOU MAY NOT CONSIDER THEM AS

3   EVIDENCE OR INSTRUCTIONS ON THE LAW WHICH I WILL BE PROVIDING

4   TO YOU AT THE END OF THE CASE.  NEVERTHELESS, THESE STATEMENTS

5   AND ARGUMENTS ARE INTENDED TO HELP YOU UNDERSTAND THE ISSUES IN

6   THE CASE AND THE EVIDENCE AS IT COMES IN AS WELL AS THE

7   POSITIONS TAKEN BY BOTH SIDES.

8            SO I ASK NOW TO GIVE YOUR FULL ATTENTION TO EACH

9   LAWYER AS THEY BRING THEIR OPENING STATEMENT.  MR. GORSKI, I

10  RECOGNIZE YOU.

11           MR. GORSKI:  THANK YOU, YOUR HONOR.  LADIES AND

12  GENTLEMEN OF THE JURY, GOOD MORNING AND THANK YOU FOR

13  PARTICIPATING IN THIS IMPORTANT CIVIL PROCESS.  I CAN ASSURE

14  YOU THAT EVERYBODY HERE IS TRULY GRATEFUL FOR YOU TAKING TIME

15  OUT OF YOUR DAY TO PARTICIPATE IN THIS TRIAL.

16           AS YOU ALREADY KNOW FROM THE SELECTION PROCESS, MY

17  NAME IS GREG GORSKI.  I'M AN ATTORNEY.  I REPRESENT THE

18  PLAINTIFF IN THIS CASE.  HIS NAME IS TONY SMITH.  HE'S SITTING

19  RIGHT THERE AT THE END OF THE TABLE.  ALSO WITH ME TODAY IS

20  MY PARALEGAL ILIJANA VUKAS WHO WORKS WITH ME AT OUR LAW

21  OFFICE.

22           LET ME SET THE STAGE FOR WHY WE'RE HERE IN COURT

23  TODAY.  IN SEPTEMBER 2012 A RECRUITER WORKING FOR A TRUCKING

24  COMPANY CALLED THE DART TRANSIT COMPANY ORDERED A NATIONAL

25  CRIMINAL BACKGROUND CHECK FROM THE DEFENDANT IN THIS CASE

1   E-BACKGROUNDCHECKS.COM.  NOW DURING THE TRIAL, I MAY ALSO REFER

2   TO THE DEFENDANT AS BGC OR SOMETIMES JUST

3   BACKGROUNDCHECKS.COM.  SO IF YOU USE ANY OF THOSE, YOU'LL KNOW

4   WHO I'M REFERRING TO.

5            THE CRIMINAL REPORT WAS TO BE ABOUT MY CLIENT MR.

6   SMITH AS PART OF HIS PENDING EMPLOYMENT WITH DART AS A TRUCK

7   DRIVER.  THE RECRUITER ENTERED THE FOLLOWING INFORMATION INTO A

8   WEBPAGE THAT WAS OPERATED BY BGC AS THE ONLY WAY TO OBTAIN THIS

9   NATIONAL CRIMINAL BACKGROUND CHECK:  NAME TONY WILLIE SMITH,

10  DATE OF BIRTH NOVEMBER 17TH, 1979, SOCIAL SECURITY NUMBER

11  339-84-XXXX, WORK STATE GEORGIA.  THIS IS ALL MR. SMITH'S

12  CORRECT FULL NAME, HIS CORRECT DATE OF BIRTH AND HIS CORRECT

13  SOCIAL SECURITY NUMBER.

14           THAT INFORMATION WAS THEN ELECTRONICALLY SENT TO A

15  BGC COMPUTER, AND IN A MATTER OF SECONDS THE BGC COMPUTER

16  GENERATED A CRIMINAL REPORT THAT GOT SENT RIGHT BACK TO THE

17  DART RECRUITER AND APPEARED ON HIS COMPUTER SCREEN.

18           THE REPORT CONTAINED SIX CRIMINAL CONVICTIONS THAT

19  WOULD HAVE OTHERWISE PRECLUDED MY CLIENT FROM GETTING HIRED AT

20  DART.  THE CRIMINAL CONVICTIONS, HOWEVER, DID NOT BELONG TO MY

21  CLIENT MR. SMITH HERE.  THEY BELONGED TO ANOTHER TONY SMITH

22  FROM PHILADELPHIA, PENNSYLVANIA WHO IS NO RELATION TO MY CLIENT

23  AT ALL.  HE DOES NOT KNOW THIS PERSON.  HE'S NEVER MET THIS

24  PERSON.  MY CLIENT HERE HAS NEVER EVEN BEEN TO THE STATE OF

25  PENNSYLVANIA AND DOES NOT KNOW ANYBODY IN THE STATE OF

1    PENNSYLVANIA.

2            NOW, WHAT YOU MAY BE ASKING YOURSELF IS HOW COULD

3    THIS HAPPEN, AND THAT'S WHAT THIS CASE IS ABOUT, THOSE FEW

4    SECONDS WHERE BGC'S COMPUTERS GENERATE A REPORT THAT FALSELY

5    ACCUSES MR. SMITH OF CRIMES HE DID NOT COMMIT.

6            NOW, AS YOU HEARD IN JUDGE VINEYARD'S INSTRUCTIONS,

7    THIS CASE INVOLVES THE FAIR CREDIT REPORTING ACT SOMETIMES

8    CALLS THE FCRA, AND AS PART OF HIS INITIAL INSTRUCTIONS TO YOU,

9    HE EXPLAINED THAT THE FCRA HAS RULES FOR GENERATING CRIMINAL

10   BACKGROUND CHECKS THAT REQUIRE COMPANIES LIKE BGC TO EMPLOY

11   REASONABLE PROCEDURES TO ENSURE MAXIMUM POSSIBLE ACCURACY.  I

12   UNDERSCORE THAT.  THE RULE REQUIRES MAXIMUM POSSIBLE ACCURACY.

13           NOW AT THE END OF THIS TRIAL, I'M GOING TO ASK YOU TO

14   RETURN A VERDICT IN FAVOR OF MR. SMITH PRECISELY BECAUSE BGC

15   DOES NOT FOLLOW THE FCRA'S RULES FOR ACHIEVING MAXIMUM POSSIBLE

16   ACCURACY WHEN IT SELLS AN INSTANTANEOUS NATIONAL CRIMINAL

17   BACKGROUND CHECK AND RETURNS AN ERRONEOUS REPORT LIKE THE ONE

18   SOLD ABOUT MY CLIENT CLAIMING THAT HE'S COMMITTED CRIMES THAT

19   HE DID NOT COMMIT AND JEOPARDIZING HIS LIVELIHOOD.

20           THE EVIDENCE YOU'RE GOING TO HEAR ON THOSE PROCEDURES

21   IS GOING TO COME FROM BGC'S PRESIDENT CRAIG KESSLER, WHO IS

22   HERE WITH US TODAY.  MR. KESSLER'S TESTIMONY IS GOING TO

23   PROVIDE YOU WITH THE FOLLOWING INFORMATION ABOUT HOW BGC SELLS

24   NATIONAL CRIMINAL BACKGROUND REPORTS THAT IT CALLS THE US

25   ONESEARCH AS WELL AS THE INACCURACIES THAT APPEARED ON MR.

1   SMITH'S REPORT SPECIFICALLY.

2          FIRST, THIS TESTIMONY IS GOING TO CONFIRM THAT ALL

3   THE CRIMINAL RECORDS ON BGC'S REPORT THAT WAS SOLD ABOUT MR.

4   SMITH BY BGC BY THEIR OWN ADMISSION DOES NOT BELONG TO MY

5   CLIENT.  SECOND, THE REPORTS, LIKE THE ONE SOLD ABOUT MY

6   CLIENT, ARE GENERATED INSTANTANEOUSLY.  THERE IS NO HUMAN

7   INVOLVEMENT AT ALL IN THE PROCESS OF CREATION OF THESE

8   REPORTS.

9          NEXT, YOU'RE GOING TO LEARN THAT THE REASON THAT

10  THESE FALSE RECORDS ENDED UP ON MY CLIENT'S REPORT IS BECAUSE

11  THE COMPUTER WAS ONLY LOOKING TO MATCH NAME AND DATE OF BIRTH,

12  AND THIS IS IMPORTANT.  BGC BY ITS OWN ACKNOWLEDGMENT

13  UNDERSTANDS THAT ITS COMPUTERS CANNOT DIFFERENTIATE BETWEEN

14  PEOPLE WITH THE SAME NAME AND THE SAME DATE OF BIRTH.

15         ADDITIONALLY, EVEN THOUGH DART ENTERED MR. SMITH'S

16  SOCIAL SECURITY NUMBER INTO THAT WEBPAGE AND PROVIDED IT TO

17  BGC, IT WAS NOT CONSIDERED BECAUSE BGC'S COMPUTER IS NOT

18  ATTEMPTING TO MATCH SOCIAL SECURITY NUMBERS BEFORE PLACING

19  THESE CRIMINAL RECORDS ON SOMEBODY'S REPORT.

20         ADDITIONALLY, BGC IS ABLE TO COMPARE SOCIAL SECURITY

21  NUMBERS.  THEY HAVE THE MEANS TO DO IT, BUT THEY CONSCIOUSLY

22  CHOOSE NOT TO DO SO PRIOR TO ISSUING THESE REPORTS AS A MATTER

23  OF PRACTICE.

24         BGC ALSO HAS NO SPECIAL PROCEDURES IN PLACE TO

25  ADDRESS ANY ISSUES WITH PEOPLE WHO MIGHT HAVE COMMON NAMES.

1   BGC ALSO LEAVES OFF IDENTIFYING INFORMATION THAT IS ACTUALLY

2   PART OF THE CRIMINAL RECORD AND COULD HAVE DIFFERENTIATED MR.

3   SMITH FROM THE ACTUAL PERPETRATOR, BUT THEY DO NOT PUT THAT ON

4   THE REPORT.

5           FINALLY, BGC IS NO STRANGER TO THIS PROBLEM.  MR.

6   KESSLER WILL CONFIRM THAT BGC RECEIVES DISPUTES LIKE THIS EVERY

7   DAY, MULTIPLE TIMES PER DAY.

8           NOW, AT THE END OF THIS TRIAL, I'M ALSO GOING TO ASK

9   YOU TO AWARD MONEY DAMAGES TO MR. SMITH FOR REPUTATIONAL HARM

10  THAT HE SUFFERED AND FOR EMOTIONAL DISTRESS THAT HE SUFFERED

11  GOING THROUGH THIS PROCESS.

12          WHAT YOU'RE GOING TO HEAR FROM MR. SMITH IS THAT AS

13  HE WAS DRIVING IN ON HIS FIRST DAY TO WORK, HE WAS CONTACTED BY

14  A RECRUITER AND INFORMED ABOUT THE ERRONEOUS BACKGROUND CHECK

15  AND WAS CALLED A LIAR AND DISHONEST.  HE WASN'T ALLOWED TO LOOK

16  AT THE REPORT.  HE WASN'T ABLE TO LOOK AT THE REPORT FOR A WEEK

17  THAT BGC PUT IN THE MAIL.  IT TOOK HIM A WEEK TO FINALLY LOOK

18  AT THE REPORT SO THAT HE COULD ACTUALLY SEE WHAT WAS WRONG WITH

19  IT.

20          WHILE HE WAS WAITING, HE CONTACTED THE GEORGIA JAIL,

21  GOT FINGERPRINTED TO PROVE THAT HE DID NOT HAVE THESE CRIMINAL

22  RECORDS ASSOCIATED WITH HIM.  HE EVEN CONTACTED COURTS IN

23  PENNSYLVANIA AND THE POLICE IN PENNSYLVANIA TO SHOW THAT THESE

24  CRIMINAL RECORDS ARE NOT ASSOCIATED WITH HIM.  HE EVEN CALLED

25  THE COURT WHERE THESE RECORDS CAME FROM AND CONFIRMED THE

1   RECORDS WERE NOT ASSOCIATED WITH HIM.

2          THE OTHER IMPORTANT POINT HERE, AND I HAVE A MISSED

3   SLIDE, NOBODY TO HELP HIM.  ONE OF THE IMPORTANT THINGS TO

4   UNDERSTAND HERE IS THAT ONCE THIS REPORT WAS ISSUED THE BALL

5   DOESN'T BOUNCE -- THE BALL DIDN'T BOUNCE INTO DART'S COURT TO

6   FIGURE THIS OUT.  NO MATTER WHAT MR. SMITH WENT AND GOT, DART

7   WAS NOT GOING TO INVESTIGATE THIS.  EVEN THOUGH HE ASKED --

8   EVEN THOUGH HE PROVIDED THEM WITH INFORMATION, DART WAS GOING

9   TO RELY ON THE REPORT FROM BGC UNTIL IT WAS FIXED, MEANING HE

10  COULDN'T GET THE JOB.

11         NOW WHEN HE FINALLY GOT THIS REPORT, HE CONTACTED BGC

12  THREE TIMES BY TELEPHONE, AND YOU'RE GOING TO GET TO HEAR ALL

13  THREE OF THOSE CONVERSATIONS WHEN HE CALLED BGC ON TWO

14  CONSECUTIVE DAYS.

15         HE'S ALSO GOING TO TELL YOU ABOUT THE EMBARRASSMENT

16  AND THE HUMILIATION THAT HE FELT.  HE'S ALSO GOING TO TELL YOU

17  ABOUT THE AFFECT THAT THIS HAD ON HIS FAMILY, AND HE'S ALSO

18  GOING TO TELL YOU ABOUT THE AFFECT IT HAD ON HIS MENTAL AND

19  PHYSICAL HEALTH DURING THIS TIMEFRAME.

20         FINALLY, YOU'RE ALSO GOING TO HEAR TESTIMONY FROM

21  PEGGY O'NEILL.  PEGGY O'NEILL IS THE RECRUITER AT DART WHO

22  RECEIVED THE FALSE BACKGROUND CHECK IN CONNECTION WITH MY

23  CLIENT'S APPLICATION.  NOW, MS. O'NEILL IS FROM OKLAHOMA, AND

24  BOTH SIDES AGREED THAT WE DID NOT WANT TO MAKE MS. O'NEILL

25  TRAVEL HERE TO ATLANTA FROM OKLAHOMA, BUT SHE GAVE TESTIMONY AT

1   WHAT'S CALLED A DEPOSITION, AND JUDGE VINEYARD WILL INSTRUCT

2   YOU ON THAT LATER, BUT IT WILL BE EVIDENCE THAT IS COMBINED

3   FROM BOTH SIDES IN ONE VIDEOTAPE FOR YOUR VIEWING.

4            THE IMPORTANT THING WITH RESPECT TO MS. O'NEILL'S

5   TESTIMONY IS TWO THINGS THAT CONNECT EVERYTHING TOGETHER HERE.

6   NUMBER 1, MR. SMITH'S EMPLOYMENT WAS GOING TO BE DENIED

7   SPECIFICALLY BECAUSE OF THIS BGC BACKGROUND CHECK, OKAY.  MS.

8   O'NEILL WILL SAY THAT IN HER TESTIMONY.  SECOND, DART WAS NOT

9   GOING TO HELP MR. SMITH WITH HIS PROBLEM.  THE PROBLEM WAS ON

10  MR. SMITH TO SOLVE HIMSELF IF HE WAS GOING TO GET THAT JOB.

11           NOW, THAT'S THE EVIDENCE THAT WE'RE GOING TO PRESENT

12  TO YOU HERE TODAY.  I'D LIKE YOU TO FOCUS ON A COUPLE OF THINGS

13  HERE AS YOU LISTEN TO THE EVIDENCE.  FIRST, FOCUS ON BGC'S

14  PROCEDURES FOR PREPARING THIS REPORT.  REMEMBER THAT THIS CASE

15  IS ABOUT BGC'S PROCEDURES FOR GENERATING ITS NATIONAL CRIMINAL

16  BACKGROUND REPORTS AND WHETHER THEY ASSURE MAXIMUM POSSIBLE

17  ACCURACY OF THE INFORMATION.  THIS CASE IS NOT ABOUT WHETHER

18  BGC ULTIMATELY CORRECTED THAT REPORT AT SOME LATER POINT IN

19  TIME.

20           SECOND, NOW MY CLIENT WAS ABLE TO OBTAIN A JOB AT

21  DART, BUT NOT WITHOUT GOING THROUGH A GUT WRENCHING PROCESS OF

22  HAVING HIS LIVELIHOOD PLACED IN LIMBO FOR A COUPLE OF WEEKS.

23  FOCUS ON THOSE TWO WEEKS AS MR. SMITH EXPLAINS TO YOU WHAT IT

24  WAS LIKE TO GO THROUGH A PROCESS WHERE HE WAS EFFECTIVELY

25  TREATED AS GUILTY UNTIL PROVEN INNOCENT.

1            THANK YOU, LADIES AND GENTLEMEN, AND THANK YOU FOR

2    YOUR ATTENTION.  I LOOK FORWARD TO SPEAKING WITH YOU AT THE END

3    OF THE CASE.

4            THE COURT:  MR. ANDRE, DO YOU NEED A MOMENT TO SET UP

5    THE COMPUTER FOR YOUR USE?

6            MR. ANDRE:  JUST A MINUTE OR TWO.

7            THE COURT:  ALL RIGHT.  YOU MAY TAKE THAT OPPORTUNITY

8    NOW.

9            (PAUSE IN THE PROCEEDINGS.)

10           THE COURT:  ARE YOU READY NOW?

11           MR. ANDRE:  THAT'S ALL WE NEEDED.

12           THE COURT:  YOU MAY ADDRESS THE JURY.

13           MR. ANDRE:  GOOD MORNING, LADIES AND GENTLEMEN, JUST

14   BARELY.  WE'LL PROVE TWO THINGS TO YOU DURING THIS TRIAL.

15   FIRST, WE'LL PROVE TO YOU THAT BGC MAINTAINS MORE THAN

16   REASONABLE PROCEDURES TO ASSURE MAXIMUM POSSIBLE ACCURACY

17   DESPITE WHAT HAPPENED TO MR. SMITH.

18           YOU'RE GOING TO HEAR, AS MR. GORSKI ALLUDED TO,

19   DETAILED TESTIMONY FROM CRAIG KESSLER, FOUNDER AND PRESIDENT OF

20   BGC.  YOU'LL HEAR FROM HIM BOTH IN MR. SMITH'S CASE IN CHIEF

21   AND IN OUR CASE IN CHIEF.  SECOND, WE'RE GOING TO PROVE TO YOU

22   THAT MR. SMITH WAS NOT DAMAGED BY WHAT HAPPENED TO HIM IN THIS

23   CASE.

24           THIS IS A CASE ABOUT A BACKGROUND CHECK, AND THERE'S

25   NO DISPUTE THAT IN THE FIRST INSTANCE, THE BACKGROUND CHECK

1    THAT BGC PREPARED INCLUDED RECORDS THAT MATCHED MR. SMITH'S

2    FULL FIRST NAME, LAST NAME, MONTH, DAY AND YEAR OF BIRTH, BUT

3    UNFORTUNATELY WERE NOT ACTUALLY ABOUT HIM, AND BGC REGRETS THAT

4    THAT HAPPENED, BUT THAT'S NOT THE WHOLE STORY.

5            YOU HEARD MR. GORSKI ALLUDE TO IT THERE.  YOU MAY BE

6    THINKING, YOU MAY HAVE BEEN THINKING ALL MORNING THAT THIS IS A

7    CASE WHERE SOMEBODY LOST A JOB BECAUSE OF A BACKGROUND CHECK.

8    ABSOLUTELY NOT.  TONY SMITH GOT THE JOB THAT HE WAS APPLYING

9    FOR WITH DART TRANSPORTATION.

10           SO WHY ARE WE HERE?  WE'RE HERE TO TALK ABOUT THIS

11   TIMELINE, AND THIS IS WHAT THE EVIDENCE IS GOING TO SHOW YOU.

12   WE'RE HERE TO TALK ABOUT ONE WEEK, AND THAT'S THE ONE WEEK

13   BETWEEN WEDNESDAY, SEPTEMBER 12TH WHEN DART ORDERED MR. SMITH'S

14   REPORT AND WEDNESDAY, SEPTEMBER 19TH WHICH IS THE DATE THAT BGC

15   FIXED THE REPORT, SENT IT TO DART SAYING MR. SMITH HAD NO

16   CRIMINAL RECORDS, AND THE VERY NEXT DAY YOU'LL HEAR DART

17   APPROVED HIM TO BEGIN THE JOB.

18           YOU HEARD TALK ABOUT THE WEEK THAT IT TOOK FOR MR.

19   SMITH TO RECEIVE THE REPORT.  YOU'RE GOING TO SEE THAT'S NOT

20   THE CASE.  WE KNOW THAT ON MONDAY, SEPTEMBER 17TH, LESS THAN A

21   WEEK AFTER BGC PREPARED THIS REPORT, MR. SMITH CALLED TO

22   DISPUTE IT, AND HE HAD THE REPORT IN HAND.  HE HAD IT IN HAND

23   BECAUSE BGC MAILED HIM A COPY SO THAT IF ANYTHING HAD GONE

24   WRONG HE COULD CALL AND GET IT FIXED.

25           SO REALLY WE'RE NOT EVEN HERE TO TALK ABOUT THIS

1   WHOLE WEEK.  WE'RE HERE TO TALK ABOUT JUST A COUPLE OF DAYS OF

2   IT, MAYBE TWO, MAYBE FOUR.  THE DAYS BETWEEN WHEN MR. SMITH

3   FIRST SAW THAT REPORT AND WHEN BGC FIXED IT, AND WE'RE ONLY

4   TALKING ABOUT THOSE BECAUSE AS JUDGE VINEYARD WILL INSTRUCT YOU

5   YOU'RE NOT HERE TO DECIDE WHETHER MR. SMITH LOST WAGES FROM HIS

6   JOB.  THAT'S ALREADY BEEN DECIDED BECAUSE HE GOT THE JOB.

7   YOU'RE ONLY HERE TO ASSESS WHETHER HE'S ENTITLED TO DAMAGES FOR

8   EMOTIONAL HARM, AND IT'S THOSE WHEN HE KNEW IT WAS A PROBLEM

9   AND WHEN BGC FIXED IT THAT ARE AT ISSUE.

10          AS MR. GORSKI SAID, YOU'RE GOING TO HEAR FROM JUDGE

11   VINEYARD AT THE END OF THIS CASE WHAT IT IS THAT THE LAW

12   REQUIRES, AND MR. GORSKI QUOTED IT.  BGC IS REQUIRED TO

13   MAINTAIN REASONABLE PROCEDURES TO ENSURE THE MAXIMUM POSSIBLE

14   ACCURACY OF THE INFORMATION THAT IT REPORTS.  REASONABLE

15   PROCEDURES, LADIES AND GENTLEMEN.

16          YOU'RE GOING TO HEAR TALK FROM MR. SMITH ABOUT THE

17   MANY THINGS THAT HE BELIEVES BGC SHOULD HAVE DONE DIFFERENTLY

18   IN THIS CASE, BUT THE ONE THING THE EVIDENCE WILL NEVER SHOW

19   YOU IS THAT ANY OF THOSE SUGGESTIONS ARE REASONABLE, AND THAT'S

20   WHAT THE LAW REQUIRES.

21          BY DEFINITION PROCEDURES THAT ARE REASONABLE ARE NOT

22   PERFECT.  THAT'S WHY THERE ARE CHECKS AND BALANCES IN PLACE

23   THAT YOU'RE GOING TO HEAR ABOUT TO ENSURE THAT IF IT ISN'T

24   PERFECT THE FIRST TIME, WE STILL GET IT RIGHT.  THAT'S WHAT

25   HAPPENED TO MR. SMITH, AND THOSE PROCEDURES THAT BGC MAINTAINS

1   AND THE LAW ITSELF RECOGNIZE THAT YES, HONEST MISTAKES ARE

2   GOING TO HAPPEN.  THAT'S WHY WE HAVE A MECHANISM TO FIX IT.

3          BGC, BACKGROUNDCHECKS.COM, IS WHAT WE CALL A CONSUMER

4   REPORTING AGENCY.  ESSENTIALLY IT'S A COMPANY THAT DOES

5   BACKGROUND SCREENING.  IT PROVIDES SCREENING IN A LOT DIFFERENT

6   CONTEXTS, BUT ONE OF THE MAIN ONES IT DOES IS BACKGROUND CHECKS

7   TO PROSPECTIVE EMPLOYERS WHO ARE TRYING TO MAKE SURE THEY'RE

8   GOING TO HIRE A SAFE WORK FORCE.

9          BGC'S CLIENTS, YOU'LL HEAR FROM MR. KESSLER, ARE

10  COMPANIES THAT NEED TO BE ABSOLUTELY SURE THAT THEY'RE PUTTING

11  THE RIGHT PERSON IN THE JOB.  IT'S THE SCHOOL VOLUNTEERS WHO

12  ARE GOING TO SEND OTHER PEOPLE'S KIDS OUT WITH OTHER PEOPLE'S

13  PARENTS.  IT'S TRUCKING COMPANIES WHO ARE GOING TO PUT SOMEBODY

14  BEHIND THE WHEEL OF A 20-TON VEHICLE, OR IT'S THE STAFFING

15  AGENCIES WHO ARE TRYING TO GET SOMEBODY INTO A JOB AS QUICKLY

16  AS THEY CAN AND GET THAT PERSON INTO THE WORK FORCE.

17         MR. KESSLER, WHO YOU'LL HEAR FROM, FOUNDED BGC

18  HIMSELF IN 1999 OUT IN DALLAS, TEXAS.  IT CURRENTLY EMPLOYS

19  ABOUT 75 PEOPLE WHO ARE WORKING EVERY DAY TO TRY TO GET THIS

20  RIGHT.  AS MR. KESSLER WILL TELL YOU, BGC RECOGNIZES THAT IT

21  PLAYS AN IMPORTANT ROLE IN THESE EMPLOYER'S HIRING PROCESSES,

22  AND THAT'S WHY THE IMPORTANCE THAT BGC PLAYS TOUCHES NOT ONLY

23  THE CONSUMER BUT THE EMPLOYER AS WELL.  BOTH ARE RELYING ON BGC

24  TO GET IT RIGHT, AND THAT'S WHY BGC DOES CREATE EXTRAORDINARILY

25  ROBUST PROCEDURES TO ENSURE THAT ITS REPORT ARE AS ACCURATE AS

1   THEY CAN POSSIBLY BE.

2          HOW DOES IT DO THAT?   THROUGH EVERYTHING FROM THE WAY

3   IT ACQUIRES ITS DATA TO THE WAY THAT IT MATCHES ITS RECORDS TO

4   THE WAY TO MAKE SURE THAT INACCURACIES, SHOULD THEY OCCUR,

5   NEVER REPEAT THEMSELVES.   YOU'LL HEAR ABOUT ALL THESE CHECKS

6   AND BALANCES.

7          BGC ALSO HAS A LOT OF DIFFERENT PRODUCTS.   AS MR.

8   GORSKI TOLD YOU, WE'RE ONLY HERE TO TALK ABOUT THE DATABASE

9   SEARCH THAT BGC MAKES AVAILABLE.   IT'S A DATABASE THAT'S MADE

10  UP OF HUNDREDS OF MILLIONS OF PUBLIC RECORDS FROM AROUND THE

11  COUNTRY.   THAT INFORMATION COMES DIRECTLY FROM COURTHOUSES AND

12  OTHER RECORD REPOSITORIES, AND IT'S COMPOSED OF THE INFORMATION

13  THAT THEY MAKE AVAILABLE TO BGC.

14          AS YOU'LL LEARN FROM THE EVIDENCE, THE AMOUNT OF

15  INFORMATION THAT THESE RECORD SOURCES MAKE AVAILABLE VARIES,

16  AND IT'S ALWAYS TRENDING DOWNWARD.   DOES BGC GET A SOCIAL

17  SECURITY NUMBER FOR EVERY CRIMINAL RECORD?   ABSOLUTELY NOT.

18  AND AS YOU'LL HEAR MR. KESSLER SAY THAT'S BECAUSE COURTS DON'T

19  MAKE THAT INFORMATION PUBLIC BECAUSE OF VERY REAL CONCERNS

20  ABOUT IDENTITY THEFT IF I CAN WALK INTO A COURTHOUSE AND FIND A

21  PERSON'S SOCIAL SECURITY NUMBER.

22          DOES EVERY RECORD EVEN INCLUDE A FULL DATE OF BIRTH

23  OR A MIDDLE NAME?   NO, UNFORTUNATELY SOME OF THEM DON'T.

24  THAT'S A VARIATION IN THE DATA THAT'S DRIVEN BY COURTHOUSES,

25  NOT BY SOMETHING BGC DOES.

1         AT THE END OF THE DAY, LADIES AND GENTLEMEN,

2    EMPLOYERS NEED A RELIABLE AND ACCURATE AND AN EXPEDITIOUS WAY

3    TO GAUGE SOMEBODY'S CRIMINAL RECORDS ON A NATIONAL SCALE.

4    THAT'S WHAT BGC MAKES AVAILABLE.

5         ARE THERE OTHER WAYS TO DO A BACKGROUND CHECK THAT

6    YOU MIGHT HEAR ABOUT?  OF COURSE, THERE ARE OTHER WAYS TO DO

7    EVERYTHING, BUT DATABASE SEARCHES, THE TYPE THAT BGC DOES HAVE

8    BEEN AROUND FOR DECADES.  THEY'VE BEEN USED SUCCESSFULLY AND

9    THAT'S BECAUSE THEY WORK.

10         AS YOU LISTEN TO ALL THE EVIDENCE, ONE THING YOU'RE

11    NEVER GOING TO HEAR IS A PLAUSIBLE, REASONABLE SUGGESTION FOR

12    WHY BGC WOULD WANT TO CUT CORNERS.  THEY WILL MAKE THIS

13    ARGUMENT THAT BGC IS THIS UNCARING CORPORATION.  INACCURACIES

14    ARE BAD FOR CONSUMERS, AND THEY'RE BAD FOR EMPLOYERS.  BGC HAS

15    EVERY INCENTIVE TO GET THIS RIGHT, AND THAT'S WHY IT TRIES TO

16    DO JUST THAT.

17         WITH ALL THAT IN MIND, WHAT IS THE EVIDENCE GOING TO

18    SHOW YOU HAPPENED IN THIS CASE?  IN SEPTEMBER 2012, AS YOU

19    HEARD MR. GORSKI SAY, TONY SMITH APPLIED FOR A JOB AT DART.  ON

20    WEDNESDAY, SEPTEMBER 12TH THEY ORDERED A BACKGROUND REPORT FROM

21    BGC PROVIDING THE INFORMATION THAT MR. GORSKI REFERENCED.  MR.

22    SMITH WAS APPLYING FOR A JOB INTO A TRUCK DRIVER TRAINING

23    PROGRAM.

24         AS MR. KESSLER WILL TELL YOU, BGC'S SYSTEM FOUND

25    RECORDS THAT MATCHED MR. SMITH'S FULL FIRST NAME, LAST NAME,

1   MONTH, DAY AND YEAR OF BIRTH.  THOSE RECORDS HAD NO MIDDLE NAME

2   ON THEM WHATSOEVER.  THAT WASN'T A COMPARISON POINT, BUT TO BE

3   SURE, YOU'LL HEAR MR. KESSLER TESTIFY THAT BGC USES MIDDLE

4   NAMES AS AN IMPORTANT FACTOR IN MATCHING IF THE MIDDLE NAME IS

5   ON THE RECORD TO MATCH FROM.  THAT'S NOT THE END OF THE STORY

6   WHEN BGC SENDS THE REPORT TO DART.

7           WHEN IT DID SO, IT ALSO PREPARED A LETTER FOR MR.

8   SMITH LETTING HIM KNOW THAT IT HAD SENT THAT INFORMATION TO

9   DART, AND IT SENT HIM A FULL COPY OF THE REPORT, A COPY OF A

10  DISPUTE FORM IN CASE HE SAW A PROBLEM ON THE REPORT, AND A

11  SUMMARY OF ALL OF HIS LEGAL RIGHTS UNDER THE FAIR CREDIT

12  REPORTING ACT THAT THE GOVERNMENT PUBLISHES.  IT MAILED THAT

13  INFORMATION TO HIM ON THE MORNING OF THURSDAY, SEPTEMBER 13TH

14  AS YOU CAN SEE FROM THE TIMELINE AND AS YOU WILL HEAR FROM MR.

15  KESSLER.

16          THERE'S NO DISPUTE THAT MR. SMITH RECEIVED THAT

17  LETTER, AND HE RECEIVED THE REPORT, AND IT DIDN'T TAKE THE WEEK

18  THAT MR. GORSKI ALLUDED TO BECAUSE ON MONDAY MORNING 9:30 A.M.

19  MR. SMITH CALLED BGC FOR THE VERY FIRST TIME AND SAID THESE

20  RECORDS DON'T BELONG TO ME, AND WHAT HAPPENED?  BGC IMMEDIATELY

21  BEGAN REINVESTIGATING, BUT NOT ONLY THAT, BGC SENT AN EMAIL TO

22  DART THAT SAME DAY, AND THEY SAID HOLD ON A SECOND, WE'VE GOT A

23  DISPUTE, LET US FIGURE OUT WHAT'S GOING ON, DON'T MAKE ANY

24  HIRING DECISIONS UNTIL WE DO SO.  BGC REINVESTIGATED THOSE

25  RECORDS, AND THEY DETERMINED THAT IT DIDN'T BELONG TO MR.

1  SMITH, AND THEY ISSUED A CLEAN REPORT WITH NO CRIMINAL RECORDS

2  ON IT.

3           HOW LONG DID THAT PROCESS TAKE?  THE LAW ALLOWS BGC

4  30 DAYS.  IT TOOK BARELY 48 HOURS, TWO DAYS.  MR. SMITH CALLED

5  ON WEDNESDAY -- EXCUSE ME, MONDAY, SEPTEMBER 17TH.  BY

6  WEDNESDAY, SEPTEMBER 19TH, ONE WEEK AFTER THE INITIAL REPORT

7  WAS PREPARED, BGC HAD COMPLETED ITS REINVESTIGATION.  IT ISSUED

8  A SECOND REPORT.  IT SENT THAT SECOND REPORT TO DART, AND IT

9  SENT THE SECOND REPORT TO MR. SMITH.

10          BGC GOT THIS DONE SO QUICKLY BECAUSE IT KNEW THAT A

11  JOB WAS IN THE BALANCE, AND IT NEEDED TO GET IT RIGHT, AND IT

12  DID, AND THE EVIDENCE WILL SHOW YOU WHAT HAPPENED AFTER THAT.

13  MR. SMITH GOT THE JOB.  DART HADN'T DENIED HIM.  MS. O'NEILL

14  WILL TELL YOU WE WOULD HAVE, BUT THEY DIDN'T.  THEY ALLOWED HIM

15  TO START THE JOB, AND THE VERY NEXT TUESDAY, SEPTEMBER 25TH, HE

16  STARTED THE DART TRAINING PROGRAM.  YOU'LL HEAR THAT HE

17  FINISHED THE TRAINING PROGRAM.  YOU'LL HEAR THAT HE WAS

18  SUCCESSFUL IN THE TRAINING PROGRAM, AND AT THE END OF IT DART

19  OFFERED HIM A JOB WHICH HE TURNED DOWN.

20          I SAID I'LL PROVE TO YOU THAT MR. SMITH DID NOT

21  SUFFER ANY DAMAGES IN THIS CASE.  I WANT YOU TO LISTEN CLOSELY

22  WHEN YOU HEAR THE EVIDENCE OF HOW MR. SMITH WAS SUPPOSEDLY

23  HARMED.  I WANT YOU TO ASK YOURSELF WHAT'S THERE AND WHAT'S NOT

24  THERE.

25          WE KNOW AND YOU'LL HEAR HE DIDN'T SEE A DOCTOR.  WE

1   KNOW AND YOU'LL HEAR THAT HE WASN'T SO UPSET HE WENT AND TOLD

2   HIS FRIENDS ABOUT IT.  WE KNOW HE WASN'T SO UPSET HE COULDN'T

3   START THE TRAINING PROGRAM LESS THAN A WEEK LATER, LESS THAN A

4   WEEK AFTER BGC FIXED IT.  WE KNOW THAT HE WASN'T SO UPSET THAT

5   HE COULDN'T COMPLETE THE PROGRAM AND GO ON AND TAKE A BETTER

6   JOB, AND, IN FACT, YOU WON'T HEAR TESTIMONY FROM HIS WIFE, HIS

7   FAMILY, HIS FRIENDS OR ANY OTHER PERSON TO TELL YOU JUST HOW

8   UPSET HE SUPPOSEDLY WAS.

9            LADIES AND GENTLEMEN, I TOLD YOU THIS AT THE

10  BEGINNING.  BGC DOESN'T PRETEND THAT ITS SYSTEM IS GOING TO GET

11  IT RIGHT A HUNDRED PERCENT OF THE TIME.  THAT'S NOT WHAT A

12  REASONABLE PROCEDURE REQUIRES, BUT YOU'LL HEAR TESTIMONY FROM

13  MR. KESSLER ABOUT BGC'S EFFORTS TO FIGURE OUT JUST HOW ACCURATE

14  THIS DATABASE PRODUCT IS.  THE CONCLUSION, IN MORE THAN 99.5

15  PERCENT OF ALL SEARCHES, BGC GETS IT RIGHT THE FIRST TIME.

16  REASONABLE PROCEDURES.  I THINK YOU'LL AGREE THAT 99.5 PERCENT

17  IS A REFLECTION OF BGC'S REASONABLENESS, AND AT THE END OF THE

18  DAY IN THIS CASE, IT'S A CASE WHERE THE SYSTEM WORKED THE WAY

19  IT WAS SUPPOSED TO.  BGC CORRECTED THE REPORT, AND MR. SMITH

20  GOT THE JOB HE APPLIED FOR.  THANK YOU.

21            THE COURT:  MEMBERS OF THE JURY, AS I TOLD YOU

22  EARLIER, WE'RE GOING TO TAKE OUR LUNCH BREAK AT THIS TIME.

23  IT'S JUST A FEW MINUTES AFTER NOON.  WE HAVE A CAFETERIA HERE

24  IN THE BUILDING WHERE YOU'LL BE ABLE TO DINE.  IF YOU WOULD BE

25  BACK IN THE JURY ROOM AT 1:10, TEN MINUTES AFTER ONE, WE WILL

1  BE READY TO BEGIN PRESENTATION OF THE PLAINTIFF'S CASE IN CHIEF

2  AT THAT TIME.

3          LET ME REMIND YOU THAT WHILE YOU'RE ON A BREAK AT ANY

4  TIME IN THIS CASE, AND I'LL BE REMINDING YOU OF THIS EACH TIME

5  THAT WE TAKE A BREAK, THAT YOU ARE NOT TO DISCUSS THE CASE

6  AMONG YOURSELVES NOR WITH ANYONE ELSE.  WHEN YOU'RE IN THE

7  BUILDING ON BREAKS, YOU MAY ENCOUNTER SOME OF THE ATTORNEYS OR

8  PARTIES HERE.  DON'T EXPECT TO HAVE ANY CONVERSATION WITH THEM,

9  AND THEY'RE NOT BEING RUDE IF THEY DON'T SPEAK TO YOU.  THEY'RE

10 JUST SIMPLY HONORING THEIR OBLIGATION NOT TO HAVE CONTACT WITH

11 YOU.  JUST BE SURE TO NOT DISCUSS THE CASE AMONG YOURSELVES OR

12 WITH ANYONE ELSE.  IF AT ANY TIME YOU NEED TO HAVE ANY CONTACT

13 WITH ME, PLEASE GIVE A NOTE TO THE CSO, AND HE WILL PRESENT IT

14 TO ME.

15          SO AT THIS TIME YOU'RE EXCUSED FOR LUNCH.  YOU MAY

16 RETIRE FROM THE COURTROOM.

17          (JURY RETIRED)

18          THE COURT:  I'VE GIVEN THEM JUST OVER AN HOUR FOR

19 LUNCH.  IT'S FIVE AFTER 12.  IF YOU ALL WOULD BE BACK HERE AT

20 TEN MINUTES AFTER ONE UNLESS THERE'S SOMETHING ELSE TO TAKE UP

21 BEFOREHAND, AND IF SO LET MS. MONTGOMERY KNOW, AND WE CAN COME

22 BACK A FEW MINUTES EARLY.

23          MR. GORSKI, YOU NEED TO HAVE ALL YOUR TECHNOLOGY

24 READY TO GO, AND WHO WILL BE YOUR FIRST WITNESS THIS

25 AFTERNOON?

1          MR. GORSKI:  MY FIRST WITNESSES IS GOING TO BE MR.

2     KESSLER.

3          THE COURT:  OKAY.

4          MR. GORSKI:  DID YOU SAY TEN AFTER ONE?

5          THE COURT:  YES, TEN MINUTES AFTER ONE.

6          MR. GORSKI:  YOUR HONOR, I DO HAVE ONE ISSUE.  I

7     DIDN'T OBJECT DURING MR. ANDRE'S OPENING.  OBVIOUSLY I HAVE

8     RESPECT FOR HIM, BUT ONE OF THE THINGS MR. ANDRE DISCUSSED IN

9     HIS OPENING WAS WHAT DECISIONS MR. SMITH MADE ABOUT WHETHER TO

10    STAY AT DART AFTER HE GOT HIRED.

11         PLAINTIFF ISN'T CLAIMING DAMAGES FOR ANYTHING AFTER

12    HE OBTAINED THE EMPLOYMENT SUBSEQUENT TO THE CORRECTION.  WE

13    WOULD OBJECT THAT THAT INFORMATION WOULD BE IRRELEVANT IF THE

14    DEFENDANT IS INTENDING TO TRY TO INTRODUCE EVIDENCE ON THAT

15    SUBJECT.

16         THE SECOND THING IS MR. ANDRE ALSO USED A STATISTIC

17    IN HIS OPENING ABOUT THE NUMBER OF TIMES BGC SUPPOSEDLY, QUOTE,

18    UNQUOTE, GETS IT RIGHT.  NOW, IF MR. KESSLER IS INTENDING TO

19    TESTIFY ON A STATISTIC LIKE THAT, HE OBVIOUSLY WOULD HAVE HAD

20    TO HAVE REVIEWED DATA OR REPORTS THAT WOULD CORROBORATE THAT.

21    THOSE REPORTS HAVE NEVER BEEN PRODUCED IN THIS LAWSUIT.  WE'VE

22    NEVER BEEN ABLE TO INSPECT ANYTHING THAT WOULD CORROBORATE

23    THAT.  SO WE WOULD ARGUE THAT STATISTICAL INFORMATION LIKE THAT

24    WOULD BE HEARSAY AT THIS POINT, OR POSSIBLY REQUIRE AN EXPERT

25    OPINION.

```
 1              THE COURT:  ALL RIGHT.
 2              MR. ANDRE:  YOUR HONOR, I WILL ADDRESS EACH IN TURN.
 3   WITH RESPECT TO MR. SMITH'S DECISION TO LEAVE DART AND NOT
 4   ACCEPT THEIR OFFER, PART OF OUR ARGUMENT IS TO UNDERSTAND HOW
 5   UPSET HE WAS, YOU NEED TO SEE HOW HE WAS ABLE TO FUNCTION GOING
 6   FORWARD.  PART OF THAT IS THAT HE WASN'T SO UPSET THAT HE
 7   COULDN'T GO START A NEW JOB.  I THINK THAT'S AN IMPORTANT
 8   CONSIDERATION FOR THE JURY WHEN YOU CONSIDER JUST HOW DAMAGED
 9   HE WAS.  THAT'S A REFLECTION OF WHAT HAPPENED IN THOSE WEEKS --
10   THE WEEK, EXCUSE ME, WHEN THE REPORT WAS AT ISSUE.
11              WITH RESPECT TO THE STATISTICS, MR. KESSLER TESTIFIED
12   ABOUT THESE EXACT STATISTICS AT HIS DEPOSITION IN JANUARY OF
13   2014.  MR. GORSKI DID A SEARCHING CROSS-EXAMINATION OF THE
14   STATISTICS AT THOSE TIMES.  THERE WERE NO SUBSEQUENT DOCUMENT
15   REQUESTS.  THERE WAS NO SUBSEQUENT DISCUSSION OF THE UNDERLYING
16   INFORMATION.
17              MR. KESSLER HAS PERSONAL KNOWLEDGE.  HE WILL VERY
18   CLEARLY TESTIFY THAT HE IS TESTIFYING AS A LAYPERSON, NOT
19   OFFERING AN EXPERT OPINION OR STATISTICAL CERTAINTY.  WE
20   WILL CONTEXTURALIZE THAT EVIDENCE, BUT AT THIS POINT I
21   DON'T UNDERSTAND HOW THERE COULD BE AN OBJECTION TO EVIDENCE
22   THAT'S BEEN IN PLAY DURING THE DISCOVERY PERIOD FOR A YEAR AND
23   A HALF.
24              MR. GORSKI:  YOUR HONOR, IF I MAY REBUT THAT
25   BRIEFLY?
```

```
 1           THE COURT:  YES, I WOULD LIKE TO HEAR FROM YOU.
 2           MR. GORSKI:  SURE, I DON'T HAVE A PROBLEM IF THE
 3   DEFENDANT WANTS TO ASK MR. SMITH WERE YOU ABLE TO START YOUR
 4   JOB.  OF COURSE.  BUT THAT BRINGS THINGS TO A LOGICAL
 5   CONCLUSION.  NOBODY IS CLAIMING ANY DAMAGES FOR WHAT'S
 6   HAPPENING THREE MONTHS LATER.  SO FOR THEM TO GET INTO LIKE WHY
 7   DID YOU DECIDE TO STAY AT DART, WHY DIDN'T YOU DECIDE TO STAY
 8   AT DART, IT JUST DOESN'T HAVE ANY NEXUS TO WHAT WE'RE CLAIMING
 9   AS DAMAGES HERE.
10           THE SECOND THING IS THIS.  AT THAT DEPOSITION I DID
11   ASK MR. KESSLER WHAT HE WAS RELYING ON TO COME UP WITH THESE
12   NUMBERS, AND HE COULDN'T POINT ME TO ANY SPECIFIC DOCUMENT AT
13   ALL, NOR WAS ANY SUBSEQUENT DOCUMENT EVER PRODUCED.  IT'S
14   IMPOSSIBLE FOR HIM TO HAVE PERSONAL KNOWLEDGE ABOUT STATISTICAL
15   INFORMATION LIKE THAT WITHOUT HAVING REVIEWED DATA THROUGH
16   A COMPUTER OR THROUGH REPORTS WHICH AGAIN MAKES THE
17   INFORMATION HEARSAY.  WE DON'T EVEN KNOW IF HE'S CAPABLE OF
18   INTERPRETING THOSE REPORTS HOWEVER HE ENDED UP GETTING THAT
19   INFORMATION.
20           THE COURT:  I THINK MR. ANDRE'S ARGUMENT IS THAT YOU
21   QUESTIONED HIM AT DEPOSITION, AND HE PROVIDED THAT TESTIMONY AT
22   DEPOSITION, AND IF YOU WERE NOT SATISFIED WITH HIS ANSWERS, YOU
23   DIDN'T FOLLOW UP WITH ANY FURTHER INQUIRY ABOUT THE BASIS FOR
24   THAT.  SO ADDRESS THAT ARGUMENT FOR ME?
25           MR. GORSKI:  FAIR ENOUGH, YOUR HONOR.  I DON'T THINK
```

1  THE BURDEN HERE IF THE DEFENDANT IS GOING TO USE IT AS PART OF

2  THEIR DEFENSE, JUST LIKE WE HAD A DISCUSSION, YOUR HONOR, ABOUT

3  THE USE OF THE DOCUMENTS THAT WERE OBTAINED FROM THE PUBLIC

4  RECORD, IF THE DEFENDANT IS GOING TO USE THIS STATISTIC AS PART

5  OF THEIR DEFENSE IN THE CASE TO SHOW THAT THEY'RE BEING

6  REASONABLE, THEN THOSE DOCUMENTS THAT SUPPORT THOSE STATISTICS

7  IS ON THE DEFENDANT'S OBLIGATION, IS ON THE DEFENDANT TO

8  PRODUCE THAT AS PART OF THEIR DISCLOSURES OR AS PART OF THEIR

9  RESPONSES TO DISCOVERY.

10        I EVEN ASKED HIM.  I SAID DO YOU HAVE A DOCUMENT.  HE

11  COULDN'T EVEN POINT TO SOMETHING SPECIFIC ABOUT WHERE THIS

12  STATISTIC CAME FROM, BUT IT'S CERTAINLY NOT ON PLAINTIFF TO

13  FORCE THE DEFENDANT TO PRODUCE A DOCUMENT THAT IT OTHERWISE

14  HAS AN AFFIRMATIVE OBLIGATION TO PRODUCE, AND, YOU KNOW, AT

15  THIS POINT THE TESTIMONY ON THAT SUBJECT, IT'S SIMPLY

16  HEARSAY WITHOUT SOME UNDERLYING FOUNDATION THAT WOULD OTHERWISE

17  END THAT, AND SOME FOUNDATION THAT COULD SUBSTANTIATE THAT

18  MR. KESSLER COULD INTERPRET THAT DATA TO REACH THOSE

19  CONCLUSIONS.

20        THE COURT:  MR. ANDRE, HOW DOES HE ARRIVE AT THAT

21  CONCLUSION?  HOW DOES MR. KESSLER ARRIVE AT THAT PERCENTAGE?

22        MR. ANDRE:  SURE, AND WE WILL LAY THAT FOUNDATION IN

23  THE TESTIMONY.  MR. KESSLER REVIEWED INTERNAL DATA FROM BGC'S

24  DISPUTE PROCESS CATEGORIZED MONTH BY MONTH.  HE LOOKED AT THE

25  NUMBER OF REPORTS THAT BGC HAD PREPARED.  TO SAY THAT THERE IS

1   A DOCUMENT WOULD REALLY BE A FALLACY, I SUPPOSE, BUT AMONG MANY

2   DISPARATE DOCUMENTS IS THE INFORMATION THAT HE AS THE PRESIDENT

3   OF THE COMPANY REVIEWED, NOW HAS PERSONAL KNOWLEDGE OF AND IS

4   PREPARED TO TESTIFY.

5           I DISAGREE THAT IT'S NOT THE PLAINTIFF'S BURDEN.  IT

6   IS THEIR BURDEN TO ASK US TO PRODUCE DOCUMENTS THAT THEY THINK

7   ARE ESSENTIAL.  THE DIFFERENCE BETWEEN THE REPORTS THAT WE

8   DISCUSSED LAST WEEK AND THIS IS THAT WE ASKED FOR THAT

9   INFORMATION AND DIDN'T GET IT.

10          WE VOLUNTEERED THIS DURING THE DISCOVERY PERIOD.

11  THERE WAS CROSS-EXAMINATION ON IT.  THERE WAS NO SUBSEQUENT

12  REQUEST FOR ANY OF THE UNDERLYING DATA.  I THINK IT'S BEEN

13  OBVIOUS FOR 18 MONTHS THAT THIS WOULD BE AN ASPECT OF OUR CASE

14  THAT COULD HAVE BEEN ADDRESSED WEEKS, MONTHS, EVEN DAYS AGO,

15  NOT AT LUNCHTIME DURING THE DAY OF THE TRIAL.

16          MR. GORSKI:  YOUR HONOR, FIRST OFF, WHAT MR. ANDRE

17  DESCRIBED IS PARADIGM HEARSAY.  I HAVE LOOKED AT OTHER REPORTS,

18  AND BASED ON THESE REPORTS THAT I HAVE LOOKED AT, I HAVE COME

19  UP WITH THIS NUMBER.  THAT IS A PARADIGM EXAMPLE OF HEARSAY.

20          SECOND, WHAT I'M HEARING IS I WANT TO HAVE MY CAKE

21  AND EAT IT, TOO.  THEY FILED A MOTION IN LIMINE ON THIS SIDE

22  OVER DOCUMENTS THAT WE PRODUCED THAT WERE PUBLIC RECORDS OPENLY

23  AVAILABLE TO ANYBODY, AND NOW THEY'RE SAYING EVEN THOUGH RULE

24  26(A) IS CRYSTAL CLEAR THAT IF THERE IS SOME DOCUMENT YOU'RE

25  GOING TO AFFIRMATIVELY RELY ON IN YOUR CASE YOU PRODUCE IT THAT

1    THEY DON'T HAVE TO PRODUCE THIS DOCUMENT.

2             MR. ANDRE:  YOUR HONOR, WE'RE NOT RELYING ON A

3    PARTICULAR DOCUMENT.  MR. KESSLER WAS NOT ASKED, FOR EXAMPLE,

4    TO PRODUCE EVERY DOCUMENT THAT HE MAY HAVE REVIEWED IN ADVANCE

5    OF HIS DEPOSITION TO GAIN THE KNOWLEDGE NECESSARY TO SERVE AS A

6    30(B)(6) WITNESS, AND I'D ALSO ADD THAT WE REFERENCED THESE

7    STATISTICS AND CITED TO THE APPLICABLE PORTIONS OF MR.

8    KESSLER'S TESTIMONY IN OUR SUMMARY JUDGMENT BRIEFING, AS WELL.

9             MR. GORSKI:  AND JUST BECAUSE THEY CITE TO THIS STUFF

10   DOES NOT MAKE IT ANY LESS, YOU KNOW, HEARSAY OR THE FACT THAT

11   THE WITNESS MAY NOT POSSESS THE APPLICABLE EXPERTISE.  IT

12   DOESN'T CHANGE THE FACT THAT IT MAY NOT BE ADMISSIBLE EVIDENCE

13   HERE.

14            THE COURT:  MR. ANDRE, WHAT CONCERNS ME A LITTLE BIT

15   HERE IS THAT MR. KESSLER OBVIOUSLY REVIEWED RECORDS TO

16   ARRIVE -- BASED ON YOUR EXPLANATION OF IT HE REVIEWED RECORDS

17   TO ARRIVE AT THE CONCLUSION THAT HE WANTS TO TESTIFY TO THAT

18   YOU'RE PROPOSING TO OFFER, BUT THOSE RECORDS YOU'RE CONTENDING

19   DID NOT HAVE TO BE PART OF YOUR DISCLOSURES, AND THEY WERE NOT

20   RESPONSIVE TO ANY DISCOVERY REQUESTS THAT WAS MADE BY THE

21   PLAINTIFF?

22            MR. ANDRE:  YES, YOUR HONOR, AND THERE WAS NO FURTHER

23   FOLLOW UP.  I WOULD SUBMIT THAT WITNESSES REVIEW A LOT OF

24   MATERIAL TO REACH CONCLUSIONS THAT ARE NECESSARY FOR TESTIMONY,

25   BUT THERE IS NO OBLIGATION TO PRODUCE EVERY UNDERLYING DOCUMENT

1    THAT FORMS THE BASIS OF AN OPINION.  THAT'S NOT WHAT RULE 26

2    SAYS.

3           AND WITH RESPECT TO HEARSAY, YOUR HONOR, THE DOCUMENT

4    ISN'T BEING INTRODUCED FOR THE TRUTH OF THE MATTER ASSERTED,

5    AND IF IT WERE AND MR. KESSLER CAN GLADLY LAY THE FOUNDATION

6    THAT THESE ARE BUSINESS RECORDS THAT CONSTITUTE AN EXCEPTION TO

7    THE HEARSAY RULE.

8           MR. GORSKI:  WELL, YOUR HONOR, THERE ARE NO DOCUMENTS

9    YET, SO WE'RE NOT EVEN AT BUSINESS RECORD EXCEPTION, BUT RULE

10   26(A) IS CRYSTAL CLEAR.  IF YOU'RE GOING TO RELY AFFIRMATIVELY

11   ON A DOCUMENT IN YOUR CASE, THEN YOU HAVE TO IDENTIFY IT, AND

12   WE'VE ASKED FOR THEM TO PRODUCE ANYTHING THAT WAS PART OF THEIR

13   INITIAL DISCLOSURES.

14          AND, YOU KNOW, THE CONCEPT THAT THAT'S NOT FOR THE

15   TRUTH OF THE MATTER ASSERTED, YOU KNOW, I STRUGGLE TO

16   UNDERSTAND HERE.  THEY'RE BASICALLY TRYING TO SAY WELL WE GET

17   IT RIGHT 99.5 PERCENT OF THE TIME, AND THEREFORE WE ACTED

18   REASONABLY.  THAT AGAIN IS A PARADIGM EXAMPLE OF OFFERING

19   EVIDENCE FOR THE TRUTH OF THE MATTER ASSERTED.

20          MR. ANDRE:  YOUR HONOR, IF I MAY ADD ONE LAST THING?

21          THE COURT:  ONE LAST THING, YES, WE NEED TO LET YOU

22   ALL GET TO LUNCH, OR YOU'RE NOT GOING TO HAVE TIME.

23          MR. ANDRE:  YOUR HONOR, WE'RE NOT RELYING ON A

24   DOCUMENT THAT WOULD FALL WITHIN THE RULE 26(A) PURVIEW.  WE'RE

25   RELYING ON MR. KESSLER'S PERSONAL KNOWLEDGE.  FOR EXAMPLE, MR.

 1  KESSLER WILL TESTIFY IN DETAIL ABOUT BGC'S POLICIES AND

 2  PROCEDURES.  THERE'S NO SUGGESTION THAT WE SHOULD BE

 3  INTRODUCING THE HUNDRED PAGE MANUALS THAT GO ALONG WITH THOSE

 4  POLICIES AND PROCEDURES.  IT'S HIS PERSONAL KNOWLEDGE GLEANED

 5  FROM THE UNDERLYING DOCUMENTS.

 6          THE COURT:  BUT I THINK THAT'S THE POINT.  YOU SAID

 7  ON THE ONE HAND IT'S HIS PERSONAL KNOWLEDGE.  ON THE OTHER

 8  HAND, IT'S INFORMATION HE'S GAINED FROM REVIEWING RECORDS, AND

 9  THAT'S WHAT HE'S TESTIFYING TO.  IT'S NOT -- HE DOESN'T HAVE

10  PERSONAL KNOWLEDGE ABOUT THE PERCENTAGE RATE WITHOUT HAVING

11  CONDUCTED RESEARCH IN REVIEW OF RECORDS; IS THAT RIGHT?

12          MR. ANDRE:  YES, YOUR HONOR.

13          THE COURT:  AND THOSE UNDERLYING RECORDS, THE

14  QUESTION THAT I'M HAVING, AND I AM GOING TO LET MR. GORSKI

15  PROVIDE ME ANY INDICATION WHERE YOU BELIEVE YOU'VE REQUESTED

16  DISCOVERY OR THAT SUCH DOCUMENTS WERE OBLIGATED TO BE PRODUCED

17  ABSENT A REQUEST BY YOU, BUT IT DOES SEEM TO ME THAT'S THE

18  FIRST LINE IS WAS THIS INFORMATION THAT MR. KESSLER IS GOING TO

19  RELY ON REQUIRED TO BE PRODUCED TO THE PLAINTIFF.

20          SECONDLY, I'M GOING TO HAVE TO THINK ABOUT THE

21  HEARSAY ISSUE A LITTLE BIT BECAUSE HE IS RELYING ON RECORDS.

22  IT'S NOT HIS -- IT HAS BECOME HIS PERSONAL KNOWLEDGE, BUT IT'S

23  NOT SOMETHING HE CAN TESTIFY TO WITHOUT HAVING REVIEWED THOSE

24  RECORDS.  SO LET ME GIVE SOME THOUGHT TO THAT OVER LUNCH.

25          WITH RESPECT TO MR. SMITH'S EMPLOYMENT, THE CHART IN

1   THE OPENING STATEMENT INDICATED THAT WHAT'S AT PLAY IS A FOUR

2   OR TWO DAY PERIOD, HOWEVER IT'S MEASURED.  I THINK A SIMPLE

3   REFERENCE TO THE FACT THAT HE DID NOT TAKE EMPLOYMENT WITH DART

4   AND WENT ELSEWHERE IS SUFFICIENT TO ESTABLISH THAT POINT AND

5   NEED NOT GO ANY FURTHER THAN THAT.

6           OKAY.  SO I'LL BE THINKING ABOUT THAT ISSUE.  MR.

7   GORSKI, IF YOU HAVE SOMETHING TO POINT OUT, YOU CAN PROVIDE IT

8   TO MS. MONTGOMERY OVER THE LUNCH BREAK AFTER YOU'VE SHARED IT,

9   OF COURSE, WITH MR. ANDRE, AND, MR. ANDRE, IF YOU HAVE ANYTHING

10  TO COUNTERACT THAT ISSUE, I'LL BE HAPPY TO RECEIVE THAT FROM

11  YOU, AS WELL.

12          OKAY.  WE'LL BE IN RECESS.

13          (NOON RECESS)

14          THE COURT:  ALL RIGHT.  MR. GORSKI, DID YOU HAVE ANY

15  MORE INFORMATION YOU WANTED TO PRESENT ON THE ISSUE THAT WE

16  WERE DISCUSSING BEFORE THE BREAK?

17          MR. GORSKI:  YES, YOUR HONOR, I WOULD LIKE TO

18  SUPPLEMENT THAT.

19          THE COURT:  LET ME ASK YOU JUST FOR A MOMENT.  YOUR

20  FIRST WITNESS IS GOING TO BE MR. SMITH?

21          MR. GORSKI:  NO, MY FIRST WITNESS IS GOING TO BE MR.

22  KESSLER.

23          THE COURT:  IT IS GOING TO BE MR. KESSLER.  ALL

24  RIGHT.  SO WE NEED TO DEAL WITH THIS.  OKAY.  GO AHEAD.

25          MR. GORSKI:  YOUR HONOR, I WOULD LIKE TO SUPPLEMENT

1   OUR PRIOR DISCUSSION.  FIRST AND FOREMOST, YOUR HONOR, THE

2   NORTHERN DISTRICT OF GEORGIA HAS VERY SPECIFIC GUIDELINES FOR

3   HOW INFORMATION SHOULD BE DISCLOSED PURSUANT TO RULE 26(A).

4           ONE OF THE SPECIFIC ITEMS THAT THE NORTHERN DISTRICT

5   OF GEORGIA REQUIRES IS FOR A PARTY TO PROVIDE A COPY OR

6   DESCRIPTION BY CATEGORY AND LOCATION OF ALL DOCUMENTS, DATA

7   COMPILATIONS OR OTHER ELECTRONICALLY STORED INFORMATION AND

8   TANGIBLE THINGS THAT ARE IN YOUR POSSESSION, CUSTODY OR CONTROL

9   THAT YOU MAY USE TO SUPPORT YOUR CLAIMS OR DEFENSES.

10          I THINK IT'S UNAMBIGUOUS BASED ON THE REQUIREMENTS

11  THAT THE NORTHERN DISTRICT OF GEORGIA HAS FOR THE DISCLOSURE OF

12  DOCUMENTS THAT, YOU KNOW, THIS TYPE OF INFORMATION IS PRECISELY

13  WITHIN LINE WITH WHAT RULE 26(A) WOULD REQUIRE AND SPECIFICALLY

14  THE LOCAL RULES OF THIS COURT.

15          ADDITIONALLY, YOUR HONOR, THE PLAINTIFF SUBMITTED A

16  REQUEST FOR PRODUCTION ASKING THE DEFENDANT TO IDENTIFY ANY

17  DOCUMENTS THAT IT INTENDS TO OR MAY USE AS AN EXHIBIT AT

18  TRIAL.  OBVIOUSLY THESE DOCUMENTS HAVE NOT BE PRODUCED.

19          WE ALSO SUBMITTED AN INTERROGATORY TO THE DEFENDANT

20  THAT TO THE EXTENT THEY WERE GOING TO RELY ON ANYTHING THAT

21  WOULD REQUIRE AN EXPERT OPINION OR TESTIMONY THAT THAT PERSON

22  BE IDENTIFIED AND ANY DOCUMENTS IN WHICH THEY WERE GOING TO

23  RELY UPON BE PRODUCED.

24          FINALLY, YOUR HONOR, IF WE GO TO THE DEPOSITION

25  TRANSCRIPT, WHEN WE WERE TALKING ABOUT THIS INFORMATION, I

1    ASKED MR. KESSLER OKAY, I'M JUST QUOTING FROM THE TRANSCRIPT,

2    YOUR HONOR, OKAY, SO YOU DID SOME ANALYSIS PRIOR TO THIS

3    DEPOSITION OR IS THIS JUST INFORMATION THAT COMES FROM -- COMES

4    TO YOUR ATTENTION BECAUSE YOU'RE THE PRESIDENT?

5         ANSWER:  IT CAME TO MY ATTENTION.

6         QUESTION:  OKAY.  SO YOU JUST KNOW FROM INFORMATION

7    THAT'S BEEN PRESENTED TO YOU AS THE PRESIDENT OF THE COMPANY

8    THAT BGC HAS SOLD THE INSTANT SEARCH REPORTS FOUR MILLION TIMES

9    IN THE LAST TWO YEARS.  THAT'S MY UNDERSTANDING.

10        YOUR HONOR, NOT ONLY IS THIS HEARSAY, IT'S HEARSAY

11   WITHIN HEARSAY.  BECAUSE WHAT WE UNDERSTAND FROM THE DEPOSITION

12   TRANSCRIPT IS THAT NOT ONLY DID MR. KESSLER NOT LOOK AT THE

13   ACTUAL DATA OR INFORMATION THAT HE'S RELYING ON TO STATE THIS

14   EXHIBIT, THE INFORMATION WAS COMMUNICATED TO SOMEBODY ELSE WHO

15   COMMUNICATED IT TO HIM.  SO THERE'S TWO LEVELS OF HEARSAY HERE

16   THAT ARE PROBLEMATIC.

17        THAT'S ALL I HAVE TO SUPPLEMENT, YOUR HONOR.

18        THE COURT:  ALL RIGHT.  MR. ANDRE.

19        MR. ANDRE:  YOUR HONOR, IS IT ALL RIGHT IF I STAY

20   SEATED TO STOP MYSELF FROM FUMBLING A LITTLE BIT HERE?

21        THE COURT:  SURE.

22        MR. ANDRE:  YOUR HONOR, THE PROBLEM WE HAVE WITH THIS

23   PROPOSED STANDARD IS THAT IT WOULD MEAN MR. KESSLER CANNOT

24   EFFECTIVELY TESTIFY TO ANYTHING.  I KNOW, FOR EXAMPLE, THAT MR.

25   GORSKI WILL WANT TESTIMONY ABOUT THE UNDERLYING PROCEDURES, BUT

1  WE DO NOT HAVE IN COURT ALL OF THE MANUALS THAT GO WITH THOSE

2  PROCEDURES.

3          THE OTHER PROBLEM I HAVE IS THAT MR. GORSKI OPENED

4  THIS DOOR.  YOU SAW IN HIS OPENING STATEMENT ON HIS SLIDE FOR

5  MR. KESSLER THAT YOU WILL HEAR THAT THEY HAD COMPLAINTS ABOUT

6  THIS EVERY SINGLE DAY.  IF MR. GORSKI IS GOING TO BE ALLOWED TO

7  TALK ABOUT THE DISPUTES THAT COME INTO BGC, FAIRNESS DICTATES

8  THAT WE BE ALLOWED TO PRESENT SOME SORT OF CONTEXT AND

9  UNDERSTANDING OF WHAT THAT INFORMATION IS.  IT'S SORT OF EITHER

10  GET IT OR NEITHER GET IT.

11          I'M ALSO CONCERNED THAT INFORMATION MR. KESSLER GAINS

12  IN HIS ROLE AS THE PRESIDENT, IF WE EXCLUDE IT ENTIRELY IT

13  WOULD MEAN HE CAN'T SAY WE PRODUCED FOUR MILLION REPORTS A

14  YEAR.  THAT'S A BASIC FACT ABOUT THE COMPANY THAT HE KNOWS FROM

15  BEING THE PRESIDENT.  MR. GORSKI CAN CROSS-EXAMINE HIM ABOUT

16  THESE STATISTICS AT LENGTH.  HE CAN CROSS-EXAMINE ABOUT THE

17  METHODOLOGY, ABOUT HOW CERTAIN WE ARE IN THESE STATISTICS,

18  ABOUT THE GENESIS OF ALL OF THE NUMBERS.

19          I IDENTIFIED ONLY ONE PLACE IN DISCOVERY THAT THIS

20  WAS SPECIFICALLY ASKED FOR, THEY DID SPECIFICALLY ASK FOR IT.

21  IN THE 30(B)(6) NOTICE OF MR. KESSLER'S DEPOSITION THEY ASKED

22  FOR IT, NUMBER 9, ANY STUDIES, AUDITS, QUALITY CONTROL ANALYSES

23  OR OTHER INVESTIGATIONS THAT YOU HAVE CONDUCTED REGARDING THE

24  FREQUENCY WITH WHICH CRIMINAL RECORD INFORMATION IS ERRONEOUSLY

25  REPORTED ABOUT A CONSUMER BY YOU.  THEY REQUESTED THAT AS

1    TESTIMONY.  WE MADE IT AVAILABLE AS TESTIMONY, AND WE TOLD THEM

2    WE WOULD MAKE A WITNESS AVAILABLE WHO WAS PREPARED TO DISCUSS

3    THAT TOPIC.  THERE WAS NEVER A DOCUMENT REQUEST FOR ANY OF THE

4    UNDERLYING INFORMATION.

5            WITH RESPECT TO HEARSAY, YOUR HONOR, RULE 803 SUB 6

6    IS AN EXCEPTION TO THE HEARSAY RULE FOR RECORDS OF A REGULARLY

7    CONDUCTED ACTIVITY.  IF NECESSARY MR. KESSLER CAN SUBSTANTIATE

8    THAT THE DOCUMENTS HE REVIEWED ARE ALL BUSINESS RECORDS WHICH

9    MEANS THE UNDERLYING INFORMATION IS AN EXCEPTION TO THE HEARSAY

10   RULE.

11           FINALLY, YOUR HONOR, I WOULD ARGUE THAT WHILE I

12   APPRECIATE THE RESPECT THAT IT SHOWS TO MY OPENING, MR. GORSKI

13   SHOULD HAVE OBJECTED DURING THE OPENING.  I THINK HE'S ARGUABLY

14   WAIVED IT.  WE'VE MADE A FULL ARGUMENT TO THE JURY ABOUT THIS,

15   AND WE'RE NOW BEING ASKED TO NOT BE ABLE TO PRESENT ANY

16   EVIDENCE TO SUBSTANTIATE IT WHICH I THINK IS A PROBLEM.

17           THAT'S WHERE WE'RE AT, YOUR HONOR.

18           THE COURT:  DURING THE LUNCH IN MY RESEARCH, I RAN

19   ACROSS RULE 1006 WHICH PERTAINS TO SUMMARIES OR CHARTS OR

20   CALCULATIONS, AND THE ONLY OBJECTION THAT'S BEEN ENTERED IS AS

21   TO THE CALCULATION OF THE PERCENTAGE OF ACCURACY.  I UNDERSTAND

22   YOUR ARGUMENT, MR. ANDRE, ABOUT OTHER MATTERS THAT MR. KESSLER

23   MAY BE TESTIFYING ABOUT, BUT THE ONLY OBJECTION THAT HAS BEEN

24   MADE RAISED OR MADE IS TO THAT CALCULATION, AND I THINK 1006

25   WOULD COVER THAT BECAUSE IT IS A CALCULATION TO PROVE THE

1    CONTENT OF VOLUMINOUS WRITINGS, RECORDINGS OR PHOTOGRAPHS THAT

2    CANNOT BE CONVENIENTLY EXAMINED IN COURT.

3            THE RULE GOES ON TO SAY THAT THE PROPONENT MUST MAKE

4    THE ORIGINALS OR DUPLICATES AVAILABLE FOR EXAMINATION OR

5    COPYING OR BOTH BY OTHER PARTIES AT A REASONABLE TIME AND

6    PLACE.

7            WHAT CONCERNS ME IS THAT, PUT ASIDE WHETHER IT WAS

8    ASKED FOR IN DISCOVERY OR NOT, WE CAN DEBATE THAT, IT SEEMS TO

9    ME THAT THIS IS TESTIMONY THAT WOULD BE COVERED BY RULE 1006 AS

10   A CALCULATION OF THIS VOLUMINOUS INFORMATION, AND THE

11   OBLIGATION IS ON THE PROPONENT TO MAKE THAT AVAILABLE.

12           SO MY QUESTION IS WERE THESE UNDERLYING DOCUMENTS

13   THAT MR. KESSLER WOULD BE RELYING ON MADE AVAILABLE TO THE

14   PLAINTIFF APART FROM WHETHER HE ASKED FOR IT OR NOT?

15           MR. ANDRE:  NO, YOUR HONOR.

16           THE COURT:  OKAY.  THEN I THINK UNDER RULE 1006 IT

17   WOULD EXCLUDED.  NOW TO YOUR POINT ABOUT NO OBJECTION HAVING

18   BEEN RAISED DURING YOUR OPENING STATEMENT, THE OBJECTION WAS

19   MADE IMMEDIATELY AFTER, BROUGHT TO OUR ATTENTION.  I KNOW

20   COUNSEL OFTEN TRY TO BE RESPECTFUL OF EACH OTHER, AND I CAN'T

21   AT THIS POINT FIND THAT IT'S BEEN WAIVED BECAUSE I INSTRUCTED

22   THE JURORS THAT WHAT YOU ALL HAVE TO SAY IN OPENING IS WHAT YOU

23   ANTICIPATE THE EVIDENCE WILL BE AND THAT THEY CAN'T RELY ON

24   WHAT YOU SAY.

25           I RECOGNIZE FROM YOUR PERSPECTIVE IT WOULD HAVE BEEN

1    BETTER TO HAVE THAT RESOLVED DURING THE MIDDLE OF YOUR OPENING,

2    BUT I DON'T FIND AT THIS POINT IN TIME THAT IT'S SO PREJUDICIAL

3    OR THAT IT WAS WAIVED, BUT IF YOU SOME AUTHORITY YOU WANT ME TO

4    CONSIDER ABOUT THAT POINT, I'LL BE GLAD TO RECONSIDER OR

5    REVISIT THAT ISSUE.

6            MR. ANDRE:  UNDERSTOOD, YOUR HONOR.

7            THE COURT:  I BELIEVE THAT THAT EVIDENCE IS

8    APPROPRIATELY EXCLUDED UNDER RULE 1006.

9            MR. ANDRE:  YOUR HONOR, I WOULD LIKE TO ADDRESS THEN

10   IF THERE'S GOING TO BE SOME SORT OF PRECLUSION ON USING THE

11   PRECISE STATISTICS, I DO THINK THAT THERE HAS TO BE SOME

12   ALLOWANCE FOR MR. KESSLER TO BE ABLE TO CONTEXTURALIZE IT.

13           IF HE IS ASKED, AS I'M SURE HE WILL BE IN THE

14   FOLLOWING HOUR, WHEN YOU GET DISPUTES ABOUT THIS EVERY SINGLE

15   DAY, FOR EXAMPLE, WE HAD A PARAGRAPH IN MR. KESSLER'S

16   DECLARATION THAT WAS SUBMITTED IN SUPPORT OF SUMMARY JUDGMENT

17   THAT SAID WE RECEIVE ROUGHLY TEN DISPUTES A DAY, THAT'S

18   INFORMATION THAT I THINK, FOR EXAMPLE, WOULD PROVIDE AN

19   IMPORTANT CONTEXT EVEN IF WE DON'T GET DOWN TO DETAILED

20   STATISTICS THAT RESULT IN WHAT WE CALL OUR ACCURACY RATE.

21           I THINK THE ALTERNATIVE IS THAT MR. GORSKI IS NOT

22   ALLOWED TO SUGGEST AT ANY POINT WELL, YOU GET OTHER DISPUTES

23   ABOUT THIS.

24           MR. GORSKI:  MAY I RESPOND?

25           THE COURT:  YES, SIR.

1          MR. GORSKI:  MY SENSE OF THAT, YOUR HONOR, IS THAT
2     WE'RE TALKING ABOUT APPLES AND ORANGES THERE.  I'M GOING TO
3     PRESENT A DOCUMENT HERE THAT'S BASICALLY GOING TO SHOW THAT
4     WHEN BGC GETS A DISPUTE LIKE THE ONE MR. SMITH GOT, A DOCUMENT
5     GETS GENERATED AND MR. KESSLER GETS COPIED ON THE DOCUMENT.  SO
6     IT'S LIKE HE'S GETTING A DOCUMENT IN HIS EMAIL SAYING WELL
7     SOMEBODY DISPUTED IT.
8          SO CLEARLY HE CAN TESTIFY LIKE WELL DO YOU HAVE A
9     RECOLLECTION THAT YOU RECEIVED DISPUTES OF THIS KIND EVERY
10    DAY.  WE'RE NOT TALKING ABOUT THE DATA ANALYSIS THAT THESE
11    OTHER STATISTICS ARE GOING INTO IN THAT REGARD.
12          I MEAN IF MR. SMITH SEES A DOCUMENT AND HE'S CC'D ON
13    IT AND HE TENDS TO GET THESE DOCUMENTS ON AVERAGE A DAILY
14    BASIS, MAYBE MULTIPLE TIMES A DAY, THAT'S HIS OWN EXPERIENCE,
15    BUT THEN TO SAY THAT THAT OPENS THE DOOR TO LET THEM TO COME UP
16    WITH ALL THESE STATISTICAL ANALYSES AND WHATNOT, YOU KNOW, THAT
17    ARE OBJECTIONABLE AS YOUR HONOR HAS RULED, I DISAGREE WITH
18    THAT.
19          THE COURT:  WELL, IF HE'S COPIED ON THE REPORTS AND
20    HE CAN TESTIFY FROM PERSONAL KNOWLEDGE THAT HE GETS ABOUT TEN A
21    DAY, THAT WOULD BE ADMISSIBLE TESTIMONY, WOULDN'T IT?  HE'S NOT
22    RESEARCHING THAT.  HE KNOWS FROM HIS PERSONAL EXPERIENCE I GET
23    AN EMAIL NOTIFICATION AND I CAN TESTIFY THAT I GET ABOUT TEN A
24    DAY.
25          MR. GORSKI:  AND THAT'S BASICALLY THE APPROACH WE'RE

1    TAKING HERE, YOUR HONOR.  WE'RE NOT --

2              THE COURT:  I DON'T SEE THAT AS A VALID OBJECTION IF

3    IT'S BASED ON HIS PERSONAL TESTIMONY, AND HE'S GIVING HIS BEST

4    RECOLLECTION AND BEST ESTIMATE ABOUT WHAT THOSE FIGURES ARE IF

5    THAT'S WHAT HE'S OFFERING, MR. ANDRE.

6              MR. ANDRE:  YES, YOUR HONOR, AND THESE EMAILS

7    IDENTIFY THE NATURE OF THE DISPUTE WHICH MEANS THAT MR. KESSLER

8    HAS PERSONAL KNOWLEDGE OF ABOUT HOW MANY EMAILS HE GETS A DAY

9    THAT SAY YOU REPORTED THE WRONG RECORD ABOUT THE WRONG PERSON

10   TO MR. GORSKI --

11             THE COURT:  I THINK HE CAN TESTIFY TO THAT.

12             MR. GORSKI:  OKAY.  SO DO SOME OF THEM TURN OUT TO

13   ACTUALLY BE THE PERPETRATOR, THE ONE THEY ACTUALLY BELONG TO,

14   ALL RIGHT, THAT'S A FAIR CROSS-EXAMINATION QUESTION.  I DON'T

15   HAVE A PROBLEM WITH THAT.

16             THE POINT I'M TRYING TO MAKE, THOUGH, IS I THINK

17   GOING BEYOND SOMETHING LIKE THAT IS WHAT I'M CONCERNED ABOUT

18   WITH RESPECT TO THAT TESTIMONY.

19             THE COURT:  WELL, YOU MAY ENTER OBJECTIONS IF YOU

20   WANT TO AS NECESSARY, BUT THE ONLY ISSUE BEFORE ME WAS THIS

21   STATISTIC THAT WAS MENTIONED IN THE OPENING, AND I HAVE

22   SUSTAINED YOUR OBJECTION AS TO THAT.

23             MR. GORSKI, ARE YOU READY TO PROCEED WITH THE

24   PRESENTATION OF THE PLAINTIFF'S CASE IN CHIEF?

25             MR. GORSKI:  I AM, YOUR HONOR.

1          THE COURT:  YOU MAY BRING THE JURORS IN PLEASE, SIR.

2  THANK YOU.

3          ARE YOU GOING TO INVOKE THE RULE OF SEQUESTRATION?

4  DO YOU HAVE ANY WITNESSES IN THE COURTROOM?

5          MR. ANDRE:  YOUR HONOR, THE ONLY WITNESSES ARE THE

6  PARTIES AND THE PARTY REPRESENTATIVE.

7          THE COURT:  ALL RIGHT.  I JUST SAW SOME FOLKS HERE IN

8  THE COURTROOM.  I JUST WANTED TO MAKE SURE.  ALL RIGHT.

9          (JURY PRESENT)

10         THE COURT:  MEMBERS OF THE JURY, I APOLOGIZE, WE'RE A

11  FEW MINUTES LATER THAN I ANTICIPATED.  WE HAD A COUPLE OF

12  ISSUES TO TAKE UP OUTSIDE YOUR PRESENCE, AND DURING THE COURSE

13  OF THE TRIAL, THERE MAY BE TIMES WHEN WE HAVE TO EXCUSE YOU

14  FROM THE COURTROOM TO TAKE UP PROCEDURAL ISSUES THAT DON'T

15  CONCERN YOU BUT DO CONCERN ISSUES THAT I NEED TO ADDRESS, AND

16  THAT'S WHY WE WERE DELAYED TODAY.

17         SO AT THIS TIME THE PLAINTIFF IS READY TO BEGIN

18  PRESENTING HIS EVIDENCE.  MR. GORSKI.

19         MR. GORSKI:  YOUR HONOR, PLAINTIFF CALLS CRAIG

20  KESSLER ON CROSS.

21         THE CLERK:  PLEASE RAISE YOUR RIGHT HAND TO TAKE THE

22  OATH.

23                       CRAIG KESSLER,

24  HAVING BEEN DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

25         THE CLERK:  IF YOU WILL HAVE A SEAT, PLEASE, AND

1   STATE YOUR FULL NAME FOR THE RECORD AND SPELL YOUR LAST NAME

2   ALSO.

3            THE WITNESS:  CRAIG KESSLER, K E S S L E R.

4                      CROSS-EXAMINATION

5   BY MR. GORSKI:

6   Q.   GOOD AFTERNOON, MR. KESSLER.

7   A.   GOOD AFTERNOON.

8   Q.   MR. KESSLER, YOU ARE THE PRESIDENT OF BGC,

9   E-BACKGROUNDCHECKS.COM, CORRECT?

10  A.   CORRECT.

11  Q.   AND BGC IS HEADQUARTERED IN DALLAS, TEXAS; IS THAT

12  CORRECT?

13  A.   YES.

14  Q.   AND BGC IS IN THE BUSINESS OF SELLING CRIMINAL BACKGROUND

15  CHECKS AMONG OTHER THINGS; IS THAT CORRECT?

16  A.   CORRECT.

17  Q.   AND ONE OF BGC'S CUSTOMERS IS THE DART TRANSIT COMPANY,

18  CORRECT?

19  A.   YES.

20  Q.   NOW, MR. KESSLER, THERE IS A BINDER THAT HAS BEEN PLACED

21  IN THE BOX THERE THAT CONTAINS DOCUMENTS.  THE DOCUMENT THAT

22  I'D LIKE TO BRING TO YOUR ATTENTION AT THIS POINT WILL BE A

23  DOCUMENT IN THE SECTION FOR JOINT DOCUMENTS THAT HAS BEEN

24  MARKED NUMBER 1.

25            MR. GORSKI:  YOUR HONOR, SINCE THIS IS A DOCUMENT

1   THAT WAS JOINTLY STIPULATED TO, I WOULD LIKE TO ADMIT THE

2   DOCUMENT THAT'S MARKED J-1 INTO EVIDENCE AT THIS TIME.

3           MR. ANDRE:  NO OBJECTIONS.

4           THE COURT:  IT WILL BE ADMITTED AS A JOINT EXHIBIT.

5           MR. GORSKI:  MAY I PROJECT THE EXHIBIT?

6           THE COURT:  YOU MAY.

7   BY MR. GORSKI:

8   Q.   MR. KESSLER, ARE YOU AT THE SAME DOCUMENT THAT WE'RE AT ON

9   THE SCREEN HERE?

10  A.   YES.  IS IT ONE?

11  Q.   SHOULD BE J-1.  IT SHOULD BE IN THE JOINT SECTION UNDER

12  NUMBER 1?

13          THE COURT:  YOU MAY APPROACH AND HELP HIM FIND THE

14  EXHIBIT, MR. GORSKI.

15          THE WITNESS:  I SEE ONE, BUT I DON'T SEE -- OKAY.

16  BY MR. GORSKI:

17  Q.   MR. KESSLER, ARE YOU ON THE SAME PAGE THAT THE SCREEN IS

18  PROJECTING?

19  A.   YES.

20  Q.   GREAT.  AM I CORRECT THAT THIS IS A CRIMINAL BACKGROUND

21  REPORT THAT WAS PREPARED BY BGC?

22  A.   YES.

23  Q.   AND THIS IS A REPORT THAT WAS PREPARED FOR THE DART

24  TRANSIT COMPANY?

25  A.   CORRECT.

1  Q.   AND IT WAS A REPORT THAT WAS PREPARED ON SEPTEMBER 12,

2  2011?

3  A.   I'M SORRY?

4        THE COURT:  2011 OR 2012?.

5  BY MR. GORSKI:

6  Q.   MY APOLOGIES, IT WAS REPORT THAT WAS PREPARED ON SEPTEMBER

7  12TH, 2012?

8  A.   CORRECT.

9  Q.   AND AM I CORRECT THAT THE CRIMINAL BACKGROUND REPORT THAT

10  YOU'RE LOOKING AT RIGHT NOW IS A BACKGROUND REPORT ABOUT THE

11  PLAINTIFF TONY SMITH?

12  A.   YES.

13  Q.   AND THE PRODUCT, THE BACKGROUND REPORT PRODUCT THAT WAS

14  SOLD HERE IS CALLED THE US ONESEARCH, CORRECT?

15  A.   YES.

16  Q.   AND AM I CORRECT THAT THE US ONESEARCH IS MARKETED AS A

17  SEARCH THAT COMPRISES MANY COUNTIES -- THE CRIMINAL RECORDS

18  FROM THROUGHOUT MANY COUNTIES THROUGHOUT THE COUNTRY?

19  A.   YES, AND OTHER SOURCES, AS WELL.

20  Q.   AND AM I ALSO CORRECT THAT WHAT WE'RE LOOKING AT NOW IS

21  WHAT THE REPORT WOULD LOOK LIKE TO A DART REPRESENTATIVE

22  REVIEWING THE REPORT?

23  A.   CORRECT.

24  Q.   OKAY.  NOW, I'D LIKE TO TURN YOUR ATTENTION NOW TO THE

25  BOTTOM OF THE FIRST PAGE, AND DO YOU SEE THAT THERE IS A

1  CRIMINAL RECORD APPEARING THERE?

2  A.    YES.

3  Q.    AND IT IS A CRIMINAL CONVICTION FOR CRIMINAL CONSPIRACY;

4  DO YOU SEE THAT?

5  A.    YES.

6  Q.    AND AM I CORRECT THAT THIS CRIMINAL CONVICTION DOES NOT

7  BELONG TO PLAINTIFF TONY SMITH?

8  A.    CORRECT.

9  Q.    I'D LIKE YOU TO GO TO THE NEXT PAGE, AND THERE IS AN

10 ADDITIONAL CRIMINAL CONVICTION ON THAT PAGE, AS WELL, CORRECT?

11 A.    YES.

12 Q.    AND THIS CRIMINAL CONVICTION IS DESCRIBED WITH

13 ABBREVIATIONS MANUFACTURING, DELIVERING OR POSSESSING,

14 POSSESSION WITH THE INTENT TO MANUFACTURE OR DELIVER CONTROLLED

15 SUBSTANCES; IS THAT CORRECT?

16 A.    YES.

17 Q.    AND IT'S AGAIN A CRIMINAL CONVICTION FROM PHILADELPHIA,

18 CORRECT?

19 A.    YES.

20 Q.    AM I ALSO CORRECT THAT THIS CRIMINAL RECORD DOES NOT

21 BELONG TO THE PLAINTIFF TONY SMITH?

22 A.    CORRECT.

23 Q.    I'D LIKE YOU TO GO TO THE BOTTOM OF THE PAGE, AND THERE IS

24 ALSO ANOTHER CRIMINAL CONVICTION ON THIS REPORT, CORRECT?

25 A.    YES.

1  Q.   AND THIS CRIMINAL CONVICTION IS STATED AS KNOWING,

2  INTENTIONALLY POSSESSING CONTROLLED SUBSTANCES; IS THAT

3  CORRECT?

4  A.   YES.

5  Q.   AND THIS AGAIN IS ALSO FROM PHILADELPHIA, CORRECT?

6  A.   YES.

7  Q.   AM I ALSO CORRECT THAT THIS CRIMINAL RECORD ALSO DOES NOT

8  BELONG TO TONY SMITH, THE PLAINTIFF HERE?

9  A.   CORRECT.

10  Q.   I'D LIKE YOU TO GO TO THE NEXT PAGE, AND THERE ARE TWO

11  MORE CRIMINAL CONVICTIONS ON THIS PAGE, AS WELL, CORRECT?

12  A.   YES.

13  Q.   AND AT THE TOP OF THE PAGE THERE'S A CRIMINAL CONVICTION

14  FOR POSSESSION, SOME SORT OF ABBREVIATION CRIME OF VIOLENCE.  I

15  DON'T KNOW WHAT THE ABBREVIATION IS; IS THAT CORRECT?

16  A.   YES.

17  Q.   AND THIS IS AGAIN A RECORD FROM PHILADELPHIA, CORRECT?

18  A.   YES.

19  Q.   AND AM I ALSO CORRECT THAT THIS IS ALSO A CRIMINAL RECORD

20  THAT DOES NOT BELONG TO THE PLAINTIFF TONY SMITH?

21  A.   CORRECT.

22  Q.   FURTHER DOWN THAT PAGE, THERE IS ANOTHER CRIMINAL

23  CONVICTION, CORRECT?

24  A.   CORRECT.

25  Q.   AND THIS CRIMINAL CONVICTION IS FOR CARRYING FIREARMS

1   WITHOUT A LICENSE; IS THAT CORRECT?

2   A.   CORRECT.

3   Q.   THIS IS ALSO A CRIMINAL RECORD FROM PHILADELPHIA?

4   A.   CORRECT.

5   Q.   AM I ALSO CORRECT THAT THIS RECORD DOES NOT BELONG TO THE

6   PLAINTIFF TONY SMITH?

7   A.   YES.

8   Q.   I'D LIKE YOU TO GO TO THE NEXT PAGE.  WE'RE ON PAGE 4 NOW,

9   CORRECT?

10   A.   YES.

11   Q.   AND THERE IS ANOTHER CRIMINAL CONVICTION AT THE TOP OF

12   THIS PAGE; IS THAT CORRECT?

13   A.   CORRECT.

14   Q.   AND THIS IS FOR INTENT TO POSSESS A CONTROLLED SUBSTANCE;

15   IS THAT CORRECT?

16   A.   YES.

17   Q.   AND THIS IS ALSO A CRIMINAL RECORD FROM PHILADELPHIA,

18   CORRECT?

19   A.   CORRECT.

20   Q.   AM I ALSO CORRECT THAT THIS RECORD DOES NOT BELONG TO TONY

21   SMITH?

22   A.   CORRECT.

23   Q.   AND THEN THE REMAINDER OF THE REPORT COMPLETES ITSELF

24   THERE.

25            SO AM I CORRECT THAT THERE ARE SIX CRIMINAL RECORDS

1  ON THIS BACKGROUND CHECK THAT DON'T BELONG TO TONY SMITH?

2  A.   YES.

3  Q.   AM I CORRECT THAT THESE ARE CRIMINAL RECORDS THAT BELONG

4  TO ANOTHER PERSON ALSO NAMED TONY SMITH WHO'S FROM

5  PHILADELPHIA, PENNSYLVANIA AND HAS THE SAME DATE OF BIRTH AS

6  MR. SMITH, THE PLAINTIFF?

7           MR. ANDRE:  OBJECTION, YOUR HONOR, WE'VE ESTABLISHED

8  AND DO NOT DISPUTE THAT THE SIX RECORDS DON'T BELONG TO THE

9  PLAINTIFF.  I THINK THAT POINT HAS BEEN COVERED.

10          THE COURT:  SUSTAINED.

11 BY MR. GORSKI:

12 Q.   OKAY.  I'D LIKE YOU TO GO TO THE TOP.

13 A.   TOP OF WHAT?

14 Q.   OF THE DOCUMENT THAT WE'VE BEEN LOOKING AT.

15 A.   OKAY.

16 Q.   AND IF WE LOOK AT THE TOP OF THE DOCUMENT, YOU'LL SEE THAT

17 THERE IS INFORMATION ABOUT THE APPLICANT, IN THIS CASE THE

18 PLAINTIFF; IS THAT CORRECT?

19 A.   ARE WE BACK ON PAGE 1 NOW?

20 Q.   PAGE 1 ON THE TOP LEFT-HAND SIDE.

21 A.   CAN YOU ASK ME THE QUESTION AGAIN?

22 Q.   YES, AT THE TOP LEFT-HAND SIDE OF THE DOCUMENT IS

23 INFORMATION THAT WAS PROVIDED BY DART ABOUT THE APPLICANT, IN

24 THIS CASE MR. SMITH, THE PLAINTIFF?

25 A.   THAT IS CORRECT.

1  Q.    AND THE INFORMATION THAT WAS PROVIDED BY DART TO BGC ON

2  THE FIRST LINE IS TONY WILLIE SMITH; IS THAT CORRECT?

3  A.    YES.

4  Q.    AND DART ALSO PROVIDED HIS FULL SOCIAL SECURITY NUMBER,

5  ALTHOUGH IT'S BEEN X'D OUT IN THIS PARTICULAR DOCUMENT; IS THAT

6  CORRECT?

7  A.    THAT'S CORRECT.

8  Q.    AND IT ALSO PROVIDED HIS FULL DATE OF BIRTH, EVEN THOUGH

9  IT HAS BEEN PARTIALLY X'D OUT IN THIS DOCUMENT?

10  A.    CORRECT.

11  Q.    DART ALSO PROVIDED THE WORK STATE FOR MR. SMITH?

12  A.    CORRECT.

13  Q.    NOW, AM I CORRECT THAT THE RECORDS THAT WE HAVE DISCUSSED

14  AT THIS POINT WERE MATCHED TO MR. SMITH, THE PLAINTIFF HERE,

15  BECAUSE HE POSSESSES THE SAME FIRST NAME, LAST NAME AND DATE OF

16  BIRTH AT THE ACTUAL PERPETRATOR?

17  A.    YES.

18  Q.    AM I CORRECT THAT IN PREPARING THIS REPORT THAT THE SOCIAL

19  SECURITY NUMBER THAT WAS PROVIDED BY BGC WAS NOT CONSIDERED IN

20  DETERMINING WHETHER OR NOT TO MATCH THESE RECORDS THAT WE'VE

21  DISCUSSED TO MR. SMITH, THE PLAINTIFF?

22  A.    PROVIDED BY BGC, THE SOCIAL SECURITY NUMBER, YOU MEAN BY

23  DART?

24  Q.    AM I CORRECT THAT THE SOCIAL SECURITY NUMBER ABOUT MR.

25  SMITH, THE PLAINTIFF HERE, THAT WAS PROVIDED BY DART WAS NOT

1   CONSIDERED IN DETERMINING WHETHER OR NOT TO MATCH THESE

2   CRIMINAL RECORDS ON MR. SMITH'S REPORT?

3   A.   WELL, IT WASN'T CONSIDERED BECAUSE THE FACT OF THE MATTER

4   WHEN WE TALK ABOUT THE ABILITY TO MATCH IS WE SIMPLY DO NOT GET

5   THE SOCIAL SECURITY NUMBER FROM OUR JURISDICTIONS, FROM OUR

6   SOURCES THAT ARE IN OUR DATABASE.  I KNOW OF NO SOURCE IN

7   OUR DATABASE THAT WE ACTUALLY GET THE SOCIAL SECURITY NUMBER

8   FROM.

9            SO TO BE ABLE TO MATCH UPON THAT, NO, WE DID NOT

10  MATCH ON IT BECAUSE WE DID NOT HAVE THAT INFORMATION.

11  Q.   OKAY.  WE'LL COVER YOUR COMMENTS IN A MINUTE, BUT TO

12  CONTINUE ON, AM I ALSO CORRECT THAT THE FACT THAT THE WORK

13  STATE DIFFERED FROM WHERE THE CRIMINAL RECORDS WERE COMING FROM

14  WAS NOT CONSIDERED IN DETERMINING WHETHER TO MATCH THESE

15  CRIMINAL RECORDS TO MR. SMITH, THE PLAINTIFF HERE?

16  A.   THAT'S CORRECT.

17  Q.   OKAY.  NOW, AM I CORRECT THAT THE BGC REPORTS FOR THE

18  NATIONAL CRIMINAL BACKGROUND CHECK ARE SOLD OVER THE WEB; IS

19  THAT CORRECT?

20  A.   YES.

21  Q.   SO IF A PERSON WANTS TO BUY A REPORT FROM BGC LIKE THE ONE

22  THAT WAS SOLD HERE, THEY GO ON THE WEB AND PLUG THIS

23  INFORMATION IN?

24  A.   YES, AS LONG AS THEY'VE SET UP AN ACCOUNT.  THEY'VE BEEN

25  VETTED.  THEY HAVE A USER NAME AND PASSWORD.

1  Q.    OKAY.  AND THE ONLY REQUIRED INFORMATION THAT BGC ASKS FOR

2  FROM A POTENTIAL CUSTOMER IS FIRST NAME, MIDDLE NAME, LAST

3  NAME -- MIDDLE NAME OR MIDDLE INITIAL, LAST NAME AND DATE OF

4  BIRTH; IS THAT CORRECT?

5  A.    HIS FULL DATE OF BIRTH.

6  Q.    CORRECT.  AND YOU COULD ALSO ENTER IT WITHOUT A MIDDLE

7  NAME IF YOU CERTIFY THAT THE PERSON DOESN'T HAVE A MIDDLE NAME?

8  A.    YES.

9  Q.    ENTERING A SOCIAL SECURITY NUMBER AS FAR AS BGC IS

10 CONCERNED IS OPTIONAL?

11 A.    YES, IT WAS AT THAT TIME.

12 Q.    ENTERING THE WORK STATE IS ALSO OPTIONAL?

13 A.    I BELIEVE AT THAT TIME IT WAS REQUIRED.

14 Q.    NOW ONCE YOUR CUSTOMER MAKES A REQUEST THROUGH THE WEB FOR

15 THE CRIMINAL BACKGROUND REPORT, THAT REQUEST IS FULFILLED IN AN

16 ENTIRELY AUTOMATED FASHION; IS THAT CORRECT?

17 A.    CORRECT.

18 Q.    SO NO ACTUAL PERSON FROM BGC TAKES THE DATA, PLUGS IT IN

19 OR REVIEWS IT PRIOR TO THAT REPORT BEING ISSUED TO THE

20 CUSTOMER?

21 A.    THAT'S CORRECT.

22 Q.    AND THERE'S NO ACTUAL PERSON INVOLVED IN FULFILLING THE

23 REQUEST, MEANING WHEN THE REQUEST COMES IN BGC DOESN'T SEND

24 SOMEBODY TO THE COURTHOUSE TO LOOK AT THE RECORDS, CORRECT?

25 A.    NOT FOR THE US ONESEARCH.

1  Q.   AND THAT'S THE PRODUCT THAT WAS SOLD ABOUT THE PLAINTIFF

2  MR. SMITH?

3  A.   THAT'S CORRECT.

4  Q.   NOW, WHEN A CUSTOMER ENTERS THE DATA INTO THE WEBSITE AND

5  IT'S SENT TO BGC, THE RESPONSE BACK FROM BGC IS NEARLY

6  INSTANTANEOUS, CORRECT?

7  A.   YES.

8  Q.   AND THAT'S BECAUSE ALL OF THE INFORMATION THAT'S GOING TO

9  BE USED TO PREPARE THIS REPORT IS PRELOADED ONTO THE COMPUTER

10  WHEN THE REPORT IS GENERATED, CORRECT?

11  A.   YES, IT WILL HIT OUR DATABASE AND THEN RETURN INSTANTLY.

12  Q.   NOW AS A GENERAL MATTER, BGC WILL PUT CRIMINAL RECORDS ON

13  A REPORT IF THERE'S A FIRST NAME AND LAST NAME MATCH ALONG WITH

14  A DATE OF BIRTH MATCH SO LONG AS THERE'S NOT A MIDDLE NAME

15  MISMATCH; IS THAT CORRECT?

16  A.   CORRECT.

17  Q.   NOW, YOU AGREE THAT TONY SMITH -- STRIKE THAT.

18       NOW, YOU AGREE THAT THE INFORMATION THAT WAS ENTERED

19  BY DART INCLUDED MR. SMITH'S MIDDLE NAME, CORRECT?

20  A.   CORRECT.

21  Q.   AND THE INFORMATION THAT WAS PRESENTED WAS WILLIE,

22  CORRECT?  THE INFORMATION PRESENTED TO DART FOR THE REPORT WAS

23  THE MIDDLE NAME WILLIE?

24  A.   THAT'S WHAT THEY SUBMITTED.

25  Q.   DO YOU KNOW WHETHER OR NOT THE ACTUAL PERPETRATOR HAS A

1  DIFFERENT MIDDLE NAME?

2  A.    I DO NOT.

3  Q.    DO YOU KNOW WHETHER OR NOT THE ACTUAL PERPETRATOR HAS A

4  MIDDLE NAME THAT BEGINS WITH F?

5  A.    I DO NOT.

6  Q.    NOW, CAN WE AGREE THAT OTHER THAN MR. SMITH HERE, THERE

7  ARE OTHER PEOPLE WHO WILL HAVE THE SAME NAME AND THE SAME DATE

8  OF BIRTH?

9  A.    YES.

10  Q.    AND THAT THE MATCHING SYSTEM THAT BGC USES CANNOT

11  DIFFERENTIATE BETWEEN PEOPLE WHO HAVE THE SAME NAME AND SAME

12  DATE OF BIRTH?

13  A.    IF YOU'RE REFERRING TO THE DIFFERENTIATION, YES, WE HAVE

14  THAT SITUATION COME UP FROM TIME TO TIME.  IT'S NOT OFTEN, BUT

15  THE PROCEDURES THAT WE DO HAVE IN PLACE IN REGARDS TO THAT WITH

16  THE MIDDLE NAME CAPABILITIES AGAIN HELPS US RETURN THE

17  INFORMATION FROM AN ACCURACY STANDPOINT.

18        ALSO WHEN WE TALK ABOUT -- AGAIN IF WE HAD THE

19  INFORMATION FROM THE COURTS ITSELF ABOUT THE SOCIAL SECURITY

20  NUMBER, WE WOULD BE ABLE TO MATCH ON A NAME LIKE THAT THAT'S

21  COMMON.

22  Q.    I KNOW YOU WANT TO TALK ABOUT THAT.  WE'RE GOING TO GET TO

23  THAT IN A MINUTE, BUT JUST TO BE CLEAR, THE COMPUTER SYSTEM

24  WHEN THE NAME IS THE SAME AND THE DATE OF BIRTH IS THE SAME

25  CANNOT MAKE A DIFFERENTIATION BETWEEN THOSE TWO CONSUMERS OR

1   PEOPLE?

2   A.   NOT WITHOUT ADDITIONAL IDENTIFIERS.

3   Q.   I'M SORRY?

4   A.   NOT WITHOUT AN ADDITIONAL IDENTIFIER.

5   Q.   BUT IT WILL RETURN THE RECORDS WHEN THAT IS A MATCH IN

6   THAT WAY?

7   A.   YES, IN THAT SCENARIO, BECAUSE AGAIN WE DO NOT KNOW

8   NECESSARILY WHAT THE MIDDLE NAME MAY BE.

9   Q.   CAN WE ALSO AGREE THAT PEOPLE CAN HAVE THE SAME NAME

10  AND THE SAME DATE OF BIRTH WITH DIFFERENT SOCIAL SECURITY

11  NUMBERS?

12  A.   YES.

13  Q.   AM I CORRECT THAT THAT'S THE CASE HERE, MR. SMITH, THE

14  PLAINTIFF, HAD A DIFFERENT SOCIAL SECURITY NUMBER THAN THE

15  ACTUAL PERPETRATOR?

16  A.   YES.

17  Q.   CAN WE AGREE THAT SOCIAL SECURITY NUMBERS ARE AN EFFECTIVE

18  WAY TO DIFFERENTIATE BETWEEN TWO PEOPLE WITH THE SAME NAME AND

19  SAME DATE OF BIRTH?

20  A.   YES.

21  Q.   NOW AFTER BGC SOLD THE REPORT THAT WE'VE LOOKED AT ALREADY

22  TO DART, IS IT YOUR UNDERSTANDING THAT SOMETIME THEREAFTER MR.

23  SMITH, THE PLAINTIFF HERE, WAGED A DISPUTE WITH BGC?

24  A.   YES.

25  Q.   I'D LIKE YOU TO TAKE A LOOK, MR. KESSLER, INTO THE BINDER

1   AGAIN.

2   A.   OKAY.

3   Q.   AND I'D LIKE YOU TO GO TO THE DOCUMENT IN THE SAME SECTION

4   THAT'S BEEN PLACED UNDER TAB 3?

5   A.   OKAY.

6           MR. GORSKI:  AND, AGAIN, YOUR HONOR, THIS IS ANOTHER

7   DOCUMENT THAT'S BEEN STIPULATED AS A JOINT EXHIBIT.  SO I'D

8   LIKE TO ENTER EXHIBIT J-3 INTO EVIDENCE.

9           MR. ANDRE:  NO OBJECTION.

10          THE COURT:  WITH RESPECT TO EACH OF THE EXHIBITS THAT

11   ARE MARKED AS A JOINT EXHIBIT IS THERE GOING TO BE ANY

12   OBJECTION?

13          MR. ANDRE:  NONE FROM THE DEFENSE.

14          THE COURT:  ANY REASON NOT TO JUST ADMIT THOSE AT

15   THIS TIME, MR. GORSKI?

16          MR. ANDRE:  YOUR HONOR, MY ONLY REQUEST WOULD BE --

17   I UNDERSTAND THAT DOCUMENTS ADMITTED ARE DOCUMENTS THAT WILL GO

18   BACK WITH THE JURY, AND I WOULD THINK THAT ONLY DOCUMENTS THAT

19   ARE ACTUALLY USED IN THE CASE SHOULD GO BACK.  SO WHILE I HAVE

20   NO OBJECTION ON PRINCIPLE TO ADMITTING ALL OF THEM, I WOULD ASK

21   THAT THE JURY STILL ONLY HAVE THE ONES USED.

22          THE COURT:  CERTAINLY.

23          MR. GORSKI:  YES, I AGREE SO LONG AS IT'S USED, NO

24   OBJECTION.

25          THE COURT:  SO AS YOU TENDER A JOINT EXHIBIT, THERE'S

1  NO NEED TO SEEK A REVIEW.  THOSE WILL BE ADMITTED AS YOU TENDER

2  THEM.

3          MR. GORSKI:  THANK YOU, YOUR HONOR.  MAY I PROJECT

4  THE EXHIBIT, YOUR HONOR?

5          THE COURT:  YES, YOU MAY.

6  BY MR. GORSKI:

7  Q.  MR. KESSLER, DO YOU RECOGNIZE THIS DOCUMENT?

8  A.  YES, I DO.

9  Q.  OKAY.  AND WHAT IS THIS?

10 A.  THIS IS AN INTERNAL DOCUMENT STATING THE STATUS OF A

11 PARTICULAR DISPUTE, AND WHAT WAS DONE.

12 Q.  OKAY.  AND YOU ARE -- THIS IS AN EMAIL, CORRECT?

13 A.  CORRECT.

14 Q.  SO BGC USES EMAILS TO MEMORIALIZE WHEN SOMEBODY DISPUTES?

15 A.  YES, AND THEN WE ACTUALLY PUT IT IN THE ACCOUNT FOR DART

16 IN THIS EXAMPLE.

17 Q.  OKAY.  AND IN THIS CASE YOU'RE ACTUALLY COPIED ON THIS

18 EMAIL; IS THAT CORRECT?

19 A.  CORRECT.

20 Q.  NOW, I'D LIKE TO FOCUS -- ACTUALLY JUST SO WE'RE CLEAR,

21 WHAT THIS EMAIL REPRESENTS IS THE PRODUCT OF AFTER MR. SMITH

22 HAS ALREADY DISPUTED TO BGC BUT THE REPORT HAS ALREADY BEEN

23 SOLD TO DART AT THIS TIME, CORRECT?

24 A.  YES.

25 Q.  DART HAS BEEN MADE AWARE OF WHAT WAS ON THE REPORT THAT

1   WE'VE ALREADY LOOKED AT, CORRECT?

2   A.   CORRECT.

3   Q.   NOW AFTER MR. SMITH DISPUTES, AM I CORRECT THAT THE

4   DOCUMENT MEMORIALIZES THAT THE PERSON HANDLING THIS WAS ABLE TO

5   CALL THE PHILADELPHIA COURT AT A SPECIFIC PHONE NUMBER AND WAS

6   ABLE TO VERIFY THAT MR. SMITH, THE PLAINTIFF HERE, WAS NOT THE

7   PERPETRATOR OF THESE CRIMES BECAUSE THE SOCIAL SECURITY NUMBERS

8   ON THOSE RECORDS DID NOT MATCH PLAINTIFF'S?

9   A.   THAT'S CORRECT.

10   Q.   SO AM I CORRECT AT LEAST WITH RESPECT TO MR. SMITH'S

11   SITUATION THAT BGC WAS ABLE TO DO SOMETHING TO CONFIRM WHETHER

12   THE SOCIAL SECURITY NUMBERS MATCHED ON THESE REPORTS?

13           MR. ANDRE:  OBJECTION, ASKED AND ANSWERED.

14           THE COURT:  OVERRULED.

15           THE WITNESS:  ASK IT AGAIN?

16   BY MR. GORSKI:

17   Q.   AM I CORRECT THAT BGC WAS ABLE TO DO SOMETHING TO

18   DETERMINE AT LEAST WITH RESPECT TO PLAINTIFF HERE WHETHER OR

19   NOT THE SOCIAL SECURITY NUMBERS MATCHED ON THESE CRIMINAL

20   RECORDS?

21   A.   CORRECT.

22   Q.   AND THIS PROCESS THAT WE'VE DESCRIBED HERE, WHICH IS

23   CALLING A COURT TO CONFIRM WHETHER OR NOT THE SOCIAL SECURITY

24   NUMBER EXISTS, IS NOT JUST SOMETHING THAT BGC WILL DO IN

25   CONNECTION WITH MR. SMITH, IT WILL DO THAT IN OTHER

1  CIRCUMSTANCES, TOO, WHEN IT RECEIVES DISPUTES?

2  A.   IT IS A PROCESS THAT WE USE, YES.

3  Q.   AM I ALSO CORRECT IT'S THE MAIN PROCESS THAT YOU USE ONCE

4  YOU RECEIVE A DISPUTE TO RECONCILE WHETHER OR NOT THE RECORDS

5  BELONG TO THE APPLICANT?

6  A.   IT IS, AGAIN IT IS A PROCESS THAT WE UTILIZE, BUT AGAIN

7  SOME COURTS WILL NOT CONFIRM OR DISCONFIRM BASED ON SOCIAL

8  SECURITY NUMBER, SO WE HAVE TO RELY ON MAYBE A DRIVER'S

9  LICENSE, PARTICULARS ABOUT THE ATTORNEYS, PROBATION OFFICERS.

10  THERE'S OTHER PROCESSES THAT WE USE OUTSIDE OF THE SSN, BUT WE

11  DO USE THAT.

12  Q.   I UNDERSTAND THERE MAY BE AN INSTANCE WHERE YOU CAN'T DO

13  IT IN ONE COUNTY?

14  A.   I'D SAY IT'S MORE THAN ONE COUNTY.

15  Q.   OKAY.  BUT YOU WERE ABLE TO DO IT WITH RESPECT TO RECORDS

16  IN PHILADELPHIA, CORRECT?

17  A.   YES.

18  Q.   AND THERE ARE OTHER COURTS WHERE YOU CAN DO THE SAME

19  THING?

20  A.   YES.

21  Q.   OKAY.  AM I CORRECT THAT BGC IS NOT CHARGED FOR CALLING A

22  COURT TO RECONCILE WHETHER OR NOT THE SOCIAL SECURITY NUMBERS

23  MATCH OR NOT?

24  A.   NO, WE'RE NOT CHARGED.

25  Q.   SO THE ONLY COST TO BGC TO DO THAT IS JUST THE TIME IT

1  TAKES AN EMPLOYEE TO CALL THE COURT AND MAKE THE CONFIRMATION?

2  A.   CORRECT.

3  Q.   AM I ALSO CORRECT THAT BGC DOES NOT DO THIS AT THE TIME

4  THE REPORT IS SOLD?

5  A.   YES, WE DON'T DO THAT AT THE TIME IT'S SOLD, AND, AGAIN,

6  ON THAT, IT WOULD REALLY TAX THE COURTS TO BE ABLE TO TAKE THE

7  AMOUNT OF CALLS IT WOULD TAKE ON EVERY PARTICULAR HIT THAT, YOU

8  KNOW, A BACKGROUND CHECK REPORT COULD HAVE.  SO IT MAY SOUND

9  FEASIBLE, BUT IT'S NOT PRACTICAL.  SO THIS IS WHY WE UTILIZE IT

10  WHEN WE HAVE OUR DISPUTE PROCESS.

11  Q.   OKAY.  NOW, IN ADDITION TO THAT, IF WE LOOK AT THIS EMAIL

12  YOU'LL SEE THAT THE EMAIL SAYS VERIFIED BY PENNSYLVANIA COURT

13  ONLINE DATABASE, THEY HAVE NO ADDITIONAL IDENTIFIERS; DO YOU

14  SEE THAT?

15  A.   YES, I DO.

16  Q.   AM I CORRECT THAT MEANS THAT SOMEBODY AT BGC ALSO OBTAINED

17  AN ONLINE RECORD OF -- SOME KIND OF ONLINE RECORD OF THE

18  CRIMINAL DOCKET ASSOCIATED WITH THESE CRIMINAL RECORDS; IS THAT

19  CORRECT?

20  A.   YES, THEY WENT TO THE PENNSYLVANIA COURT, UNIFIED COURT, I

21  BELIEVE, ONLINE.

22  Q.   YOU SAID THEY WENT TO THE COURT, BUT YOU'RE TALKING

23  ABOUT --

24  A.   ONLINE, YES.

25  Q.   OKAY.  I'D LIKE YOU TO TURN TO THE EXHIBIT THAT'S BEEN

1  MARKED J-2.

2  A.   OKAY.

3  Q.   OKAY.  NOW IS THIS THE ONLINE DOCUMENT THAT WAS REFERRED

4  TO IN THE EMAIL?

5  A.   YES, I BELIEVE IT WAS.

6  Q.   AGAIN JUST SO WE'RE CLEAR, THIS DOCUMENT IS NOT A DOCUMENT

7  THAT BGC OBTAINS WHEN IT INITIALLY SELLS THE REPORT.  IT'S

8  SOMETHING THAT IT ONLY GOES AND GETS AFTER SOMEBODY LIKE TONY

9  SMITH DISPUTES THE ACCURACY OF THE CRIMINAL RECORDS?

10  A.   THIS IS NOT PART OF THE DATABASE SEARCH, IF YOU WILL.

11  Q.   OKAY.  AM I CORRECT ON THIS DOCUMENT THE DOCUMENT

12  IDENTIFIES THE RACE OF THE PERPETRATOR?

13  A.   YES.

14  Q.   AND WHAT I'VE PROJECTED RIGHT HERE IS THAT WHAT YOU'RE

15  LOOKING AT, AS WELL?

16  A.   YES.

17  Q.   AND AM I CORRECT THAT THE DOCUMENT THAT WAS OBTAINED SHOWS

18  THAT THE PERPETRATOR WAS ASIAN?

19  A.   CORRECT.

20  Q.   DOES BGC INCLUDE RACE INFORMATION ABOUT THE PERPETRATOR IN

21  THE CRIMINAL BACKGROUND CHECK?

22  A.   WE DO NOT, AND THE REASONS BEHIND THAT --

23  Q.   THAT'S ALL I ASKED.

24           MR. ANDRE:  YOUR HONOR, THE WITNESS SHOULD BE ALLOWED

25  TO FINISH HIS ANSWER.

1          MR. GORSKI:  WELL, YOUR HONOR, I DIDN'T ASK FOR AN

2    EXPLANATION.  IF HE'D LIKE TO ASK ON CROSS, THEN THAT'S --

3          THE COURT:  I'M GOING TO ALLOW HIM TO GO AHEAD AND

4    EXPLAIN.  YOU CAN EXPLAIN NOW, MR. KESSLER.

5          THE WITNESS:  OKAY.  SO WE DON'T COLLECT THE

6    INFORMATION MEANING THE SOURCES DO NOT PROVIDE US THE ACTUAL

7    RACE.  WE ALSO HAVE FOUND THAT THE RACE IS UNRELIABLE.

8    BECAUSE, AGAIN, IT'S EITHER BEING SELF-REPORTED.  WHEN A LAW

9    ENFORCEMENT MAY BE ASKING YOU WHAT YOUR RACE MIGHT BE, YOU MAY

10   SAY ONE THING, AND IT'S REALLY NOT, AND/OR A POLICE OFFICER MAY

11   JUST CHECK A BOX, NOT KNOWING, JUST CHECKS A BOX, AND THAT'S

12   THE INFORMATION ENTERED.

13         SO WE DON'T LOOK AT THAT AS A VERY RELIABLE THING TO

14   MATCH ON, BUT ON TOP OF THAT, WE DON'T EVEN GET IT FROM

15   JURISDICTIONS TO HAVE THAT OPPORTUNITY TO MATCH ON.  SO THAT'S

16   WHY WE BELIEVE IT'S UNRELIABLE.

17   BY MR. GORSKI:

18   Q.   BUT IT WAS AVAILABLE HERE?

19   A.   IT WAS AVAILABLE HERE, BUT NOT FROM THE DATA THAT WE

20   RECEIVED FROM PENNSYLVANIA AOC THAT GENERATED THE US ONESEARCH.

21   Q.   OKAY.  SO WHATEVER DATA THAT BGC PURCHASED DIDN'T HAVE

22   THAT, BUT IT WAS SOMETHING THAT WAS AVAILABLE WHEN BGC'S

23   EMPLOYEE DID THIS ONLINE SEARCH?

24   A.   THAT'S CORRECT.

25   Q.   NOW I'D LIKE TO GO A LITTLE BIT FURTHER DOWN THE DOCUMENT,

1   AND YOU AGREE THAT THE DOCUMENT IS A SUMMARY OF ALL THE

2   CRIMINAL -- OF SOME OF THE CRIMINAL RECORDS THAT WE'VE

3   DISCUSSED IN CONNECTION WITH THE REPORT THAT WAS ORIGINALLY

4   SOLD ABOUT MR. SMITH, CORRECT?

5   A.   CORRECT.

6   Q.   NOW, AM I CORRECT WITH RESPECT TO A PORTION OF THE

7   CRIMINAL CONVICTIONS THAT APPEAR ON THE ORIGINAL REPORT, THE

8   SUMMARY THAT WAS OBTAINED SUBSEQUENTLY BY BGC INCLUDED THE

9   NAME OF THE DEFENSE ATTORNEY WHO REPRESENTED THE ACTUAL

10  PERPETRATOR?

11  A.   YES, I SEE THAT.

12  Q.   THAT WAS THE CASE WITH RESPECT TO THIS PARTICULAR

13  PROCEEDING AT THE TOP WHERE THE DEFENSE ATTORNEY IS NAMED

14  STEVEN LAVER?

15  A.   YES.

16  Q.   AND THE DEFENSE ATTORNEY IS IDENTIFIED WITH RESPECT TO ALL

17  OF THE OTHER CRIMINAL COMPLAINTS THAT ARE LISTED ON THIS

18  DOCUMENT, AS WELL, CORRECT?

19  A.   CORRECT.

20  Q.   NOW BGC ALSO DOES NOT REPORT THE NAME OF THE DEFENSE

21  ATTORNEY WHO REPRESENTED THE PERPETRATOR WHEN IT SELLS THAT

22  INITIAL REPORT, DOES IT?

23  A.   NO, IT DOES NOT.

24  Q.   NOW I'D LIKE TO GO TO THE BOTTOM OF THE DOCUMENT THAT

25  CONTAINS THE TWO PARAGRAPHS AT THE BOTTOM, I THINK IT'S ON

1  EVERY PAGE, SO IF YOU GET TO PAGE 1 AT THE BOTTOM?

2  A.   OKAY.

3  Q.   IT'S STILL A LITTLE HARD TO READ, SO I'M JUST GOING TO

4  READ FROM THE DOCUMENT.  OKAY.  AT THE BOTTOM THE PARAGRAPH

5  SAYS COURT SUMMARY REPORT INFORMATION SHOULD NOT BE USED IN

6  PLACE OF A CRIMINAL HISTORY BACKGROUND CHECK WHICH CAN ONLY BE

7  PROVIDED BY THE PENNSYLVANIA STATE POLICE.

8           NOW, MR. KESSLER, DOES BGC AT LEAST WITH RESPECT

9  TO RECORDS ORIGINATING FROM PENNSYLVANIA DO ANYTHING AT THE

10  TIME IT SELLS THE REPORT TO CONTACT THE STATE POLICE TO

11  CONFIRM WHETHER OR NOT THESE RECORDS BELONG TO THE APPLICANT OR

12  NOT?

13  A.   NO, I'M NOT NECESSARILY SAYING THAT THAT'S WHAT I THINK

14  THAT THIS PARTICULAR PARAGRAPH MEANS.

15  Q.   AM I ALSO CORRECT, MR. KESSLER, IN YOUR EXPERIENCE MR.

16  SMITH IS NOT THE FIRST PERSON WHO HAS COMPLAINED TO BGC THAT

17  THEY ARE NOT THE PERPETRATOR OF THE CRIMES THAT APPEAR ON A BGC

18  REPORT?

19  A.   THAT'S CORRECT.

20  Q.   AND BY YOUR ESTIMATION, AM I CORRECT THAT BGC RECEIVES

21  COMPLAINTS OF THAT KIND APPROXIMATELY EVERY DAY?

22  A.   I CAN'T SAY NECESSARILY EVERY DAY.  WE DO RECEIVE DISPUTES

23  ON A DAILY BASIS, BUT I DON'T KNOW HOW MANY OF THEM --

24  Q.   YOU RECEIVE DISPUTES ON A DAILY BASIS, CORRECT?

25  A.   ON AVERAGE, YES.

1          MR. GORSKI:  MR. KESSLER, I DON'T HAVE ANY OTHER

2    QUESTIONS FOR YOU ON MY DIRECT.  THANK YOU FOR NOW.

3          THE COURT:  MR. ANDRE, DO YOU HAVE ANY QUESTIONS AT

4    THIS TIME OF MR. KESSLER?

5          MR. ANDRE:  I DO, YOUR HONOR.  COULD I GET A 90

6    SECOND BATHROOM BREAK?  IF NOT, I CAN POWER THROUGH.  I'VE BEEN

7    DRINKING A CONSIDERABLE AMOUNT OF WATER.

8          THE COURT:  I DON'T WANT TO PUT YOU IN DISTRESS.

9    WE'LL TAKE A BRIEF RECESS FOR YOU.  WE'LL IN RECESS FOR FIVE

10   MINUTES.

11          (RECESS)

12          THE COURT:  PLEASE BE SEATED.  ALL RIGHT, MR. ANDRE.

13                    DIRECT EXAMINATION

14   BY MR. ANDRE:

15   Q.   MR. KESSLER, I HAVE A COUPLE OF THINGS I'D LIKE TO FOLLOW

16   UP ON FROM YOUR CONVERSATION.  IF I COULD ASK YOU TO SPEAK UP,

17   I WAS HAVING A LITTLE BIT OF A HARD TIME --

18   A.   OKAY.

19   Q.   MR. KESSLER, DO YOU RECALL WHEN MR. GORSKI ASKED YOU WHAT

20   BGC REQUIRES TO MAKE A MATCH IN THE FIRST INSTANCE?

21   A.   YES.

22   Q.   AND I BELIEVE YOU SAID FIRST NAME, LAST NAME, DATE OF

23   BIRTH AND NO MIDDLE NAME MISMATCH; DO YOU RECALL THAT?

24   A.   YES.

25   Q.   WHAT DOES THE TERM NO MIDDLE NAME MISMATCH MEAN?

1   A.   THE BEST WAY TO DESCRIBE NO MIDDLE NAME MISMATCH IS TO USE

2   AN EXAMPLE.  SO MY NAME IS CRAIG CONNER KESSLER.  SO IF WE TYPE

3   IN CRAIG CONNER, THE MIDDLE NAME CONNER KESSLER, THEN WHAT THE

4   SYSTEM WILL DO FROM A MATCHING LOGIC IS IT WOULD LOOK FOR CRAIG

5   CONNER KESSLER, IT WILL LOOK FOR CRAIG C. KESSLER, OR IT WILL

6   LOOK FOR CRAIG NO MIDDLE NAME KESSLER.  IT WILL NOT BRING BACK

7   CRAIG SAM KESSLER OR CRAIG T. KESSLER.

8   Q.   WHEN YOU SAY NO MIDDLE NAME OR C, ARE YOU TALKING ABOUT ON

9   THE CRIMINAL RECORDS THEMSELVES?

10  A.   YES.

11  Q.   MR. KESSLER, MR. GORSKI ASKED YOU SOME QUESTIONS ABOUT THE

12  WORK STATE ON MR. SMITH'S REPORT BEING GEORGIA; DO YOU RECALL

13  THAT?

14  A.   YES.

15  Q.   DID DART MAKE ANY INDICATION TO YOU THAT MR. SMITH HAD

16  NEVER BEEN TO PENNSYLVANIA, FOR EXAMPLE?

17  A.   NO.

18  Q.   MR. KESSLER, YOU WERE ASKED SOME QUESTIONS ABOUT SOCIAL

19  SECURITY NUMBERS; DO YOU RECALL THAT?

20  A.   YES.

21  Q.   AS A GENERAL MATTER DO YOU KNOW HOW MANY REPORTS BGC

22  PREPARES PER YEAR?

23  A.   TWO MILLION PER YEAR.

24  Q.   AND --

25          MR. GORSKI:  OBJECTION, YOUR HONOR, CAN WE GET A

1    SIDEBAR?

2            THE COURT:  YES, YOU MAY APPROACH.

3            (AT THE BENCH)

4            MR. GORSKI:  IT FEELS LIKE THEY'RE GOING INTO THE

5    AREA THAT YOUR HONOR HAS ALREADY EXCLUDED WHICH IS DATA

6    COMPILATION ABOUT HOW MANY REPORTS ARE PREPARED AND WHATNOT.

7    THERE'S NO WAY THIS WITNESS CAN TESTIFY ABOUT THAT WITHOUT THE

8    DATA.  WE'VE ALREADY BEEN THROUGH THIS, YOUR HONOR.

9            THE COURT:  WELL, WE DISCUSSED THIS AT THE BREAK, AND

10   I EMPHASIZED THAT THE ONLY OBJECTION THAT HAD BEEN MADE WAS TO

11   THAT PERCENTAGE.  NOW YOU SPECIFICALLY MENTIONED THIS FOUR

12   MILLION FIGURE, AND I DIDN'T HEAR ANY OTHER ARGUMENTS ABOUT

13   OTHER FACTORS.  I SAID YOU COULD ENTER OBJECTIONS AS YOU WANT

14   TO.

15           MR. GORSKI:  YES, UNDERSTOOD, YOUR HONOR, BUT MY

16   OBJECTION WOULD BE THE SAME BECAUSE AGAIN WE'RE TALKING ABOUT

17   SOMEBODY TRYING TO DO SOME KIND OF COMPILATION TO FIGURE OUT

18   HOW MANY REPORTS ARE SOLD, AND THAT ENDS UP BEING IN A REPORT

19   THAT IS REVIEWED, AND BASED ON WHAT WE'VE ALREADY SEEN, HE DID

20   NOT LOOK -- IF HE LOOKED AT SOME REPORT WHICH IS HEARSAY, AND

21   ALSO DOES NOT COMPLY WITH THE RULES OF EVIDENCE REGARDING

22   CALCULATIONS, OR IT'S HEARSAY WITHIN HEARSAY WHICH MEANS

23   SOMEBODY TOLD HIM WHAT THAT SAID.  IN ADDITION TO VIOLATING THE

24   RULES OF EVIDENCE REQUIRING COMPILATIONS OR CALCULATIONS OF

25   DATA AS YOUR HONOR HAS ALREADY STATED.

1          MR. ANDRE:  YOUR HONOR, I ASKED HIM DO YOU KNOW HOW

2    MANY REPORTS BGC RUNS.  HE SAID YES AND PROVIDED THE ANSWER.

3    WE'RE NOT GOING INTO DETAILED STATISTICS.  DO YOU, THE

4    PRESIDENT, UNDERSTAND THE VOLUME OF BUSINESS THAT YOU DO AS A

5    GENERAL MATTER, THAT'S INFORMATION THAT HE -- AND I CAN LAY

6    MORE FOUNDATION AS TO PERSONAL KNOWLEDGE.

7          MR. GORSKI:  IT'S IN EVIDENCE, YOUR HONOR.  I MEAN

8    THE GUY DOES NOT GET A COPY OF EVERY REPORT THAT'S SOLD.  HE

9    HAS TO BE DOING SOME SORT OF DATA ANALYSIS, OR BASICALLY HE'S

10   HAVING SOMEBODY DO IT FOR HIM AND THEN TELLING HIM, BUT AGAIN

11   THIS IS HEARSAY WITHIN HEARSAY, AND ALSO IT DOESN'T COMPLY, AS

12   WE'VE ALREADY DISCUSSED, WITH THE RULES FOR CALCULATIONS.

13         THE COURT:  I DON'T SEE THAT AS NECESSARILY THE SAME

14   KIND OF CALCULATION THAT WAS AT ISSUE EARLIER WHICH WAS A

15   PERCENTAGE MATTER.  HE'S STATING FROM HIS POSITION AS PRESIDENT

16   HOW MANY RECORDS -- WHAT WAS YOUR QUESTION?

17         MR. ANDRE:  REPORTS PER YEAR.

18         THE COURT:  ON AN ANNUAL BASIS.  SO I WILL LET YOU

19   LAY SOME FOUNDATION FOR -- IF HE'S RELYING ON BUSINESS RECORDS,

20   SOME BUSINESS RECORD BASIS FOR THAT, THAT WOULD BE AN EXCEPTION

21   TO HEARSAY AS WE TALKED ABOUT EARLIER.  I THINK THAT'S WHERE

22   YOU WERE HEADED WITH YOUR COMPILATION.  TO ME THAT'S A

23   DIFFERENT CALCULATION THAN THE ISSUE EARLIER.

24         MR. GORSKI:  EVEN IF IT'S A BUSINESS RECORD

25   EXCEPTION, YOUR HONOR, THE BUSINESS RECORD DOESN'T EXIST IN

1   THIS CASE.  SO HE CAN'T SAY IT'S A BUSINESS RECORD IF THEY

2   HAVEN'T PRODUCED THE DOCUMENT.

3             THE COURT:  MR. ANDRE.

4             MR. ANDRE:  YOUR HONOR, HE HAS PERSONAL KNOWLEDGE OF

5   THE WORKINGS OF THIS COMPANY.  WHAT MR. GORSKI IS ASKING FOR IS

6   THE EMAILS, AND HE SEES THE ANNUAL REPORT THAT MIGHT SAY THIS

7   IS THE VOLUME WE DID THIS YEAR.  HE FOUNDED THE COMPANY.  HE'S

8   FAMILIAR WITH THE VOLUME OF BUSINESS.

9             THE COURT:  LET ME ASK YOU WHILE WE'RE AT THE BENCH

10  HERE, DO YOU INTEND TO GO INTO OTHER THINGS OTHER THAN THIS

11  FIGURE?

12            MR. ANDRE:  JUST THAT QUESTION.

13            THE COURT:  ALL RIGHT.  I'M GOING TO OVERRULE THE

14  OBJECTION AND ALLOW THAT QUESTION.

15            (IN OPEN COURT.)

16  BY MR. ANDRE:

17  Q.   MR. KESSLER, FOR EVERY REPORT THAT BGC PREPARES, WHY

18  DOESN'T IT JUST CALL THE COURT ON THE FRONT END AND CHECK THE

19  SOCIAL SECURITY NUMBER?

20  A.   WELL, AS I WAS MENTIONING THE REASON THAT THAT IS NOT

21  PRACTICAL IS WE GET SOME PUSHBACK FROM THE COURTS EVEN WHEN

22  WE'RE TRYING TO GET ADDITIONAL INFORMATION FROM THEM JUST ON

23  DISPUTES.

24            SO WHEN YOU LOOK AT THE VOLUME OF SEARCHES THAT I

25  JUST STATED WHICH WE DO TWO MILLION SEARCHES A YEAR, YOU'RE

1   GOING TO HAVE A PERCENTAGE OF THAT, A HIT RATIO WHICH IS

2   BASICALLY ROUGHLY 10 PERCENT THAT SOMEBODY EVEN HAS A HIT.

3           SO THAT GETS YOU DOWN TO 200,000 PARTICULAR RECORDS,

4   AND OF THAT WE BASICALLY WILL HAVE, YOU KNOW, IF YOU THINK

5   ABOUT ON 200,000 RECORDS HAVING TO CALL THE COURT ON EVERY

6   SINGLE ONE OF THOSE, THAT WOULD INUNDATE THE COURT SYSTEM.  IT

7   WOULD BREAK THEIR INFRASTRUCTURE.  THEY WOULD STOP TAKING OUR

8   CALLS.  THEY WOULD PASS LEGISLATION THAT BASICALLY SAYS THE

9   BACKGROUND INDUSTRY CANNOT PLACE CALLS TO THE COURTS ANY

10  LONGER.  THEREFORE THE EMPLOYER AND THE CONSUMER LOSE IN THIS

11  SCENARIO.  SO IT'S JUST REALLY NOT FEASIBLE AT THE END OF THE

12  DAY.

13  Q.   IS THAT A DECISION BGC MAKES BECAUSE IT'S COSTING YOU

14  MONEY?

15  A.   ABSOLUTELY NOT.  WE WOULD LOVE TO BE ABLE TO.  WE WOULD

16  BUILD THE STAFF TO DO THAT.  AGAIN, IT'S AT THE COURT LEVEL.

17  THE COURT CLERKS ARE ALREADY INUNDATED WITH OTHER ITEMS EVEN

18  OUTSIDE OF CRIMINAL RECORDS, AND SO IT REALLY WOULD BREAK THEIR

19  INFRASTRUCTURE.

20  Q.   MR. KESSLER, THERE WAS A DISCUSSION OF RACE ON THE

21  RECORDS; DO YOU RECALL THAT?

22  A.   YES.

23  Q.   IN YOUR EXPERIENCE DO EMPLOYERS COLLECT RACE DATA?

24  A.   NO, ACTUALLY THE EEOC PROVIDES A GUIDANCE THAT THEY DO NOT

25  RECOMMEND THAT DURING THE APPLICATION PROCESS OR THE HIRING.

1  Q.    DID DART SUPPLY ANY INFORMATION TO YOU ABOUT MR. SMITH'S

2  RACE WHEN IT ORDERED THIS REPORT?

3  A.    THEY DID NOT.

4  Q.    MR. KESSLER, THERE WAS SOME DISCUSSION ABOUT THE DEFENSE

5  ATTORNEY IN THE CASE UP IN PHILADELPHIA; DO YOU RECALL THAT?

6  A.    YES.

7  Q.    IS THERE ANY REASON THAT INFORMATION WOULD HAVE HELPED YOU

8  IN MAKING A MATCH OR A MISMATCH TO MR. SMITH?

9  A.    NO.

10  Q.    IS THERE ANY REASON SITTING HERE TODAY WHY YOU WOULD KNOW

11  OR NOT KNOW ANYTHING ABOUT THAT DEFENSE ATTORNEY?

12  A.    YEAH, I DON'T.

13  Q.    MR. KESSLER, THERE WAS A DISCUSSION OF THE DISCLAIMER AT

14  THE BOTTOM OF THE AOC RECORD; DO YOU RECALL THAT?

15  A.    YES.

16  Q.    DO YOU KNOW WHAT AOC STANDS FOR?

17  A.    ADMINISTRATION OF THE COURTS.

18  Q.    THERE WAS A DISCUSSION OF A DISCLAIMER; DO YOU RECALL

19  THAT?

20  A.    YES.

21  Q.    DO YOU HAVE A CONTRACT WITH THE AOC?

22  A.    YES, WE DO.

23  Q.    IS THAT A CONTRACT TO SELL BULK DATA TO YOU?

24  A.    YES.

25  Q.    DOES THAT CONTRACT SPECIFY THAT IT WILL BE USED IN

1   CRIMINAL BACKGROUND CHECKS?

2   A.   YES.

3           MR. ANDRE:  NOTHING FURTHER, YOUR HONOR.

4           THE COURT:  ANYTHING FURTHER FOR THIS WITNESS AT THIS

5   TIME?

6           MR. GORSKI:  A FEW BRIEF REBUTTAL QUESTIONS, YOUR

7   HONOR.

8           THE COURT:  ALL RIGHT.

9                       RECROSS-EXAMINATION

10  BY MR. GORSKI:

11  Q.   MR. KESSLER, FOLLOWING UP ON SOME OF THE QUESTIONS THAT

12  MR. ANDRE ASKED, THERE ISN'T A SPECIFIC LINE ITEM ENTRY ON THE

13  WEBPAGE WHEN A CUSTOMER IS ENTERING THE DATA TO RULE OUT WHAT

14  STATES THE APPLICANT HAS BEEN TO; IS THAT CORRECT?

15  A.   YOU MEAN WHERE THEY'VE ACTUALLY TRAVELED?

16  Q.   YEAH, MR. ANDRE HAD ASKED YOU ABOUT WHETHER DART EVER

17  INFORMED BGC THAT HE HAD NEVER BEEN TO PENNSYLVANIA.  WHAT I'M

18  TRYING TO CONFIRM WITH YOU IS THAT THE BGC WEBSITE DOESN'T HAVE

19  AN AREA FOR DART TO ENTER WHETHER OR NOT SOMEBODY HAS BEEN TO A

20  SPECIFIC STATE OR NOT; IS THAT CORRECT?

21  A.   THAT'S CORRECT.

22  Q.   NOW AM I ALSO CORRECT THAT AT LEAST IN PART CHECKING ON

23  THE SOCIAL SECURITY NUMBER AT LEAST IN THE CONTEXT OF CALLING

24  THE COURT AS IT WAS DONE HERE WITH MR. SMITH IS NOT PRACTICAL

25  BECAUSE THE PRODUCT YOU'RE SELLING HERE IS ONE THAT YOU WANT TO

1  SELL INSTANTANEOUSLY?

2  A.    WELL, YES, I MEAN THE SITUATION IS IS YOU'RE GOING TO BE

3  LOOKING AT A DRAMATIC MORE LOAD TO THE COURTS BASED ON THE HITS

4  THAT ARE GENERATED FROM A DATABASE SEARCH, YES.

5  Q.    BUT IT'S ALSO AT LEAST IN PART NOT PRACTICAL BECAUSE

6  YOU'RE TRYING TO SELL THIS PRODUCT IN A MATTER OF SECONDS?

7  A.    YEAH, I MEAN IT'S AN INSTANT SEARCH, BUT THERE ARE NEEDS

8  FOR THAT PARTICULAR SEARCH.  SO IF YOU'RE TRYING TO GET AT

9  BECAUSE IT'S INSTANT VERSUS SOMETHING ELSE, I DON'T KNOW WHERE

10  YOU'RE GOING WITH THAT.

11  Q.    DO YOU THINK AN EMPLOYER MIGHT FIND THE RACE OF THE

12  APPLICANT HELPFUL IN RULING OUT THAT THE APPLICANT IS NOT THE

13  PERPETRATOR?

14  A.    AGAIN AS I MENTIONED, WE DON'T GET THAT INFORMATION, AND

15  WE DEEM IT TO BE UNRELIABLE.  SO, NO, I DON'T THINK AN EMPLOYER

16  WOULD WANT TO MAKE A DECISION BASED --

17  Q.    OKAY.

18  A.    EXCUSE ME, LET ME FINISH IF I COULD.  THE CONSUMER

19  REPORTING AGENCY IS NOT REPORTING ACCURATE INFORMATION THAT WE

20  CAN RELY ON.

21  Q.    OKAY.  AND DO YOU THINK AN EMPLOYER MIGHT FIND IT HELPFUL

22  OR THE APPLICANT HIMSELF ONCE HE FINALLY RECEIVES HIS REPORT

23  MIGHT FIND IT HELPFUL TO KNOW WHO A DEFENSE ATTORNEY WAS IN

24  CONNECTION WITH THAT PARTICULAR CRIMINAL RECORD?

25  A.    I DON'T SEE ANY VALUE IN THE DEFENSE INFORMATION.

1          MR. GORSKI:  NO OTHER QUESTIONS, YOUR HONOR.  THANK

2    YOU.

3          THE COURT:  ALL RIGHT.  MR. KESSLER, YOU MAY STEP

4    DOWN AT THIS TIME.  CALL YOUR NEXT WITNESS, MR. GORSKI.

5          MR. GORSKI:  PLAINTIFF CALLS TONY SMITH, THE

6    PLAINTIFF.

7          THE CLERK:  PLEASE RAISE YOUR RIGHT HAND TO TAKE THE

8    OATH.

9                    TONY W. SMITH,

10   HAVING BEEN DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

11         THE CLERK:  IF YOU WILL HAVE A SEAT, PLEASE, AND

12   STATE YOUR FULL NAME FOR THE RECORD AND SPELL YOUR LAST NAME

13   ALSO.

14         THE WITNESS:  TONY WILLIE SMITH.

15         MR. GORSKI:  YOUR HONOR, MAY I HAVE ANOTHER MOMENT?

16   I NEED TO PREPARE THE AUDIO RECORDINGS THAT ARE GOING TO BE

17   PLAYED.

18         THE COURT:  YOU MAY TAKE A MOMENT TO DO THAT, YES,

19   SIR.

20         (PAUSE IN THE PROCEEDINGS.)

21                    DIRECT EXAMINATION

22   BY MR. GORSKI:

23   Q.   GOOD AFTERNOON, MR. SMITH.  IF YOU COULD AGAIN FOR THE

24   JURY STATE YOUR FULL NAME PLEASE?

25   A.   TONY WILLIE SMITH.

1  Q.   AND WHAT IS YOUR FULL DATE OF BIRTH?

2  A.   11-17-1979.

3  Q.   ARE YOU MARRIED, MR. SMITH?  DO YOU HAVE ANY CHILDREN?

4  A.   YES, I HAVE A FIANCE.  HER NAME IS STEPHANIE.  WE'VE BEEN

5  TOGETHER FOR EIGHT YEARS.  WE PLAN ON GETTING MARRIED IN

6  OCTOBER OF THIS YEAR, AND I ALSO HAVE A DAUGHTER.  HER NAME IS

7  SIDNEY, AND SHE'S THREE YEARS OLD.

8  Q.   AND WHAT DOES YOUR WIFE DO?

9  A.   SHE'S A RADIOLOGY TECHNICIAN.

10  Q.   WHAT CITY DO YOU CURRENTLY LIVE IN?

11  A.   IN AUSTELL.

12  Q.   AUSTELL, GEORGIA?

13  A.   AUSTELL, GEORGIA.

14  Q.   WHAT OTHER PLACES PRIOR TO AUSTELL, GEORGIA HAVE YOU LIVED

15  THROUGHOUT YOUR LIFE?

16  A.   I STAYED IN CHICAGO.  HIGH SCHOOL IN DETROIT.  COLLEGE IN

17  KNOXVILLE, TENNESSEE.  COLLEGE IN ATLANTA, GEORGIA.  I STAYED

18  IN DECATUR, POWDER SPRINGS, GEORGIA, MARIETTA AND ALSO

19  MABLETON, GEORGIA.

20  Q.   AND WHERE DO YOUR MOTHER AND FATHER RESIDE?

21  A.   CHICAGO, ILLINOIS.

22  Q.   DO YOU HAVE ANY BROTHERS OR SISTERS?

23  A.   YES, I HAVE TWO SISTERS, TONYA SMITH AND TOMARA SMITH.

24  Q.   WHERE DO THEY LIVE?

25  A.   CHICAGO, ILLINOIS.

1   Q.   HOW MUCH TIME HAVE YOU SPENT LIVING IN THE STATE OF

2   PENNSYLVANIA OR THE CITY OF PHILADELPHIA?

3   A.   NONE AT ALL.

4   Q.   HOW MANY TIMES HAVE YOU VISITED THE STATE OF PENNSYLVANIA

5   OR THE CITY OF PHILADELPHIA?

6   A.   NONE AT ALL.

7   Q.   WHO DO YOU KNOW WHO LIVES IN THE STATE OF PENNSYLVANIA OR

8   THE CITY OF PHILADELPHIA?

9   A.   NO ONE.

10  Q.   WHAT DO YOU DO FOR A LIVING?

11  A.   I AM A TRUCK DRIVER.

12  Q.   AND HOW LONG HAVE YOU BEEN DOING THAT?

13  A.   FOR THREE YEARS, SINCE 2012.

14  Q.   WHAT MADE YOU DECIDE TO GET INTO TRUCKING?

15  A.   I GOT INTO TRUCKING BECAUSE IT WAS STEADY WORK.  I CAN

16  MAINTAIN MY BILLS, AND I CAN ALSO SUPPORT MY FAMILY WHEN I'M

17  DRIVING, YOU KNOW, BEING A TRUCK DRIVER.

18  Q.   WHERE DO YOU CURRENTLY WORK?

19  A.   I CURRENTLY WORK AT A COMPANY CALLED DYNAMICS.

20  Q.   OKAY.  AND CAN YOU GIVE US A DESCRIPTION OF WHAT YOUR

21  NORMAL JOB IS LIKE?

22  A.   EVERY DAY ON A DAILY BASIS MONDAY THROUGH FRIDAY, I WAKE

23  UP FROM 4:30 A.M.  I DRIVE FROM SMYRNA, GEORGIA TO ATLANTA,

24  GEORGIA TO DROP OFF OFFICE FURNITURE.  FROM ATLANTA, GEORGIA

25  BACK TO SMYRNA AND THAT'S MY MORNING RUN FROM 4:30 TO EIGHT

1  O'CLOCK.

2          I HAVE AN EVENING RUN I DO FROM 5:30 P.M. THAT'S FROM

3  SMYRNA, GEORGIA TO BUFORD, GEORGIA, AND FROM BUFORD, GEORGIA

4  BACK TO SMYRNA, GEORGIA FROM 5:30 TO EXACTLY 10 P.M.

5  Q.  DID YOU MAKE YOUR MORNING RUN TODAY?

6  A.  YES.

7  Q.  ARE YOU GOING TO MAKE YOUR EVENING RUN AFTER COURT IS OVER

8  TODAY?

9  A.  YES.

10  Q.  DO YOU REMEMBER APPLYING FOR EMPLOYMENT WITH A COMPANY

11  CALLED THE DART TRANSIT COMPANY?

12  A.  YES.

13  Q.  CAN YOU EXPLAIN WHAT THE DART TRANSIT COMPANY IS?

14  A.  IT'S A TRUCKING COMPANY.  THEY HAVE VARIOUS OPTIONS AS FAR

15  AS DRIVING LOCAL AND ALSO OVER THE ROAD.  IT'S A TRUCKING

16  COMPANY.

17  Q.  OKAY.  WE'LL GET TO THAT IN A MINUTE.  DO YOU HAVE A

18  RECOLLECTION OF WHEN YOU APPLIED FOR EMPLOYMENT?

19  A.  SEPTEMBER 2012.

20  Q.  THAT WAS EMPLOYMENT WITH DART, CORRECT?

21  A.  YES.

22  Q.  AND WHAT WAS THE POSITION YOU WERE APPLYING FOR?

23  A.  A TRUCK DRIVER, A LOCAL TRUCK DRIVER.

24  Q.  OKAY.  NOW WHY DID YOU APPLY TO WORK AT DART?

25  A.  I APPLIED BECAUSE THEY HAD A LOCAL POSITION, AND BASICALLY

1   I WANTED TO SEE MY FAMILY EVERY DAY.  I HAD JUST HAD A LITTLE

2   DAUGHTER, AND IT WAS A PERFECT FIT FOR ME SO I COULD SEE MY

3   FAMILY ON A DAILY BASIS.

4   Q.   NOW COULD YOU GIVE US A DESCRIPTION OF WHAT YOU MEAN WHEN

5   YOU TALK ABOUT A LOCAL RUN OR A LOCAL POSITION?

6   A.   WELL, LOCAL, THE LOCAL POSITION WAS I'LL BE HOME EVERY

7   DAY.  I DID A CERTAIN AMOUNT OF HOURS A DAY, AND I WAS ALWAYS

8   HOME EVERY DAY.  I DID NO TIME OVER THE ROAD.

9        THE OVER THE ROAD WAS WHEN YOU'RE OUT FOR THREE

10  WEEKS, AND YOU'RE HOME FOR ONE WEEK, AND MY FAMILY JUST

11  DIDN'T -- I COULDN'T DO THAT.

12  Q.   OKAY.  NOW, WHAT WAS YOUR CURRENT JOB WHEN YOU APPLIED FOR

13  THE JOB AT DART?

14  A.   I JUST GOT OUT OF CDL SCHOOL.  I PAID ALL MY MONEY FOR THE

15  CDL CLASS FOR CDL SCHOOL, AND I WASN'T EMPLOYED.  I DIDN'T HAVE

16  A JOB.

17  Q.   OKAY.  NOW, HOW DID YOU APPLY FOR THE JOB?

18  A.   DID THE APPLICATION ONLINE.

19  Q.   AND WHAT HAPPENED THEN AFTER YOU APPLIED ONLINE?

20  A.   AFTER THE APPLICATION ONLINE, I WAS CALLED BY A RECRUITER

21  NAMED PEGGY O'NEILL.  WE ACTUALLY DID AN INTERVIEW OVER THE

22  PHONE.

23  Q.   OKAY.  AND WAS THERE A NEXT STEP IN THE PROCESS?

24  A.   YES, THE INTERVIEW WENT WELL.  SHE TOLD ME THAT SHE WAS

25  GOING TO GET ME IN CONTACT WITH THE MANAGER OVER AT DART, AND

1  FOR ME TO HEAD OVER THERE THE NEXT DAY TO ACTUALLY HAVE AN

2  INTERVIEW WITH THE MANAGER ALSO.

3  Q.   DID THAT INTERVIEW OCCUR?

4  A.   YES, THE INTERVIEWED OCCURRED.  WE HAD THE INTERVIEW.  HE

5  SAID IT WENT WELL.  HE SAID I WAS A PERFECT CANDIDATE FOR THE

6  JOB.  HE TOLD ME THE NEXT STEP FOR ME TO DO WAS I WOULD ALSO

7  GET A BACKGROUND CHECK, A PHYSICAL AND ALSO A DRUG TEST, AND

8  FROM THERE I WOULD BE IN CONTACT WITH THE RECRUITER AGAIN.

9  Q.   OKAY.  AND THEN WHAT HAPPENED AFTER THAT WITH RESPECT TO

10  YOUR APPLICATION?

11  A.   I GOT A CALL FROM THE RECRUITER.  SHE TOLD ME -- SHE TOLD

12  ME THAT THE DRUG TEST WENT THROUGH GOOD.  SHE TOLD ME THAT THE

13  PHYSICAL TEST WENT THROUGH GOOD, AND I WAS TO GO AHEAD AND

14  REPORT TO THE JOB, AND WE WAS JUST GOING TO WAIT ON THE

15  BACKGROUND CHECK, BUT SHE TOLD ME THAT I COULD GO AHEAD AND

16  REPORT TO THE JOB THE NEXT FOLLOWING DAY.

17  Q.   OKAY.  AND DID YOU REPORT TO THE JOB OR ATTEMPT TO REPORT

18  TO THE JOB?

19  A.   YES, I WOKE UP AT ABOUT 4:30 THAT MORNING.  DART IS

20  ACTUALLY LOCATED IN BUFORD, GEORGIA.  SO I WOKE UP THAT MORNING

21  AND TRIED TO BEAT TRAFFIC, DROVE TO BUFORD, GEORGIA, AND I

22  RECEIVED A PHONE CALL FROM THE RECRUITER STATING THAT I LIED TO

23  HER AND THAT I DIDN'T PASS MY BACKGROUND CHECK.

24       SHE TOLD ME I WASN'T BEING UP FRONT WITH HER, AND,

25  YOU KNOW, SHE SAID I SHOULD HAVE BEEN UP FRONT, YOU KNOW, I

1  KIND OF ASKED HER WHAT WAS ON THE BACKGROUND CHECK, AND SHE

2  TOLD ME SHE COULDN'T TELL ME, THAT I WOULD HAVE TO WAIT TO GET

3  A RESPONSE BACK FROM THE BACKGROUND COMPANY.

4  Q.   OKAY.  NOW, WHEN DO YOU ESTIMATE YOU ACTUALLY RECEIVED

5  THAT RESPONSE DOCUMENT BACK FROM THE BACKGROUND COMPANY?

6  A.   MAYBE ABOUT A WEEK.

7  Q.   SO JUST TO BE CLEAR, THIS WASN'T SOMETHING YOU LOOKED AT

8  AT THE SAME TIME YOU WERE CALLED BY MS. O'NEILL?

9  A.   NO.

10  Q.   BY YOUR ESTIMATION IT WAS A WEEK LATER?

11  A.   YES.

12  Q.   NOW, CAN YOU DESCRIBE HOW IT FELT TO HAVE TO WAIT TO

13  RECEIVE THIS INFORMATION?

14  A.   IT REALLY HURT.  I FELT VERY DEFLATED.  I DIDN'T KNOW

15  WHAT OTHER STEPS TO DO.  MY FAMILY WAS DEPENDING ON ME.  IT

16  JUST -- IT REALLY HURT BAD.  I DIDN'T KNOW WHAT OTHER STEPS TO

17  TAKE, YOU KNOW, JUST TO GO BACK HOME AND JUST WAIT, YOU KNOW,

18  JUST WAIT IT OUT FOR A PIECE OF PAPER WITH SOME INFORMATION ON

19  IT.

20  Q.   NOW, DID YOU DO ANYTHING WHILE YOU WERE WAITING FOR THE

21  LETTER?

22  A.   WELL, THE FIRST THING I DID WAS I ACTUALLY GOT A

23  REPORT FROM THE COUNTY THAT I STAY IN.  I ACTUALLY DID A

24  BACKGROUND CHECK ON MY OWN SELF JUST TO SEE IF I HAD ANYTHING

25  THAT JUST POPPED UP FROM MY COUNTY.  SO THAT'S ACTUALLY WHAT I

1   DID FIRST.

2   Q.   OKAY.  AND WHAT WAS THE RESULT OF THAT?

3   A.   NOTHING HAD CAME UP.  THE WHOLE REPORT WAS CLEAR.  THEY

4   TOLD ME THEY DIDN'T HAVE ANYTHING ON ME AFTER I RECEIVED THE

5   REPORT.

6   Q.   OKAY.  NOW, THE TIME YOU WERE APPLYING FOR THE DART JOB,

7   DID YOU HAVE ANY OTHER JOB OPTIONS?

8   A.   YES, I HAD A COUPLE OVER-THE-ROAD JOBS, BUT I KIND OF HAD

9   THEM ON HOLD BECAUSE I REALLY WANTED TO DO THE LOCAL RUNS.  I

10  REALLY WANTED TO BE A PART OF DART.

11  Q.   NOW, AT SOME POINT IN TIME DO YOU RECALL ACTUALLY

12  RECEIVING THE DOCUMENT IN THE MAIL THAT WE'VE JUST BEEN TALKING

13  ABOUT, THE BACKGROUND REPORT?

14  A.   YES.

15  Q.   MR. SMITH, I'D LIKE YOU TO GRAB THAT BINDER, AND I'D LIKE

16  YOU TO TURN TO THE SECTION THAT'S BEEN MARKED NUMBER 5.

17  A.   OKAY.

18  Q.   AND DO YOU RECOGNIZE THAT DOCUMENT AS THE DOCUMENT THAT

19  YOU RECEIVED IN THE MAIL FROM THE DEFENDANT, THE CRIMINAL

20  BACKGROUND CHECK?

21  A.   YES.

22        MR. GORSKI:  YOUR HONOR, AT THIS TIME I'D LIKE TO

23  ADMIT INTO EVIDENCE THE DOCUMENT THAT'S BEEN PREVIOUSLY

24  DESIGNATED AS PLAINTIFF'S EXHIBIT 5.

25        MR. ANDRE:  YOUR HONOR, WE WOULD RENEW OUR OBJECTION

1   FROM THE SUBMISSION WITH THE PRETRIAL ORDER WHICH IS THIS

2   APPEARS TO BE AN INCOMPLETE DOCUMENT TO US.  IT DOESN'T MATCH,

3   FOR EXAMPLE, THE DOCUMENT WE WERE LOOKING AT J-2.  I BELIEVE IT

4   MIGHT BE MISSING THE FIRST PAGE.

5           SUBJECT TO THAT, I HAVE NO CONCERNS ABOUT

6   AUTHENTICITY.

7           MR. GORSKI:  YOUR HONOR, MAY I RESPOND TO THAT?

8           THE COURT:  YES.

9           MR. GORSKI:  THE SIMPLE FACT THAT IT MAY NOT BE A

10  COMPLETE DOCUMENT DOESN'T MEAN THAT IT'S NOT A DOCUMENT THAT

11  THE DEFENDANT DOESN'T RECOGNIZE PORTIONS OF AND DOESN'T PLAY A

12  ROLE IN HIS EXPERIENCE HERE.

13          THE COURT:  WHAT YOU'VE TENDERED IS WHAT YOU HAVE AS

14  YOUR COMPLETE EXHIBIT?

15          MR. GORSKI:  THAT'S WHAT HE'S GOT, YOUR HONOR, YES.

16          THE COURT:  I'LL OVERRULE THE OBJECTION AND ALLOW

17  PLAINTIFF'S EXHIBIT 5 INTO EVIDENCE.

18          MR. GORSKI:  MAY I PROJECT THE EXHIBIT, YOUR HONOR?

19          THE COURT:  YOU MAY.

20  BY MR. GORSKI:

21  Q.   SO, MR. SMITH, WHAT YOU'RE LOOKING AT IN THE BINDER THERE

22  IS THE SAME THING AS WHAT WE SEE ON THE SCREEN HERE?

23  A.   YES.

24  Q.   WHAT DO YOU SEE ON THE REPORT?

25  A.   I SEE MY FIRST NAME, LAST NAME, DATE OF BIRTH, AND I ALSO

1   SEE INFORMATION, CRIMINAL INFORMATION THAT DOESN'T PERTAIN TO

2   ME AT ALL.

3   Q.   LET'S JUST BE CLEAR, DO ANY OF THE RECORDS THAT YOU SEE ON

4   THAT DOCUMENT BELONG TO YOU?

5   A.   NO, SIR.

6   Q.   NOW AFTER YOU GOT A COPY OF THIS REPORT BY YOUR ESTIMATE A

7   WEEK LATER, WHAT DID YOU DO THEN?

8   A.   I ACTUALLY DID A BACKGROUND CHECK WITH THE CITY OF

9   PHILADELPHIA, AND I ALSO DID A BACKGROUND CHECK WITH THE CLERK

10   OF COURTS IN PHILADELPHIA.

11          I RECEIVED THE BACKGROUND REPORT, AND WHEN I TALKED

12   TO THE CLERK -- WELL, FIRST, WHEN I GOT THE INFORMATION BACK

13   FROM THE JAIL, THEY TOLD ME THAT THEY DIDN'T HAVE ANY RECORD OF

14   MY NAME WITH MY SOCIAL SECURITY NUMBER.   THEN I ALSO TALKED TO

15   THE CLERK OF COURTS --

16          MR. ANDRE:  YOUR HONOR, I NEED TO OBJECT BEFORE THE

17   WITNESS GOES ANY FURTHER WITH TESTIMONY THAT IS UNQUESTIONABLY

18   HEARSAY.

19          MR. GORSKI:  YOUR HONOR, I DISAGREE WITH THAT.  THE

20   TESTIMONY IS NOT BEING SUBMITTED FOR THE TRUTH OF THE MATTER

21   ASSERTED.  IT'S BEING SUBMITTED FOR THE AFFECT ON HERE AND

22   PLAINTIFF'S CLAIMS FOR DAMAGES IN THIS CASE.

23          THE COURT:  YOU'RE GOING TO NEED TO APPROACH ON

24   THAT.

25          (AT THE BENCH)

1          THE COURT:  I NEED TO UNDERSTAND WHY IT'S NOT BEING

2     OFFERED FOR THE TRUTH OF THE MATTER, THE WAY YOU POSED IT TO

3     HIM.

4          MR. GORSKI:  YOUR HONOR, I MEAN AT THIS POINT IT'S

5     VIRTUALLY UNDISPUTED THAT THESE RECORDS DO NOT BELONG.  THEIR

6     OWN WITNESSES ADMITTED THIS.  I'M NOT PUTTING MR. SMITH UP TO

7     PROVE THAT THESE DON'T BELONG TO HIM.

8          WHAT I'M TRYING TO DO IS GIVE THE JURY AN IDEA OF

9     WHAT MR. SMITH WENT THROUGH AND HIS PSYCHOLOGY OF WHAT HE WENT

10    THROUGH IN CONNECTION WITH GETTING A REPORT, TRYING TO FIGURE

11    OUT WHAT'S GOING ON BEING TOLD THAT THESE DON'T BELONG TO HIM,

12    YOU KNOW, HE'S CONFUSED AND ANXIOUS ABOUT WHAT TO DO NEXT.

13    THERE IS --

14         THE COURT:  THAT'S FINE, BUT THE QUESTION YOU'VE

15    POSED COULD SUGGEST THAT BGC SHOULD HAVE DONE WHAT HE DID WHICH

16    IS CALL THEM UP AND ASK FOR THAT.  THAT'S WHAT I THINK THE

17    OBJECTION IS BASED ON.  SO I'M GOING TO SUSTAIN THE OBJECTION.

18         YOU CAN ASK THOSE KIND OF QUESTIONS YOU TALKED ABOUT,

19    THAT'S CERTAINLY ALL RELEVANT TO HIM, BUT THE QUESTION AS POSED

20    I THINK THE OBJECTION SHOULD BE SUSTAINED BECAUSE IT WOULD BE

21    HEARSAY.  THAT'S THE ONLY THING I HEARD IT WAS BEING OFFERED

22    FOR WAS TO SHOW YOU COULD GET THAT INFORMATION IF YOU CALLED

23    THE CLERK.

24         MR. GORSKI:  OKAY.  THANK YOU, YOUR HONOR.

25         (IN OPEN COURT.)

1          THE COURT:  PROCEED WITH YOUR NEXT QUESTION, MR.

2  GORSKI.  THE OBJECTION IS SUSTAINED.

3  BY MR. GORSKI:

4  Q.   WHY WERE YOU CALLING THE COURTS?

5  A.   THE REASON WHY I CALLED THE COURTS IS BECAUSE I WAS

6  CONFUSED WHY -- I WAS JUST CONFUSED AS TO HOW MY NAME HAD GOT

7  MIXED UP.  I NEVER HAD A SITUATION HAPPEN LIKE THIS BEFORE.

8  Q.   OKAY.  NOW, IN ADDITION TO WHAT YOU ALREADY DESCRIBED, DID

9  YOU DO ANYTHING ELSE AFTER YOU RECEIVED THE REPORT?

10  A.   YES, I ACTUALLY CALLED THE BACKGROUND CHECK COMPANY.

11  Q.   OKAY.  WE'LL GET TO THAT IN A MINUTE.  DO YOU RECALL DOING

12  ANYTHING ELSE PRIOR TO THAT?

13  A.   WELL, I CALLED THE RECRUITER BACK, AND I TALKED TO HER,

14  AND SHE TOLD ME -- I WAS LETTING HER KNOW WHAT WAS GOING ON

15  WITH THE INFORMATION THAT I HAD FOUND OUT, AND SHE TOLD ME

16  BASICALLY THERE'S NOTHING THAT SHE CAN DO, AND THAT THE

17  BACKGROUND COMPANY WOULD HAVE TO DO EVERYTHING, THAT I COULDN'T

18  DO NOTHING, THAT THE BACKGROUND COMPANY, YOU KNOW, THAT I WOULD

19  HAVE TO TAKE IT UP WITH THE BACKGROUND COMPANY.

20  Q.   OKAY.  AND WHEN YOU'RE TALKING ABOUT THE BACKGROUND

21  COMPANY, YOU'RE TALKING ABOUT THE DEFENDANT HERE?

22  A.   YES.

23  Q.   NOW, YOU JUST SAID THAT YOU CALLED THE BACKGROUND COMPANY

24  MEANING THE DEFENDANT; IS THAT CORRECT?

25  A.   YES.

1  Q.   WHAT DID YOU DO?

2  A.   I CALLED AND THE FIRST TIME I RECEIVED A VOICEMAIL.  I

3  CALLED A SECOND TIME AND NO ONE ANSWERED.  THEN I CALLED A

4  THIRD TIME, AND I ACTUALLY TALKED TO SOMEBODY.  I TALKED TO A

5  REPRESENTATIVE.

6  Q.   OKAY.  NOW, WE'RE GOING TO GET TO THAT CALL IN A MINUTE,

7  BUT IN ADDITION TO MAKING A PHONE CALL DID YOU DO ANYTHING ELSE

8  WITH RESPECT TO COMMUNICATING WITH THE DEFENDANT?

9  A.   AFTER TWO, I GOT THE TWO BACKGROUND CHECKS FROM

10  PHILADELPHIA.

11  Q.   DO YOU REMEMBER DOING ANYTHING IN TERMS OF SENDING THEM A

12  LETTER OR A DOCUMENT OR SOMETHING?

13  A.   WELL, YES, AFTER I RECEIVED THE LETTER BACK, I ACTUALLY

14  DID A DISPUTE, AND I SENT THE BACKGROUND CHECKS COMPANY A

15  DISPUTE LETTER BACK.

16  Q.   WHEN YOU SAY SENT, WHAT DO YOU MEAN YOU DID?

17  A.   WELL, I ACTUALLY FAXED IT BACK TO THEN.

18        MR. GORSKI:  OKAY.  AT THIS TIME, YOUR HONOR, I WOULD

19  LIKE TO PLAY THE RECORDING OF THE CALL THAT MR. SMITH JUST

20  IDENTIFIED.  AGAIN IT'S A JOINT EXHIBIT.  MAY I DO SO?

21        THE COURT:  YES.  LET ME INSTRUCT THE JURORS THAT

22  YOU'RE GOING TO HEAR RECORDED CONVERSATIONS, AND THIS IS BEING

23  ADMITTED AS AN EXHIBIT.  SO YOU MAY CONSIDER IT AS YOU WOULD

24  OTHER EVIDENCE AS PRESENTED.

25        JUST IDENTIFY THE EXHIBIT NUMBER, AND THE CONTENT,

1  COUNSEL, WILL NOT BE RECORDED BY THE COURT REPORTER SINCE WE

2  HAVE IT AS AN EXHIBIT.

3          MR. GORSKI:  AND I'LL STATE FOR THE RECORD AND FOR

4  THE ASSISTANCE OF DEFENSE COUNSEL, THE RECORDING THAT IS GOING

5  TO BE PLAYED RIGHT NOW IS THE RECORDING THAT WAS PREVIOUSLY

6  MARKED FOR PURPOSES OF LITIGATION AS BGC-178.

7          MR. ANDRE:  WHICH WILL BE JOINT EXHIBIT 5, YOUR

8  HONOR.

9          (AUDIO RECORDING WAS PLAYED IN OPEN COURT.)

10 BY MR. GORSKI:

11 Q.  OKAY.  NOW, MR. SMITH, DO YOU RECOGNIZE YOUR VOICE ON THAT

12 RECORDING?

13 A.  YES.

14 Q.  IS THIS THE FIRST CALL THAT YOU PLACED TO THE DEFENDANT

15 ABOUT THE ERRONEOUS REPORT?

16 A.  YES.

17 Q.  WHAT WERE YOUR FEELINGS ABOUT THAT CALL?

18 A.  I FELT LIKE THE REPRESENTATIVE THAT WAS ON THE PHONE, THEY

19 KIND OF TOOK IT LIGHT.  I WANTED THEM TO HURRY UP AND GET ONTO

20 IT AND MAKE THINGS HAPPEN, BUT IT FELT LIKE THEY WERE

21 PROCRASTINATING LIKE SHE WAS JUST GOING TO PUT IT TO THE SIDE

22 AND GET TO IT LATER.  I JUST DIDN'T HAVE THE CONFIDENT LIKE

23 THEY WAS GOING TO TAKE CARE OF IT.  SO I JUST KIND OF FELT

24 LIKE, YOU KNOW, THEY REALLY DIDN'T CARE.

25 Q.  HOW DID YOU FEEL ABOUT HER STATEMENT THAT IT MAY TAKE UP

1  TO 30 DAYS?

2  A.   I MEAN 30 DAYS, I JUST DIDN'T UNDERSTAND HOW, YOU KNOW,

3  THEY HAD ALL MY INFORMATION, AND THEY COULD STILL CONFUSE ME,

4  AND 30 DAYS JUST SEEMED LIKE IT WAS TOO LONG.

5  Q.   NOW, DID YOU MAKE ANY OTHER TELEPHONE CALLS TO THE

6  DEFENDANT IN CONNECTION WITH THIS?

7  A.   YES, I CALLED THEM AGAIN.

8  Q.   NOW WHEN YOU SAY YOU CALLED THEM AGAIN, WHEN DID YOU CALL

9  THEM AGAIN?

10  A.   THE SAME DAY.

11          MR. GORSKI:  OKAY.  YOUR HONOR, AT THIS TIME I'D LIKE

12  TO PLAY THE RECORDING THAT'S BEEN MARKED J-6.

13          THE COURT:  YOU MAY.

14          (AUDIO RECORDING WAS PLAYED IN OPEN COURT.)

15  BY MR. GORSKI:

16  Q.   MR. SMITH, DO YOU RECOGNIZE YOUR VOICE ON THAT CALL?

17  A.   YES.

18  Q.   IS THAT THE SECOND CALL THAT YOU MADE TO THE DEFENDANT?

19  A.   YES.

20  Q.   AND THIS WAS A CALL THAT YOU MADE AGAIN ON THE SAME DAY?

21  A.   YES.

22  Q.   NOW, WHY DID YOU CALL AGAIN?

23  A.   BECAUSE I STILL WAS CONFUSED, I WAS BAFFLED ALSO.  I

24  REALLY DIDN'T UNDERSTAND WHAT WAS GOING ON.  SO I DECIDED TO

25  CALL AGAIN, AND WHEN I DID CALL, NOBODY ANSWERED THAT DAY.  I

1 LEFT A VOICEMAIL, SO THEY CALLED ME THE NEXT DAY.

2 Q.   YOU'RE TALKING ABOUT ANOTHER CALL?

3 A.   YES.

4          MR. GORSKI:  YOUR HONOR, AT THIS TIME I'D LIKE TO

5 PLAY THE THIRD RECORDING WHICH HAS BEEN MARKED J-7.

6          THE COURT:  YOU MAY.

7          (AUDIO RECORDING WAS PLAYED IN OPEN COURT.)

8 BY MR. GORSKI:

9 Q.   MR. SMITH, DO YOU RECOGNIZE YOUR VOICE ON THAT CALL?

10 A.   YES.

11 Q.   AND, AGAIN, IS THIS AS YOU RECOLLECT THE THIRD

12 CONVERSATION YOU HAD WITH THE DEFENDANT?

13 A.   YES.

14 Q.   OKAY.  AM I CORRECT TO SUMMARIZE THAT YOU HAD THREE

15 TELEPHONE CALLS WITH THE DEFENDANT IN TWO DAYS OVER THE

16 BACKGROUND CHECK; IS THAT RIGHT?

17 A.   YES.

18 Q.   OKAY.  NOW, WHY DID YOU CALL THREE TIMES?

19 A.   I CALLED THREE TIMES BECAUSE I WAS STARTING TO GET ANGRY.

20 THEY KEPT GIVING ME THE SAME ANSWER.  THEY REALLY COULDN'T GIVE

21 ME A COMPLETE TIMEFRAME WHEN IT WAS GOING TO BE, YOU KNOW, THE

22 FIRST PERSON SAID 30 DAYS.  THE SECOND PERSON SAID ONE TO TWO

23 WEEKS.  THE THIRD PERSON SAID MAYBE A COUPLE OF DAYS.

24          I REALLY DIDN'T KNOW WHAT THE REAL ANSWER WAS, SO I

25 WAS CONFUSED AGAIN, AND I WAS JUST GETTING VERY HIGHLY UPSET.

1   I REALLY DIDN'T KNOW WHAT ELSE TO DO AFTER THAT, BECAUSE THESE

2   GUYS HAVE THE POWER TO, YOU KNOW, FOR ME TO GET HIRED OR NOT.

3   THIS IS MY FIRST TRUCKING JOB, AND I REALLY WANTED IT.

4           SO I JUST WANTED SOME ANSWERS ON WHY THEY ACTUALLY

5   JUST COULDN'T PUT MY SOCIAL SECURITY NUMBER WITH THE

6   INFORMATION THAT THEY HAD, AND I REALLY DIDN'T UNDERSTAND WHY

7   IT COULD HAVE JUST TOOK THEM LIKE ONE OR TWO DAYS.

8   Q.   OKAY.  NOW, MR. SMITH, YOU SAID THAT YOU WERE GETTING

9   UPSET?

10  A.   YES.

11  Q.   CAN YOU DESCRIBE WHAT EFFECTS THIS WAS HAVING ON YOU AT

12  THIS POINT?

13  A.   WELL, IT WAS JUST TO THE POINT TO WHERE MY FAMILY WAS --

14  MY FAMILY WAS DISAPPOINTED, YOU KNOW, MY MOM, DAD, MY WIFE,

15  EVERYBODY WAS DISAPPOINTED, YOU KNOW, I THOUGHT I HAD A JOB,

16  THEN I DIDN'T HAVE A JOB, AND, YOU KNOW, I WORK OUT ON A DAILY

17  BASIS.  I WASN'T WORKING OUT.  I REALLY DIDN'T HAVE AN APPETITE

18  UNTIL I CAN GET THIS STUFF RESOLVED.  IT JUST WORE ME DOWN.  IT

19  WORE ME DOWN.

20  Q.   OKAY.  NOW, AT SOME POINT LATER, YOU DID GET A JOB WITH

21  DART?

22  A.   YES.

23  Q.   COULD YOU ESTIMATE HOW LONG IT WAS BETWEEN THE TIME THAT

24  YOU RECEIVED THAT INITIAL PHONE CALL FROM THE RECRUITER TELLING

25  YOU ABOUT THE REPORT TO WHEN YOU CAN ESTIMATE THAT YOU STARTED

1  WORKING WITH DART?

2  A.    THE TIMEFRAME?

3  Q.    YEAH, ABOUT HOW LONG WAS THAT TIME PERIOD?

4  A.    IT SEEMED LIKE TWO WEEKS OR A WEEK.

5  Q.    OKAY.  AND GIVE US AN IDEA OF HOW MUCH ATTENTION YOU WERE

6  GIVING TO THIS PROBLEM WHILE WE WERE IN THAT TIME PERIOD THAT

7  YOU JUST ESTIMATED?

8  A.    I GAVE IT ATTENTION EVERY DAY I COULD HAVE, EVERY MINUTE,

9  EVERY HOUR, I WAS CALLING COURTS, CALLING PHILADELPHIA, CALLING

10 GEORGIA COURTS, COMING TO THE COURTS, MEETING WITH CLERKS IN

11 GEORGIA, CHECKING EMAILS, CHECKING FAXES.  THIS WAS ON A DAILY

12 BASIS I WAS DOING SOMETHING TO TRY TO GET THIS RESOLVED.

13 Q.    OKAY.  NOW, LOOKING AT THAT TIME PERIOD AGAIN, CAN YOU

14 GIVE US A DESCRIPTION OF WHAT AFFECT THIS HAD ON YOUR DAILY

15 HABITS?

16 A.    A LOT OF MY DAILY HABITS WAS ON HOLD.  I WASN'T MAKING NO

17 MONEY.  REALLY COULDN'T DO TOO MUCH.  WASN'T WORKING OUT.  THE

18 LOSS OF APPETITE.  I JUST HAD A LOT OF STUFF GOING ON.  I

19 COULDN'T REALLY DO DAILY THINGS UNTIL I GOT THIS ISSUE

20 RESOLVED.

21 Q.    WHAT KIND OF AFFECT DID IT HAVE ON YOUR FAMILY LIFE?

22 A.    THEY WAS UPSET.  I MEAN I KIND OF WAS DISTANT FROM THEM.

23 I KIND OF HAD AN ATTITUDE, YOU KNOW, BECAUSE I WANTED THIS

24 STUFF TO HAPPEN SO BAD, AND, YOU KNOW, I KIND OF DID THEM

25 WRONG, YOU KNOW, BECAUSE I WAS JUST TRYING TO GET THIS OVER MY

1  HEAD.  SO MY FAMILY KIND OF HAD AN EFFECT ON IT ALSO.

2  Q.  OKAY.  AND CAN YOU TELL ME WHETHER OR NOT THE PROCESS IN

3  YOUR RECOLLECTION CAUSED YOU ANY EMBARRASSMENT OR HUMILIATION?

4  A.  YEAH, I WAS VERY EMBARRASSED TELLING SO MANY PEOPLE THAT I

5  HAD A JOB LINED UP, AND THEY WOULD SEE ME, YOU KNOW, AT HOME,

6  THEY WOULD SAY HEY, I THOUGHT YOU HAD A JOB.  WELL, YOU KNOW,

7  SOME STUFF HAPPENED, AND, YOU KNOW, SO I FELT VERY EMBARRASSED

8  ABOUT WHAT WAS GOING ON.  A LOT OF PEOPLE THOUGHT I LIED, YOU

9  KNOW.

10  Q.  OKAY.  DO YOU HAVE A RECOLLECTION OF EVER RECEIVING AN

11  APOLOGY FROM THE DEFENDANT?

12  A.  I RECEIVED AN APOLOGY -- WELL, ACTUALLY I GOT A CALL FROM

13  DART, THE COMPANY DART, THE RECRUITER PEGGY O'NEILL, SHE

14  ACTUALLY CALLED ME AND JUST TOLD ME THAT SHE WAS SORRY FOR

15  EVERYTHING, YOU KNOW, THAT SHE SAID EVERYTHING THAT HAD EXPIRED

16  AND EVERYTHING, AND, YOU KNOW, THAT WAS OKAY, I ACCEPTED HER

17  APOLOGY AND, YOU KNOW, SHE TOLD ME CONGRATULATIONS, EVERYTHING

18  WENT THROUGH, AND I ENDED UP GETTING THE JOB, BUT AS FAR AS THE

19  BACKGROUND COMPANY, I NEVER -- DIDN'T RECEIVE NOTHING.  I

20  DIDN'T RECEIVE A THANK YOU OR A SORRY FOR PUTTING YOU THROUGH

21  THIS OR A COURTESY CALL OR NOTHING.  I DIDN'T RECEIVE ANYTHING

22  FROM THEM.

23       MR. GORSKI:  I HAVE NO MORE QUESTIONS.

24       THE COURT:  MR. ANDRE, YOU MAY CROSS-EXAMINE.

25       MR. ANDRE:  MAY I HAVE JUST A MOMENT FOR THE

1  TECHNOLOGY SWITCHOVER?

2          THE COURT:  ALL RIGHT.

3          (PAUSE IN THE PROCEEDINGS.)

4                  CROSS-EXAMINATION

5  BY MR. ANDRE:

6  Q.   GOOD AFTERNOON, MR. SMITH.

7  A.   GOOD AFTERNOON.

8  Q.   WE'VE MET BEFORE, RIGHT?

9  A.   YES, A COUPLE OF MONTHS AGO.

10  Q.   I TOOK YOUR DEPOSITION IN THIS CASE; DO YOU REMEMBER THAT?

11  A.   YES.

12          THE COURT:  MR. SMITH, WILL YOU PULL THAT MICROPHONE

13  CLOSE TO YOU.  JUST BE SURE TO SPEAK UP SO WE CAN ALL HEAR YOU.

14  THANK YOU, SIR.

15  BY MR. ANDRE:

16  Q.   MR. SMITH, YOUR FULL FIRST NAME IS JUST TONY, RIGHT?

17  A.   YOUR FIRST NAME IS ANTHONY?

18  A.   NO.

19  Q.   WHAT IS YOUR FULL FIRST NAME?

20  A.   TONY WILLIE SMITH.

21  Q.   YOUR FIRST NAME IS JUST TONY, CORRECT?

22  A.   MY FIRST NAME IS TONY, YES.

23  Q.   NOT ANTHONY?

24  A.   NO.

25  Q.   YOUR DAD'S NAME IS ALSO TONY SMITH?

1  A.    CORRECT.

2  Q.    BUT YOUR DAD DOESN'T HAVE A MIDDLE NAME?

3  A.    NO.

4  Q.    SO HIS PERSONAL RECORDS LIKE HIS BANK RECORDS, HIS PUBLIC

5  RECORDS, THOSE WOULD JUST SAY TONY SMITH?

6  A.    I HAVE NO IDEA.

7  Q.    AND YOU'RE ACTUALLY TONY SMITH, JR., RIGHT?

8  A.    YES.

9  Q.    AND YOU DON'T ALWAYS GO BY TONY SMITH, JR., THOUGH?

10  A.    NO, I HAVE TO PUT MY MIDDLE NAME THAT WAY I DON'T GET

11  CONFUSED.  I MEAN I ALWAYS PUT MY MIDDLE NAME.

12  Q.    BUT SOMETIMES YOU PUT JUNIOR SOMETIMES YOU DON'T PUT

13  JUNIOR?

14  A.    MOST OF THE TIMES I PUT JUNIOR.  IT'S USUALLY THREE

15  SLASHES ACROSS.  I DON'T PUT THE J-R.

16  Q.    SO YOU'RE REALLY TONY SMITH, III?

17  A.    YES, TONY WILLIE SMITH, III.

18  Q.    BUT YOU DON'T ALWAYS GO BY THE THIRD EITHER?

19  A.    YES, I DO.

20  Q.    DID YOU PUT THE THIRD ON YOUR REPORT TO DART, YOUR

21  APPLICATION TO DART?

22  A.    I'M NOT SURE.

23           MR. GORSKI:  OBJECT.

24           THE COURT:  OVERRULED.

25  BY MR. ANDRE:

1 Q.   MR. SMITH, YOU APPLIED TO DART'S TRAINING PROGRAM IN EARLY

2 SEPTEMBER 2012, CORRECT?

3 A.   I DON'T KNOW IF IT WAS EARLY, BUT I DO REMEMBER IT WAS

4 SEPTEMBER 2012.

5 Q.   AND YOU WERE TELLING MR. GORSKI YOU DIDN'T HAVE A JOB AT

6 THE TIME?

7 A.   CORRECT.

8 Q.   SO YOU DIDN'T LEAVE ANOTHER OPPORTUNITY TO GO WORK FOR

9 DART?

10 A.   NO.

11 Q.   AND YOU FILLED OUT A WRITTEN APPLICATION FOR DART?

12 A.   YES.

13 Q.   YOU FILLED THAT OUT ON SEPTEMBER 11TH, 2012?

14 A.   I'M NOT SURE.

15        MR. ANDRE:  YOUR HONOR, MAY I APPROACH?

16        THE COURT:  YOU MAY.

17 BY MR. ANDRE:

18 Q.   MR. SMITH, I'VE HANDED YOU A DOCUMENT THAT'S BEEN MARKED

19 AS DEFENDANT'S EXHIBIT 10.  I REALIZE IT'S A LITTLE HARD TO

20 READ, BUT CAN YOU TELL WHAT THIS DOCUMENT IS?

21 A.   IT LOOKS LIKE A DART CERTIFICATION APPLICATION.  IT SAYS

22 DART CERTIFICATION QUESTIONNAIRE.

23 Q.   DO YOU RECOGNIZE YOUR HANDWRITING ON THIS DOCUMENT?

24 A.   YES.

25        MR. ANDRE:  YOUR HONOR, WE WOULD MOVE FOR THE

1   ADMISSION OF DEFENDANT'S EXHIBIT 10, MR. SMITH'S APPLICATION.

2           MR. GORSKI:  YOUR HONOR, WE OBJECT.  COULD WE MEET AT

3   SIDEBAR?

4           THE COURT:  YES, YOU MAY.

5           (AT THE BENCH)

6           MR. GORSKI:  I OBJECTED TO THIS EXHIBIT AT THE OUTSET

7   BECAUSE THERE WAS AN IRRELEVANT PURPOSE FOR THE DOCUMENT, AND

8   WE HAD IT AT THE FINAL PRETRIAL CONFERENCE, AND MR. ANDRE SAID

9   HE DOESN'T THINK --

10          THE COURT:  YES, THAT'S WHAT I THOUGHT, TOO.

11          MR. GORSKI:  AGAIN I FEEL LIKE WE DESERVE KIND OF A

12  PROFFER AT THIS POINT --

13          MR. ANDRE:  FOR EXHIBITS FOR MR. SMITH, I INTEND TO

14  SHOW HIM WHAT THE DOCUMENT IS SO HE CAN LOOK THROUGH IT SO WE

15  CAN CONFIRM THAT IT DOES SAY THE THINGS THAT HE DOESN'T RECALL.

16  HE SAYS I DON'T REMEMBER WHAT I PUT ON IT, I DON'T REMEMBER THE

17  DATE I DID IT.

18          THE COURT:  WHAT'S THE RELEVANCE OF HIM GOING THROUGH

19  THIS?

20          MR. ANDRE:  FOR THE TIMELINE.

21          THE COURT:  I AGREE TIMELINE IS IMPORTANT.  CAN YOU

22  SHOW IT TO HIM AND SEE IF IT REFRESHES HIS RECOLLECTION.  I

23  DON'T KNOW THAT THE CONTENT IS RELEVANT, BUT CERTAINLY THE

24  TIMEFRAME IS.

25          MR. ANDRE:  SURE.

1            (IN OPEN COURT.)

2   BY MR. ANDRE:

3   Q.   MR. SMITH, I ASKED YOU A MOMENT AGO IF YOU APPLIED TO DART

4   AND FILLED OUT A WRITTEN APPLICATION ON SEPTEMBER 11TH, AND YOU

5   SAID YOU DIDN'T RECALL.  DO YOU REMEMBER THAT TESTIMONY?

6   A.   A FEW SECONDS AGO?

7   Q.   YES.

8   A.   YES.

9   Q.   IF YOU REVIEW THE DOCUMENT THAT I'VE PLACED IN FRONT OF

10  YOU AS DEFENDANT'S EXHIBIT 10, DOES THIS REFRESH YOUR

11  RECOLLECTION ABOUT WHETHER YOU FILLED OUT AN APPLICATION ON THE

12  11TH?

13  A.   YES.

14  Q.   AND, MR. SMITH, WHEN YOU FILLED OUT YOUR WRITTEN

15  APPLICATION TO DART, YOU DIDN'T WRITE TONY WILLIE SMITH, III?

16  A.   NO, I DIDN'T.

17  Q.   YOU JUST WROTE TONY WILLIE SMITH?

18  A.   CORRECT.

19  Q.   AND YOU DIDN'T WRITE TONY WILLIE SMITH, JR.?

20  A.   NO.

21  Q.   AND THE INFORMATION THAT YOU FILLED OUT ON THE APPLICATION

22  FOR DART, THAT'S THE INFORMATION THAT DART WOULD HAVE TO USE TO

23  RUN A BACKGROUND CHECK ABOUT YOU?

24  A.   CORRECT.

25            MR. GORSKI:  OBJECTION, IT CALLS FOR SPECULATION.

1            THE COURT:  OVERRULED.

2  BY MR. ANDRE:

3  Q.   MR. SMITH, YOU SPOKE WITH PEGGY O'NEILL AT DART AS THE

4  RECRUITER, CORRECT?

5  A.   YES.

6  Q.   BUT DIDN'T MEET MS. O'NEILL AS YOU WERE GOING THROUGH THIS

7  PROCESS?

8  A.   NO, WE ALWAYS CONVERSATED OVER THE PHONE.

9  Q.   YOU DIDN'T SEE HER FACE TO FACE?

10  A.   NO.

11  Q.   SHE DIDN'T KNOW WHAT YOU LOOKED LIKE?

12  A.   NO.

13  Q.   AND ON THE APPLICATION YOU FILLED OUT FOR DART, YOU DIDN'T

14  INDICATE YOUR RACE ANYWHERE?

15  A.   I DON'T KNOW.  IS THERE A SECTION FOR IT BECAUSE IT'S KIND

16  OF BLURRED, THE APPLICATION IS?

17  Q.   MR. SMITH, DO YOU RECALL WRITING YOUR RACE ANYWHERE ON THE

18  APPLICATION?

19  A.   NO, BUT I DID ALSO SUBMIT A DRIVER'S LICENSE.

20  Q.   AND YOU AGREE THAT DART RAN A BACKGROUND CHECK ABOUT YOU?

21  A.   YES.

22  Q.   AND AT THE TIME YOU FILLED OUT YOUR APPLICATION, YOU KNEW

23  YOU DIDN'T HAVE A JOB YET?

24  A.   CORRECT.

25  Q.   AND DART DID RUN A BACKGROUND CHECK ABOUT YOU?

1  A.  YES.

2  Q.  AND THE RECRUITER FROM DART, YOU SAID, CALLED AND TOLD YOU

3  YOU COULDN'T START BECAUSE OF THAT BACKGROUND CHECK?

4  A.  RIGHT.

5  Q.  YOU TOLD HER I DON'T HAVE ANY CRIMINAL HISTORY?

6  A.  SAY AGAIN?

7  Q.  AND YOU TOLD HER BUT I DON'T HAVE A CRIMINAL HISTORY?

8  A.  RIGHT.

9  Q.  AND SHE TOLD YOU IF YOU CAN GET THE REPORT CORRECTED

10  THEY'D CONTINUE TO CONSIDER YOU?

11  A.  SHE TOLD ME THAT IF THE BACKGROUND COMPANY CAN GET IT

12  CORRECTED, THEN THEY WILL CONSIDER HIRING HE, NOT ME MYSELF.

13  BECAUSE SHE BASICALLY TOLD ME THAT THERE'S NOTHING I CAN DO TO

14  CORRECT IT ON MY OWN.

15  Q.  MR. SMITH, BGC SENT YOU A LETTER TELLING YOU THAT IT HAD

16  PREPARED A REPORT FOR DART, CORRECT?

17  A.  YES.

18  Q.  AND YOU RECEIVED THAT LETTER?

19  A.  YES.

20  Q.  AT YOUR HOME HERE IN POWDER SPRINGS?

21  A.  YES.

22  Q.  AND THAT LETTER INCLUDED A COPY OF THE REPORT?

23  A.  CORRECT.

24  Q.  AND IT WAS AFTER YOU GOT THAT LETTER IN THE MAIL THAT YOU

25  CALLED BGC TO DISPUTE?

1  A.  YES, ACTUALLY, YES, I DID, YEAH, I CALLED.

2  Q.  AND THOSE CALLS WE LISTENED TO A MOMENT AGO, THE FIRST ONE

3  THAT WAS MONDAY MORNING, SEPTEMBER 17TH, 2012, CORRECT?

4  A.  I'M NOT SURE IF THAT WAS A MONDAY OR THE CORRECT DAY, BUT

5  I DO KNOW THAT I DID MAKE THREE PHONE CALLS.

6  Q.  YOU'D AGREE THAT DART CORRECTED YOUR REPORT?

7          MR. GORSKI:  OBJECTION, YOUR HONOR, NO FOUNDATION FOR

8  THAT.

9          MR. ANDRE:  I'M SORRY, I MEANT TO SAY BGC.

10          THE COURT:  POSE THE QUESTION TO HIM AGAIN.  THE

11  OBJECTION IS SUSTAINED AS PHRASED.

12  BY MR. ANDRE:

13  Q.  MR. SMITH, YOU ULTIMATELY DISPUTED YOUR REPORT WITH BGC?

14  A.  YES, I CALLED THEM AND TOLD THEM THERE WAS SOMETHING GOING

15  ON WITH IT.

16  Q.  AND YOU RECEIVED A LETTER FROM BGC TELLING YOU THAT THEY

17  HAD FIXED THE REPORT?

18  A.  THE SAME DAY OR WHEN?

19  Q.  SUBSEQUENTLY?

20  A.  THAT WAS AFTER I MADE THE PHONE CALL AND I WAITED?

21  Q.  YOU SUBSEQUENTLY RECEIVED A LETTER FROM BGC THAT TOLD YOU?

22  A.  LATER ON, LATER ON?

23  Q.  YES.

24  A.  YES.

25  Q.  AND AS A RESULT OF THAT, YOU KNOW THAT ULTIMATELY THERE

1  WAS A CLEAN REPORT ABOUT YOU PREPARED BY BGC?

2  A.   YES.

3  Q.   AND THAT CLEAN REPORT IS DATED SEPTEMBER 19TH, 2012,

4  CORRECT?

5  A.   I'M NOT SURE.  IF YOU HAVE THE PAPERWORK, THEN I COULD SAY

6  YES.

7            MR. ANDRE:  SURE.  MAY I APPROACH, YOUR HONOR?

8            THE COURT:  YOU MAY.

9  BY MR. ANDRE:

10  Q.   MR. SMITH, DO YOU RECOGNIZE THIS DOCUMENT?

11  A.   YES.

12  Q.   WHAT IS IT?

13  A.   IT SAYS THE FOLLOWING IS A DISPUTE -- IT'S A DISPUTE OF

14  THE BACKGROUND -- IT'S A DISPUTE BACKGROUND INVESTIGATION.

15  Q.   IF YOU TURN TO THE PAGE AT THE BOTTOM RIGHT THAT'S MARKED

16  BGC00016; DO YOU SEE THAT?

17  A.   16?

18  Q.   YES, SIR.

19  A.   YEAH, I SEE IT.

20  Q.   DO YOU RECOGNIZE WHAT THIS DOCUMENT IS?

21  A.   IT'S REPORT -- IS IT A BACKGROUND CHECK?  THAT'S WHAT IT

22  IS.

23  Q.   THIS IS THE SECOND REPORT THAT BGC PREPARED ABOUT YOU,

24  RIGHT?

25  A.   OKAY.  YES.

1   Q.   YOU DID RECEIVE THIS IN THE MAIL FROM BGC?

2   A.   I'M NOT SURE IF I DID RECEIVE THIS.

3   Q.   IF YOU TURN BACK TO THE VERY FIRST PAGE OF THIS EXHIBIT,

4   MR. SMITH, YOU SEE YOUR NAME AND ADDRESS THERE?

5   A.   YES, IT ALL CAME TOGETHER LIKE THIS.

6   Q.   YOU RECEIVED IT AS ONE PACKAGE, YES?

7   A.   OKAY.

8   Q.   I'M ASKING DO YOU REMEMBER RECEIVING IT AS ONE PACKAGE?

9   A.   I'M NOT SURE, BUT IF THIS SAYS IT IS, THEN I DID.

10  Q.   MR. SMITH, I WANT TO BACK UP TO THE TELEPHONE CALLS THAT

11  WE LISTENED TO A FEW MINUTES AGO.  YOU HAD THE REPORT IN YOUR

12  HAND WHEN YOU CALLED BGC TO MAKE THAT DISPUTE?

13  A.   YES.

14  Q.   AND THE PEOPLE AT BGC TOOK DOWN YOUR INFORMATION AND SAID

15  THEY'D START A DISPUTE?

16  A.   YES.

17  Q.   THEY WEREN'T RUDE TO YOU, YES?

18  A.   NO, SHE WASN'T RUDE.

19  Q.   THEY DIDN'T CALL YOU A LIAR, FOR EXAMPLE?

20  A.   NO.

21  Q.   AND THEY TOLD YOU WE HAVE 30 DAYS, BUT IT USUALLY TAKES

22  LESS?

23  A.   THAT WAS AFTER THE SECOND PHONE CALL.

24  Q.   YOU DON'T RECALL THAT IN THE FIRST PHONE CALL?

25  A.   SHE SAID UP TO 30 DAYS.

1  Q.   MR. SMITH, WOULD IT BE HELPFUL IF I PLAYED THAT CALL FOR

2  YOU AGAIN?

3  A.   YES.

4           MR. ANDRE:  CAN WE PLAY J-5?

5           THE COURT:  CAN YOU GET TO THE RELEVANT PORTION OF IT

6  RATHER THAN LISTENING TO IT IN ITS ENTIRETY?

7           MR. ANDRE:  YOUR HONOR, I'M NOT SURE OF THE BEST WAY

8  TO SEEK.  IT'S WITHIN THE FIRST TWO MINUTES, I BELIEVE, THE

9  PORTION I'M LOOKING FOR.  WHEN WE GET THERE, I WILL STOP THE

10  RECORDING.

11          THE COURT:  ALL RIGHT.

12          MR. GORSKI:  YOUR HONOR, MY RECOLLECTION SERVES ME

13  THAT THE DISCUSSION ABOUT TIME OCCURS MULTIPLE TIMES IN THIS

14  CALL, AND I GUESS MY SENSE WOULD BE THAT IF COUNSEL WANTS TO

15  PLAY IT AGAIN, HE OUGHT TO PLAY THE WHOLE THING, OR IT

16  SHOULDN'T BE PLAYED AT ALL.  TO JUST STOP AT SOME POINT IN TIME

17  I THINK --

18          THE COURT:  WE'VE HEARD THE ENTIRE -- IF THERE'S SOME

19  POINT THAT HE WANTS TO BRING OUT SPECIFICALLY.  IF YOU WANT TO

20  STIPULATE TO THE CONTENT OF IT, THAT'S FINE, TOO.  HE'S ASKED A

21  QUESTION ABOUT WHETHER SMITH RECALLED SOMETHING IN THE

22  CONVERSATION.  I'M GOING TO ALLOW HIM TO PLAY THAT ONE PIECE OF

23  IT.  I DON'T THINK THE JURY NEEDS TO HEAR THE ENTIRE

24  CONVERSATION AGAIN.  THEY WILL HAVE IT AS AN EXHIBIT IF THEY

25  WANT TO LISTEN TO IT AGAIN.

1          MR. GORSKI:  I GUESS MY UNDERSTANDING WAS HE'S GOING

2    TO PLAY IT UNTIL HE HEARS IT.

3          THE COURT:  HE SAID IT'S IN THE FIRST TWO MINUTES.

4          MR. ANDRE:  I DON'T HAVE A WAY TO SEEK TO IT.  I

5    DON'T HAVE A TRANSCRIPT TO ALLOW ME TO GO TO ONE MINUTE AND TEN

6    SECONDS IF THAT'S WHERE I NEED TO GO WHICH IS WHY I INTEND TO

7    PRESENT IT THE WAY I DID.

8          MR. GORSKI:  I GUESS MY SENSE IS THAT IF WE'RE NOT

9    ACTUALLY JUST GOING TO LISTEN TO THE SPECIFIC PART HE'S

10   REFERRING TO AND HE'S GOING TO PLAY IT FROM THE BEGINNING UNTIL

11   SOME POINT IN TIME, I THINK, YOU KNOW, IF THE JURY IS GOING TO

12   HEAR PART OF IT, THEY SHOULD BE ALLOWED TO HEAR ALL OF IT.

13         THE COURT:  THEY HAVE HEARD IT ALL.  I'M GOING TO

14   ALLOW HIM TO PLAY A PART IF HE CAN GET TO IT WITHIN TWO

15   MINUTES.  THAT'S WHAT I'VE GIVEN HIM.  HE SAID IT'S ON THE

16   FIRST TWO MINUTES.  IF IT'S NOT THERE, WE'LL CONCLUDE AND MOVE

17   ON.

18         MR. GORSKI:  THANK YOU, YOUR HONOR.

19         (AUDIO RECORDING WAS PLAYED IN OPEN COURT.)

20   BY MR. ANDRE:

21   Q.   SO IN THIS FIRST CALL SHE TOLD YOU IT WOULD LIKELY BE

22   TAKEN CARE IN TWO WEEKS?

23   A.   YEAH, PROBABLY IN THE NEXT TWO WEEKS.

24   Q.   AND SHE ALSO TOLD YOU THAT THEY WOULD IMMEDIATELY NOTIFY

25   DART THAT YOU HAD DISPUTED?

1   A.   YES.

2   Q.   AND AT THE TIME YOU CALLED BGC THE FIRST TIME, YOU HADN'T

3   CALLED THE COURT IN PHILADELPHIA YET?

4   A.   WELL, WHEN I ACTUALLY GOT THE REPORT BACK, THAT'S -- NO, I

5   DID CALL THE COURTS.   I DID CALL THE COURTS.

6   Q.   BUT YOU ASKED THE BGC OPERATOR LATER IN THAT CALL, IF

7   YOU'LL REMEMBER, YOU SAID IS IT POSSIBLE FOR ME TO CALL THE

8   PENNSYLVANIA COURT?

9   A.   OKAY.   YEAH, YOU'RE RIGHT.

10  Q.   SO YOU HADN'T CALLED THEM YET?

11  A.   NO, I DIDN'T CALL THEM YET.   WHEN I GOT THE DISPUTE

12  LETTER, THAT'S WHEN I CALLED THAT DAY, AND I CONTINUED TO CALL

13  EVERY DAY.   I CONTINUED TO CALL THE SAME TIME THAT DAY, BECAUSE

14  THAT'S WHEN I ACTUALLY CALLED PHILADELPHIA AND GOT THE

15  BACKGROUND CHECK AND EVERYTHING.

16  Q.   AND IN BOTH OF THE SUBSEQUENT CALLS WITH BGC THAT WE

17  LISTENED TO, BOTH OF THOSE OPERATORS TOLD YOU THAT THEY WOULD

18  LIKE TO FIX THIS IN LESS THAN 30 DAYS?

19  A.   YEAH, ONE OF THEM SAID TWO WEEKS.   THE OTHER ONE SAID

20  MAYBE IN A COUPLE OF DAYS.

21  Q.   AND BGC FIXED THIS IN TWO DAYS?

22  A.   I'M NOT SURE WHEN THEY ACTUALLY -- I DON'T THINK IT WAS IN

23  TWO DAYS.

24  Q.   WELL, YOU'LL RECALL I SHOWED YOU A LETTER AT DEFENDANT'S

25  EXHIBIT 6.   IF YOU LOOK AT THE DATE AT THE TOP OF THAT, DOES

1  THAT REFRESH YOUR RECOLLECTION ABOUT WHEN BGC FIXED THIS

2  REPORT?

3  A.   WHEN?

4  Q.   THE DATE AT THE TOP OF DEFENDANT'S EXHIBIT 6?

5  A.   THAT'S 09-19.

6  Q.   DOES THAT HELP REFRESH YOUR RECOLLECTION?

7  A.   YEAH, THIS ONE THEY FIXED IT.

8  Q.   ON THE 19TH OF SEPTEMBER?

9  A.   YES.

10  Q.   AND THE ORIGINAL REPORT WAS ON SEPTEMBER 12TH?

11  A.   THAT'S NOT TWO DAYS.

12  Q.   RIGHT, AND YOU CALLED ON MONDAY, SEPTEMBER 17TH?

13  A.   THE COMPANY, I DON'T THINK THE COMPANY WAS OPEN ON THE

14  WEEKENDS, SO I JUST HAVE TO SIT THERE AND WAIT.

15  Q.   RIGHT, I UNDERSTAND.  YOU CALLED ON MONDAY BECAUSE THEY

16  WEREN'T OPEN ON THE WEEKEND?

17  A.   RIGHT.

18  Q.   AND THEY FIXED IT BY WEDNESDAY THE 19TH?

19  A.   I GUESS IF THEY FIXED IT THEN, YES.

20  Q.   MR. SMITH, YOU DIDN'T TALK TO ANY OF YOUR FRIENDS ABOUT

21  HOW UPSET YOU WERE ABOUT WHAT BGC HAD DONE?

22  A.   WELL JUST MY FAMILY.

23  Q.   BUT YOU REALLY ONLY TALKED TO YOUR FIANCE?

24  A.   WELL, YES -- WELL AT THE TIME I WAS STAYING WITH MY

25  MOTHER-IN-LAW AND FATHER-IN-LAW.

1  Q.    YOU DIDN'T DISCUSS IT WITH THEM?

2  A.    WELL, YEAH, I MEAN EVERYBODY KNEW.  THEY ALL KNEW WHAT WAS

3  GOING ON.  WE ALL STAY IN THE SAME HOUSE.

4  Q.    MR. SMITH, YOU RECALL YOU GAVE A DEPOSITION IN THIS CASE?

5  A.    YES.

6  Q.    AND AT THAT DEPOSITION YOU TOOK AN OATH TO TELL THE TRUTH?

7  A.    YES.

8  Q.    AND THAT'S THE SAME OATH YOU TOOK TODAY IN THE COURTROOM?

9  A.    YES.

10  Q.    AND YOU GAVE ME TRUTHFUL ANSWERS AT THAT DEPOSITION?

11  A.    YES.

12  Q.    AND YOU GAVE ME COMPLETE ANSWERS AT THAT DEPOSITION?

13  A.    CORRECT.

14  Q.    AND I ASKED YOU TELL ME AT THE BEGINNING OF THAT

15  DEPOSITION IF YOU DIDN'T UNDERSTAND A QUESTION, AND YOU AGREED

16  TO THAT?

17  A.    YES.

18  Q.    AND I ASKED YOU -- I TOLD YOU THAT IF YOU ANSWER A

19  QUESTION, I WOULD ASSUME YOU UNDERSTOOD IT; DO YOU REMEMBER

20  THAT?

21  A.    YES.

22  Q.    AND I ASKED YOU IF YOU NEED TO CLARIFY ANYTHING?

23  A.    YES.

24  Q.    OKAY.  AND YOU WERE PREPARED FOR THAT DEPOSITION?

25  A.    CORRECT.

1              MR. ANDRE:  MAY I APPROACH, YOUR HONOR?

2              THE COURT:  YOU MAY.

3    BY MR. ANDRE:

4    Q.   MR. SMITH, I'VE HANDED YOU AN ORIGINAL COPY OF THE

5    TRANSCRIPT FROM YOUR DEPOSITION.  DO YOU RECOGNIZE THIS AS THE

6    TESTIMONY YOU GAVE THAT DAY?

7    A.   NO, I DIDN'T GET THIS BOOKLET.  I DIDN'T RECEIVE THIS AT

8    ALL.

9    Q.   YOU'VE NEVER SEEN THIS WRITTEN TESTIMONY?

10   A.   I'VE NEVER SEEN IT IN A BOOKLET LIKE THIS AND GIVEN TO ME

11   AT ONCE LIKE THIS, NO.

12   Q.   YOU SEE ON THE FRONT WHERE IT SAYS DEPOSITION OF TONY W.

13   SMITH, MARIETTA, GEORGIA --

14   A.   YES.

15   Q.   -- MONDAY, DECEMBER 9TH, 2013?

16   A.   YES.

17   Q.   DO YOU RECALL TAKING A DEPOSITION WITH ME IN MARIETTA ON

18   DECEMBER 9TH, 2013?

19   A.   YES.

20   Q.   I'LL REPRESENT TO YOU THAT THIS IS THE ORIGINAL TESTIMONY

21   TRANSCRIPT THAT THE COURT REPORTER WROTE DOWN THAT DAY.  DO YOU

22   HAVE ANY REASON TO BELIEVE THAT IT'S NOT?

23   A.   YEAH, I UNDERSTAND, NO.

24   Q.   MR. SMITH, I'D LIKE YOU TO TURN TO PAGE 83 OF THIS

25   DEPOSITION.  ARE YOU THERE?

1  A.  YEP.

2  Q.  I'M JUST GOING TO READ SOME QUESTIONS AND ANSWERS, AND I'D

3  LIKE YOU TO TELL ME IF THAT'S YOUR TESTIMONY.

4  A.  OKAY.

5  Q.  I'LL BEGIN AT THE BOTTOM OF PAGE 83 ON LINE 24.

6        QUESTION:  DID YOU DISCUSS THAT FEELING WITH ANYBODY

7  BUT YOUR FIANCE?

8        ANSWER:  YEAH, I TALKED TO MY FIANCE ABOUT IT.

9        QUESTION:  ANYBODY ELSE?

10        ANSWER:  NO, NOBODY ELSE.

11        WAS THAT YOUR TESTIMONY THAT DAY?

12  A.  YES.

13  Q.  MR. SMITH, I'D LIKE TO YOU TO TURN TO PAGE 92 OF THIS

14  DEPOSITION TRANSCRIPT.  I'M BEGINNING TO READ AT LINE 12.

15        QUESTION:  NOBODY WANTS TO MEET AT THE COURT.  HAVE

16  YOU REVIEWED -- HAVE YOU TALKED TO ANY OF YOUR FRIENDS ABOUT

17  IT?

18        ANSWER:  NO.

19        QUESTION:  ANY COWORKERS?

20        ANSWER:  WITNESS SHAKES HEAD NEGATIVELY.

21        QUESTION:  FAMILY MEMBERS?

22        ANSWER:  NO.

23        QUESTION:  DO YOU HAVE A FACEBOOK ACCOUNT?

24        ANSWER:  YES.

25        QUESTION:  HAVE YOU EVER --

1          MR. GORSKI:  YOUR HONOR, I OBJECT.  THE FACEBOOK

2     ACCOUNT I DON'T THINK HAS ANY RELEVANCE TO THE POINT HE'S

3     TRYING TO MAKE, YOUR HONOR.

4          THE COURT:  IF YOU'VE GOT A QUESTION, CAN YOU HAND ME

5     UP THE TRANSCRIPT TO LOOK AT IT?

6          MR. ANDRE:  AT THE BOTTOM OF THE PAGE.

7          (AT THE BENCH).

8          THE COURT:  HOW DOES THAT PERTAIN TO THIS IMPEACHMENT

9     LINE THAT YOU'RE ON?

10         MR. ANDRE:  IT'S RELEVANT TO THE QUESTION ABOUT

11    WHETHER HE EVER TOLD ANYBODY ABOUT IT.  I'VE ASKED HAVE YOU

12    DONE A FACE TO FACE, AND THEN I ASKED DID YOU MAKE A FACEBOOK

13    POST FROM WHICH PEOPLE COULD INFER THAT YOU WERE UPSET ABOUT

14    THIS.

15         MR. GORSKI:  YOUR HONOR, THE WAY HE ASKED THE

16    QUESTION IS PREJUDICIAL.  HE MADE SOME PARAPHRASE FOR WHICH

17    THERE'S NO FOUNDATION FOR.  HE SAID I HATE

18    BACKGROUNDCHECKS.COM.  THERE'S NO FOUNDATION FOR THE WAY HE

19    ASKED IT THAT WAY, AND IT'S PREJUDICIAL BECAUSE IT MADE SOME

20    KIND OF INFERENCE THAT MR. SMITH SAID SOMETHING LIKE THAT.

21         THE COURT:  YEAH, I'M GOING TO SUSTAIN THE OBJECTION

22    AS TO THAT PART OF IT.

23         MR. ANDRE:  YOUR HONOR, I INTEND TO CONTINUE READING

24    THE TRANSCRIPT FROM WHERE I SAID OKAY WHICH IS RELEVANT TO THIS

25    LINE OF IMPEACHMENT, SKIPPING OVER THE FACEBOOK QUESTION WHICH

1  I WOULD NOTE THERE WAS NO OBJECTION TO AT THE TIME OF THE

2  DEPOSITION.

3          MR. GORSKI:  AND THAT'S WHERE YOU'RE GOING TO STOP?

4          MR. ANDRE:  NO, I AM GOING TO CONTINUE TO READ FOR

5  ANOTHER TWO LINES, DID YOU TALK TO HER ABOUT IT OFTEN, NO, WE

6  JUST BRIEFLY TALKED ABOUT.

7          MR. GORSKI:  OKAY.  THAT'S ALL RIGHT.

8          THE COURT:  THAT'S PERMITTED.

9          (IN OPEN COURT.)

10         THE COURT:  OBJECTION SUSTAINED.  YOU MAY CONTINUE

11 YOUR QUESTIONING.

12 BY MR. ANDRE:

13 Q.  MR. SMITH, I'M ASKING GOING TO SKIP A COUPLE OF LINES AND

14 I'M NOW READING FROM LINE 24 ON PAGE 92.

15         QUESTION:  OKAY.  SO REALLY JUST YOUR FIANCE, IF

16 ANYONE?

17         ANSWER:  YES.

18         QUESTION:  DO YOU TALK TO HER ABOUT IT OFTEN?

19         ANSWER:  NO, WE JUST BRIEFLY TALKED ABOUT IT.  IT'S

20 BEEN A LONG PROCESS.

21         WAS THAT YOUR TESTIMONY?

22 A.  YES.

23 Q.  SO WHEN YOU SAY THAT YOUR FAMILY KNEW WHAT WAS GOING ON,

24 YOU HADN'T DISCUSSED IT WITH ANY OF THEM?

25 A.  WELL, NO, MY WIFE, AND WE ALL STAYED UNDER THE SAME ROOF

1  AT THAT TIME.  SO I HAVE NO CONTROL OVER WHAT MY FIANCE TELLS

2  ANYBODY ELSE IN THE HOUSE.  I LET HER KNOW, AND SHE TOOK FROM

3  THERE, AND SHE TOLD EVERYBODY ELSE.

4  Q.   YOU SAID EARLIER IN YOUR TESTIMONY THAT YOUR FRIENDS ALL

5  KNEW WHAT WAS GOING ON, BUT YOU DIDN'T TELL ANY OF YOUR FRIENDS

6  ABOUT THIS SITUATION?

7  A.   NO.

8  Q.   AND YOU DIDN'T CALL YOUR PARENTS AND TELL THEM HOW UPSET

9  YOU WERE?

10  A.   NO.

11  Q.   YOU DIDN'T SEE A DOCTOR?

12  A.   NO.

13  Q.   YOU DIDN'T EVEN CONSIDER SEEING A DOCTOR?

14  A.   NO.

15  Q.   YOU DIDN'T TRY TO GET A PRESCRIPTION, FOR EXAMPLE, FOR

16  MEDICINE THAT MIGHT HELP YOU SLEEP?

17  A.   NO.

18  Q.   AND ONCE BGC CORRECTED YOUR REPORT, YOU SAID THIS MORNING

19  THE RECRUITER CALLED YOU AND APOLOGIZED?

20  A.   YES.

21  Q.   SHE SAID IT WOULD BE A PLEASURE TO HAVE YOU WORK FOR DART?

22  A.   CORRECT.

23  Q.   AND DART APPROVED YOUR APPLICATION THE VERY NEXT DAY AFTER

24  BGC FIXED YOUR REPORT, RIGHT?

25  A.   MAYBE A COUPLE OF DAYS AFTER THAT, I GOT A PHONE CALL.

1          MR. ANDRE:  YOUR HONOR, MAY I APPROACH SIDEBAR?

2          THE COURT:  YOU MAY.

3          (AT THE BENCH)

4          MR. ANDRE:  YOUR HONOR, I ASKED THE WITNESS YOU WERE

5    APPROVED BY DART THE VERY NEXT DAY.  HE SAID I DON'T KNOW.

6    THOSE ARE FACTS THAT WERE ADMITTED IN OUR SUMMARY JUDGMENT

7    BRIEFING.  IT'S SEEMS TO ME IF THERE'S A CONCLUSIVE LIST

8    ESTABLISHED, I DON'T UNDERSTAND WHY NOW WE'RE GETTING TESTIMONY

9    THAT VARIES FROM THAT.

10         MR. GORSKI:  SHOW ME WHAT YOU MEAN?

11         MR. ANDRE:  NUMBER 28, TWO DAYS LATER ON SEPTEMBER

12   19TH, 2012 BGC ISSUED A CORRECTED REPORT.  ON SEPTEMBER 20TH,

13   DART APPROVED PLAINTIFF TO BEGIN DART TRAINING PROGRAM WHICH HE

14   BEGAN.  THAT WAS AN ADMITTED FACT IN THE SUMMARY JUDGMENT

15   BRIEF.  WE ATTEMPTED TO MAKE IT A STIPULATION, BUT MR. GORSKI

16   DIDN'T AGREE WITH IT.  SO I THINK THE WITNESS SHOULD BE

17   PRECLUDED FROM NOW TESTIFYING IN CONTRADICTION TO ADMITTED AND

18   ESTABLISHED FACTS IN THE RECORD.

19         MR. GORSKI:  I DISAGREE.  I THINK THE WITNESS MADE A

20   FAIR ESTIMATE OF WHAT HIS RECOLLECTIONS WERE WHEN HE STARTED,

21   AND I THINK HE ESTIMATED IT TO BE ABOUT TWO WEEKS.  NOW WE GO

22   FROM THE 12TH TO THE 25TH, THAT'S ABOUT TWO WEEKS, YOUR HONOR.

23         I DON'T THINK THAT HE SHOULD BE PRECLUDED FROM

24   STATING, YOU KNOW, WHAT HIS OWN RECOLLECTIONS WERE.  IF HE

25   DOESN'T RECOLLECT EXACTLY WHAT DAY IT WAS, I MEAN SO BE IT.

1    THERE'S DART RECORDS THAT MAYBE SAY THAT.  IF HIS RECOLLECTION

2    IS IT WAS APPROXIMATELY TWO WEEKS, THAT'S CERTAINLY NOT

3    INCONSISTENT WITH THE TIMEFRAME WE'RE TALKING ABOUT HERE.

4            THE COURT:  MR. ANDRE'S ARGUMENT IS IT'S A FACT THAT

5    WAS ESTABLISHED IN THE CASE; IS THAT YOUR ARGUMENT?

6            MR. ANDRE:  YES, SIR, AN ADMITTED FACT.

7            MR. GORSKI:  WHERE IS IT ADMITTED?

8            (PAUSE IN THE PROCEEDINGS.)

9            MR. GORSKI:  OKAY.  I GUESS THE POINT I'M TRYING TO

10   MAKE, YOUR HONOR, IS THAT ALL HE'S TRYING TO TESTIFY ABOUT IS

11   WHEN HE REMEMBERS GETTING STARTED.  I MEAN HIS RECOLLECTION IS

12   IN LINE WITH THAT.  I MEAN THERE'S NOTHING PREJUDICIAL ABOUT

13   THIS.  I MEAN HE'S SAYING A COUPLE OF WEEKS, AND IF YOU'D LIKE

14   TO MAKE SOME KIND OF INSTRUCTION ON THAT, IT'S OVERLY

15   PREJUDICIAL TO MY CLIENT.  HIS ESTIMATION IS NOT OUT OF LINE.

16   WHAT HE MENTIONED HERE IS PART OF A LEGAL DOCUMENT.  I MEAN OUR

17   CLIENT'S RECOLLECTION --

18           THE COURT:  WELL, MR. ANDRE SAID HE PROPOSED IT AS A

19   STIPULATION.  IT SEEMS LIKE IT COULD BE PART OF A STIPULATION

20   THAT LESSENS THE PREJUDICE YOU'RE CONCERNED ABOUT, BUT HE SAID

21   YOU WEREN'T WILLING TO STIPULATE TO IT.  IT LOOKS TO ME LIKE

22   YOU'VE MADE AN ADMISSION TO THAT EFFECT WITH RESPECT TO SUMMARY

23   JUDGMENT.

24           SO HOW ABOUT WE TAKE IT AT THAT.  YOU ALL HAVEN'T

25   READ A STIPULATION OF FACTS YET TO THE JURY.  WHY DON'T WE

1   INCLUDE THAT AS A STIPULATED FACT?  I MEAN OTHERWISE --

2            MR. GORSKI:  I THINK IT WOULD BE FAIR TO STIPULATE

3   SOMETHING LIKE THAT IF WE COULD SAY SOMETHING ALONG THE LINES

4   THAT IT WAS ON OR ABOUT BECAUSE THE RECORD SAID HE STARTED -- I

5   MEAN HE MAY JUST BE REMEMBERING THE FIRST DAY HE SHOWS UP.

6            THE COURT:  THE ISSUE IS NOT HIS RECOLLECTION.  THE

7   ISSUE NOW PRESENTED TO ME IS WILL YOU STIPULATE TO THAT FACT?

8   I'M PROPOSING A STIPULATION OR AN ADMISSION BASED ON THESE

9   DOCUMENTS HERE.  I THINK THE STIPULATION IS A CLEANER WAY TO DO

10  IT, BUT IF THAT'S NOT WHAT YOU WANT --

11           MR. GORSKI:  I'M OKAY WITH A STIPULATION.

12           THE COURT:  YOU ALL CAN PREPARE THAT WHEN THE

13  STIPULATIONS ARE READ.

14           MR. ANDRE:  THANK YOU, YOUR HONOR.

15           (IN OPEN COURT.)

16  BY MR. ANDRE:

17  Q.   MR. SMITH, I'D LIKE TO GO BACK TO DEFENDANT'S EXHIBIT 6

18  FOR A MOMENT WHICH I PLACED IN FRONT OF YOU.  DO YOU HAVE THAT?

19  A.   THIS?

20  Q.   IT'S THE SMALLER DOCUMENT THAT HAS A BLUE STICKER IN THE

21  RIGHT BOTTOM HAND CORNER THAT SAYS D-6?

22  A.   I'VE GOT IT.

23  Q.   AND YOU SAID THIS IS THE LETTER THAT YOU RECEIVED FROM

24  BGC?

25  A.   YES.

1  Q.   AND THAT'S YOUR ADDRESS AT THE TOP?

2  A.   YES.

3         MR. ANDRE:  YOUR HONOR, WE'D MOVE FOR THE ADMISSION

4  OF DEFENDANT'S EXHIBIT 6.

5         THE COURT:  ANY OBJECTION, MR. GORSKI?

6         MR. GORSKI:  NO OBJECTION.

7         THE COURT:  IT IS ADMITTED.

8         MR. ANDRE, WE'VE REACHED 3:30.  HOW MUCH LONGER DO

9  YOU ANTICIPATE YOU NEED ON CROSS-EXAMINATION?

10        MR. ANDRE:  NOT TERRIBLY LONG, YOUR HONOR, 10, 15

11 MINUTES.

12        THE COURT:  ALL RIGHT.  IF IT'S GOING TO BE THAT

13 LONG, WE'LL GO AHEAD AND TAKE OUR AFTERNOON BREAK AT THIS POINT

14 IN TIME.  WE'LL TAKE A 15-MINUTE RECESS.

15        LADIES AND GENTLEMEN, LET ME REMIND YOU THAT YOU'VE

16 ALREADY HEARD SOME TESTIMONY IN THE CASE, BUT YOU'RE NOT TO

17 BEGIN DISCUSSING THE CASE AMONG YOURSELVES OR WITH ANYONE ELSE,

18 ANY OF THE PARTIES, THE ATTORNEYS, ANYONE ASSOCIATED WITH THE

19 CASE.  YOU'RE EXCUSED FOR 15 MINUTES.  WE'LL BE IN RECESS.

20        (JURY RETIRED)

21        THE COURT:  BEFORE WE BREAK FOR THIS 15-MINUTE BREAK,

22 I JUST WANT TO FIND OUT ABOUT THE REST OF THE AFTERNOON

23 SCHEDULE.  YOU'VE GOT ABOUT ANOTHER 15 MINUTES.  SO WHEN WE

24 COME BACK, IT LOOKS LIKE YOU'LL BE WRAPPING UP YOUR CROSS ABOUT

25 FOUR O'CLOCK OR SO.  I'M NOT GOING TO HOLD YOU FIRMLY TO THAT,

1    BUT JUST YOUR ESTIMATE.

2              MR. GORSKI, ARE YOU GOING TO HAVE ANY REDIRECT?

3              MR. GORSKI:  MY REDIRECT IS PROBABLY -- WELL, I DON'T

4    KNOW WHAT HE'S GOING TO ASK IN THE NEXT 15 MINUTES, BUT

5    ASSUMING THERE ISN'T SOMETHING THAT'S GOING TO REQUIRE MORE

6    TIME, I WOULD SAY UNDER TEN MINUTES.

7              THE COURT:  OKAY.  SO LET'S SAY WE GET TO 4:15 AT

8    THAT TIME, WHAT'S YOUR NEXT EVIDENCE TO PRESENT?

9              MR. GORSKI:  WELL, YOUR HONOR, WE HAVE TWO THINGS

10   LEFT.  ONE WOULD BE THE STIPULATIONS OF THE PARTIES --

11             THE COURT:  YOU ALL MAY BE SEATED.

12             MR. GORSKI:  ONE WOULD BE THE STIPULATIONS OF THE

13   PARTIES.  I CAN DISCUSS WITH MR. ANDRE WHAT MIGHT BE AN

14   APPROPRIATE STIPULATION REGARDING THAT SUBJECT THAT WE JUST DID

15   MAYBE DURING THIS BREAK.

16             THE COURT:  OKAY.

17             MR. GORSKI:  AND THEN IT WOULD BE THE VIDEO TESTIMONY

18   OF MS. O'NEILL.  MR. ANDRE AND I DISCUSSED THIS SUBJECT, AND

19   GIVEN THAT IT'S A MESH OF DESIGNATIONS BY THE DEFENDANT AND BY

20   THE PLAINTIFF, WE KIND OF THOUGHT WHAT WOULD BE APPROPRIATE IS

21   TO KIND OF TREAT THAT DEPOSITION VIDEOTAPE AS KIND OF A HYBRID

22   OF THE LAST PIECE OF EVIDENCE OF THE PLAINTIFF'S CASE IN CHIEF

23   AND THE FIRST PIECE OF EVIDENCE THE DEFENDANT'S DEFENSE OF THE

24   CASE.

25             WE WERE HOPING YOUR HONOR COULD PROVIDE AN

1  INSTRUCTION THAT EXPLAINS TO THE JURY THAT THIS IS EVIDENCE

2  THAT IS, YOU KNOW, IN PART DESIGNATED BY THE PLAINTIFF AS PART

3  OF THEIR CASE AND IN PART AS PART OF THE DEFENDANT'S CASE IN

4  THAT REGARD, AND AT THAT POINT WE'RE GOING TO REST.

5          THE COURT:  HOW LONG WILL IT TAKE TO PLAY THOSE

6  EXCERPTS?

7          MR. GORSKI:  THAT VIDEOTAPE IS ONLY A FEW MINUTES

8  LONG.

9          MR. ANDRE:  12 TO 13 MINUTES.

10         THE COURT:  SO WE REALISTICALLY COULD CONCLUDE THE

11 PLAINTIFF'S EVIDENCE TODAY.

12         MR. GORSKI:  I THINK SO, YES.

13         THE COURT:  AND AT THAT TIME BREAK, AND WE'LL COME

14 BACK TOMORROW FOR THE DEFENDANT'S EVIDENCE.

15         MR. ANDRE:  I THINK THAT'S RIGHT, YOUR HONOR.

16         THE COURT:  WE'LL TAKE OUR 15-MINUTE RECESS AT THIS

17 TIME, AND WE'LL PLAN ON PROCEEDING IN THAT FASHION.

18         (RECESS)

19         THE COURT:  DID YOU ALL WORK OUT THE STIPULATION

20 ISSUE?

21         MR. GORSKI:  WE HAVE, YOUR HONOR, YES.

22         THE COURT:  ALL RIGHT.  THEN I'LL RECOGNIZE YOU FOR

23 THAT AT THE CONCLUSION OF MR. SMITH'S TESTIMONY?

24         MR. GORSKI:  THAT'S RIGHT, AND THEN NEXT WILL BE THE

25 VIDEO, SO YOUR HONOR IS GOING TO GIVE AN INSTRUCTION BEFORE WE

1  DO THAT.

2          THE COURT:  OKAY.  I'LL GIVE THE INSTRUCTION THAT WAS

3  PROPOSED BY THE DEFENDANT.

4          MR. GORSKI:  WHAT WAS THAT, YOUR HONOR?

5          THE COURT:  THERE WAS A PROPOSED INSTRUCTION BY THE

6  DEFENDANT, DEFENDANT'S REQUEST FOR JURY INSTRUCTION NUMBER 5.

7          MR. GORSKI:  RIGHT, I GUESS WE WERE ALSO ASKING YOUR

8  HONOR --

9          THE COURT:  ALSO AN INSTRUCTION TO EXPLAIN THAT THIS

10  IS OFFERED PARTIALLY FOR THE PLAINTIFF AND PARTIALLY FOR THE

11  DEFENDANT.

12          MR. GORSKI:  CORRECT.

13          THE COURT:  BUT YOU ALL WON'T BE SPECIFYING WHAT

14  THOSE PARTS ARE UNTIL PERHAPS CLOSING.

15          MR. GORSKI:  FAIR ENOUGH.

16          THE COURT:  OKAY.

17          (JURY PRESENT)

18          THE COURT:  YOU MAY CONTINUE YOUR CROSS-EXAMINATION,

19  MR. ANDRE.

20  BY MR. ANDRE:

21  Q.   MR. SMITH, I'D LIKE TO BACK UP FOR A MOMENT TO A SUBJECT

22  THAT WE WERE DISCUSSING EARLIER IN YOUR TESTIMONY.

23          YOUR HONOR, MAY I APPROACH?

24          THE COURT:  YOU MAY.

25  BY MR. ANDRE:

1  Q.   D-2.  MR. SMITH, I'VE HANDED YOU A DOCUMENT THAT'S MARKED

2  AS DEFENDANT'S EXHIBIT 2; DO YOU RECOGNIZE THIS?

3  A.   YES.

4  Q.   YOU WERE TESTIFYING EARLIER THAT BGC SENT YOU A LETTER TO

5  TELL THAT YOU IT HAD SENT A REPORT TO DART; DO YOU RECALL THAT

6  TESTIMONY?

7  A.   YES.

8  Q.   AND THIS IS THE LETTER BGC SENT YOU?

9  A.   YES, IT LOOKS LIKE IT.

10  Q.   DO YOU SEE ON THE FIRST PAGE WHERE IT SAYS IT INCLUDES A

11  COPY OF THE REPORT, A SUMMARY OF YOUR RIGHTS AND A NOTIFICATION

12  DISPUTE FORM; DO YOU SEE THAT IN THE BULLET POINTS?

13  A.   YES.

14  Q.   AND IT DID INCLUDE THOSE THINGS?

15  A.   YES.

16        MR. ANDRE:  YOUR HONOR, WE WOULD MOVE FOR THE

17  ADMISSION OF DEFENDANT'S EXHIBIT 2.

18        MR. GORSKI:  NO OBJECTION.

19        THE COURT:  IT'S ADMITTED.

20  BY MR. ANDRE:

21  Q.   MR. SMITH, I'D LIKE TO TURN BACK TO WHAT HAPPENED AFTER

22  THE REPORT.  YOU DID BEGIN DART'S TRAINING PROGRAM?

23  A.   YES.

24  Q.   AND YOU COMPLETED DART'S TRAINING PROGRAM?

25  A.   NO.

1          MR. GORSKI:  OBJECTION, YOUR HONOR, CAN WE MEET AT

2   SIDEBAR PLEASE?

3          THE COURT:  YES.

4          (AT THE BENCH)

5          MR. GORSKI:  THE WAY THE QUESTION SOUNDED IT'S LIKE

6   THE DISCUSSION WE HAD IN THE BEGINNING ABOUT, YOU KNOW, WHAT

7   MR. SMITH DID AFTER HE OBTAINED THE EMPLOYMENT, AND I THINK WE

8   ALREADY WENT THROUGH THIS, AND WE OBJECT.

9          MR. ANDRE:  YOUR HONOR, FIRST, THAT'S AN OBJECTION TO

10  A QUESTION THAT HASN'T BEEN ASKED YET.  SECOND, AS I RECALL

11  WHAT I WROTE DOWN, YOUR HONOR ALLOWED THE SIMPLE REFERENCE TO

12  THE FACT THAT HE WENT AND WORKED ELSEWHERE AS AN ALLOWABLE

13  QUESTION WHICH I INTEND TO ASK.

14         AND, FINALLY, IF MR. GORSKI WANTS TO ENTER A

15  STIPULATION THAT THEY'RE SEEKING NO DAMAGES AFTER SEPTEMBER

16  25TH, THE DAY HE STARTED THE PROGRAM, WE'LL AGREE TO THAT

17  STIPULATION, AND WE CAN DROP THIS LINE OF QUESTIONING.

18         MR. GORSKI:  WE'RE NOT SEEKING DAMAGES BEYOND HIS

19  START OF EMPLOYMENT, AND I DON'T THINK WE'VE ENTERED ANY

20  EVIDENCE TO THAT EFFECT AT THIS POINT, AND I CERTAINLY DON'T

21  INTEND TO DO SO ON REBUTTAL.

22         THE COURT:  ARE YOU STIPULATING TO THAT?

23         MR. ANDRE:  AND THAT'S A STIPULATION --

24         MR. GORSKI:  WE JUST STIPULATED THAT HE STARTED

25  EMPLOYMENT ON THE 25TH, SO THE JURY WILL KNOW THAT THAT'S WHEN

1  THINGS STARTED.  I DON'T THINK WE NEED A STIPULATION THAT I'M

2  NOT SEEKING DAMAGES --

3          THE COURT:  THAT'S THE QUESTION.  YOU SAID YOU'RE NOT

4  SEEKING DAMAGES BEYOND THAT DATE?

5          MR. GORSKI:  RIGHT, BUT I DON'T THINK THAT THAT'S

6  FACTUAL EVIDENCE THAT THE JURY NEEDS TO KNOW ABOUT.  WE'RE

7  BASICALLY SAYING THESE DAMAGES -- I THINK THEY'RE CONSISTENT

8  WITH THE TESTIMONY THAT I ELICITED FROM HIM ON HIS DIRECT WHICH

9  IS BASICALLY WHAT HE WENT THROUGH BETWEEN THE TIME HE GOT

10 HIRED.  I DON'T THINK IT NEEDS TO BE A STIPULATION, AND I DON'T

11 REALLY THINK IT OPENS THE DOOR FOR HIM TO GO INTO ALL THIS

12 DISCUSSION.

13         THE COURT:  I DON'T THINK IT HAS TO BE A STIPULATION

14 AS READ TO THE JURY, BUT I THINK IF YOU'RE AGREEING TO THAT AT

15 THIS POINT IN THIS CONFERENCE, THEN IF YOU WERE TO ARGUE

16 SOMETHING DIFFERENTLY --

17         MR. GORSKI:  IF I OPEN THE DOOR, HE CAN DO THAT, BUT

18 I DON'T THINK I'VE OPENED THE DOOR.

19         MR. ANDRE:  AND, YOUR HONOR --

20         THE COURT:  I DID ALLOW YOU TO ASK A QUESTION ABOUT

21 THE FACT THAT HE DID NOT.  I DON'T THINK YOU'VE GOTTEN TO THAT

22 YET.

23         MR. ANDRE:  I HAVE ONLY ONE QUESTION WHICH IS DART

24 OFFERED YOU A JOB PERIOD.

25         THE COURT:  OKAY.  THAT'S FINE, BUT NOT INTO THE

1  TRAINING.

2          MR. GORSKI:  BUT THE PROBLEM I HAVE, YOUR HONOR, IS I

3  REALLY DON'T WANT THE JURY TO BE PREJUDICED BY MR. SMITH'S

4  DECISIONS ABOUT WHY HE MAY OR MAY NOT STAY AT DART, SO IT

5  REALLY HAS NO RELEVANCE TO THE CASE.

6          MR. ANDRE:  I DON'T INTEND TO ASK THOSE.  I INTEND TO

7  ONLY SAY DART OFFERED YOU A JOB.

8          THE COURT:  AND YOU DIDN'T TAKE IT.

9          MR. GORSKI:  WELL, YOUR HONOR, AGAIN I DON'T THINK

10 THAT'S RELEVANT WHETHER OR NOT HE TOOK THE JOB AT SOME LATER

11 POINT IN TIME BECAUSE WE'RE NOT SEEKING DAMAGES ON THAT, AND I

12 THINK IT'S GOING TO CONFUSE THE JURY.

13         THE COURT:  I TELL YOU BASED ON HIS DIRECT TESTIMONY

14 ABOUT HOW IMPORTANT IT WAS TO WORK AT DART, I THINK IT IS A

15 RELEVANT CONSIDERATION THAT HE DIDN'T TAKE IT.

16         MR. GORSKI:  OKAY.  THANK YOU.

17         THE COURT:  I'M GOING TO ALLOW HIM TO ASK THAT.

18         (IN OPEN COURT.)

19         THE COURT:  YOU MAY PROCEED, MR. ANDRE.

20 BY MR. ANDRE:

21 Q.   MR. SMITH, YOU DID COMPLETE THE DART TRAINING PROGRAM?

22 A.   NO.

23 Q.   YOU WENT THROUGH THE TRAINING PROGRAM FOR A NUMBER OF

24 WEEKS?

25 A.   YES.

1  Q.   AND DART ULTIMATELY OFFERED YOU A JOB AT END OF THAT?

2  A.   NO.

3           MR. ANDRE:  MAY I APPROACH, YOUR HONOR, SIDEBAR?

4           THE COURT:  YES, SIR.

5           (AT THE BENCH)

6           MR. ANDRE:  DART OFFERED HIM A JOB WAS AN ADMITTED

7  FACT IN SUMMARY JUDGMENT.

8           THE COURT:  AND THAT WAS ADMITTED?

9           MR. ANDRE:  YES, YOUR HONOR.

10          MR. GORSKI:  MAY I SEE THAT?

11          MR. ANDRE:  IT WAS OBJECTED TO ON THE GROUNDS OF

12 RELEVANCE AND MATERIALITY, BUT OTHERWISE ADMITTED.

13          THE COURT:  DO YOU SEE THIS RESPONSE, MR. GORSKI?

14          MR. GORSKI:  YES, YOUR HONOR, THIS IS SOMETHING MR.

15 ANDRE MAYBE COULD ASK MR. SMITH IN A DIFFERENT WAY.  I DON'T

16 THINK MR. SMITH -- YOU KNOW, JUST ASK WE OFFERED HIM TO STAY

17 ON, ASK DID YOU STAY ON.  I MEAN I THINK HE'S KIND OF

18 FRUSTRATED AT THIS POINT, AND I THINK ALL HE REALLY NEEDS TO DO

19 IS ASK ANOTHER QUESTION --

20          THE COURT:  I THOUGHT THE QUESTION WAS FAIRLY CLEAR.

21 WHAT I WOULD PROPOSE TO DO IS LET MR. ANDRE ASK THE QUESTION

22 CLEARLY AGAIN, AND IF HE DENIES IT AGAIN, THEN YOU CAN REQUEST

23 THAT THE COURT INFORM THE JURY THAT THIS ADMISSION WAS MADE.

24          MR. GORSKI:  I GUESS AS A FOLLOW-UP, I THINK SOME

25 FOLLOW-UP FOR MR. SMITH'S RECOLLECTION ON THAT POINT, AND WE

1  CAN CERTAINLY ENTER INTO STIPULATION --

2        THE COURT:  I THINK THIS WOULD GO BEYOND A

3  STIPULATION.  THIS IS A FACT ISSUE THAT HE SHOULD KNOW OR NOT

4  KNOW, AND ACCORDING TO THESE RECORDS, HE'S ADMITTED THAT HE WAS

5  OFFERED A JOB, AND NOW HE'S TESTIFIED AT LEAST TO THIS POINT

6  THAT HE WASN'T.  MAYBE HE'LL ANSWER DIFFERENTLY ON A CORRECTED

7  QUESTION.

8        MR. ANDRE:  I CAN SHOW IT TO HIM BUT NOT READ IT INTO

9  THE RECORD IN THE DEPOSITION WHERE HE SAYS HE WAS OFFERED A JOB

10  TO REFRESH HIS RECOLLECTION.

11        THE COURT:  HE DENIED BEING OFFERED A JOB.

12        MR. GORSKI:  YOUR HONOR, THIS MAY BE JUST SEMANTICS.

13  MR. SMITH DOESN'T FEEL THAT THE JOB HE WAS OFFERED WAS WHAT HE

14  WANTED OR SOMETHING LIKE THAT --

15        THE COURT:  TRY AND REPHRASE IT.

16        MR. GORSKI:  I'M NOT TRYING TO CHANGE REALITY HERE.

17  I JUST FEEL LIKE BY JUST ASKING HIM A FEW QUESTIONS IN A

18  DIFFERENT WAY, AND IF NOT, I WOULD BE OPEN TO WORKING OUT A

19  STIPULATION THAT COULD --

20        THE COURT:  WELL, I GUESS I VIEW THIS A LITTLE BIT

21  DIFFERENTLY.  THIS IN PART GOES TO HIS CREDIBILITY I THINK, AND

22  SO I WILL LET HIM TRY A COUPLE OF TIMES, AND IF HE DOESN'T,

23  THEN HE CAN ASK FOR AN INSTRUCTION, AND I WILL INSTRUCT THE

24  JURY THAT DURING THE COURSE OF THIS CASE MR. SMITH HAS ADMITTED

25  THAT WHEN HE COMPLETED THE TRAINING PROGRAM DART OFFERED HIM A

1  PERMANENT JOB AS A TRUCK DRIVER, AND HE REFUSED, AND JUST READ

2  THAT.

3            MR. ANDRE:  I'LL GIVE IT A TRY.

4            (IN OPEN COURT.)

5            THE COURT:  REPHRASE YOUR QUESTION, MR. ANDRE.

6  BY MR. ANDRE:

7  Q.   MR. SMITH, AT THE CONCLUSION WHEN YOU STOPPED

8  PARTICIPATING IN THE TRAINING PROGRAM, WHETHER IT WAS COMPLETED

9  OR NOT, DART OFFERED FOR YOU TO BE ABLE TO STAY ON WITH DART?

10  A.   YES.

11  Q.   AND YOU DIDN'T TAKE THAT OFFER?

12  A.   YEAH, I DIDN'T FINISH THE TRAINING.

13  Q.   AND THEY OFFERED FOR YOU TO BE ABLE TO EVEN KEEP WORKING

14  FOR DART AFTER THE TRAINING?

15  A.   YES.

16  Q.   AND YOU DIDN'T ACCEPT THAT OFFER EITHER?

17  A.   I DIDN'T COMPLETE THE TRAINING.  SO I DIDN'T TAKE THE

18  OFFER BECAUSE I DIDN'T COMPLETE THE TRAINING.

19            MR. ANDRE:  NO FURTHER QUESTIONS, YOUR HONOR.

20            THE COURT:  ANY REDIRECT, MR. GORSKI?

21            MR. GORSKI:  YES, YOUR HONOR.  THANK YOU.

22                      REDIRECT EXAMINATION

23  BY MR. GORSKI:

24  Q.   MR. SMITH, I'D LIKE YOU TO GO BACK TO THE DOCUMENT THAT

25  MR. ANDRE PRESENTED TO YOU.  IT WAS MARKED D-6.

1  A.   OKAY.

2  Q.   ARE YOU THERE?

3  A.   YES.

4        MR. GORSKI:  YOUR HONOR, THE DOCUMENT HAS BEEN

5  ADMITTED INTO EVIDENCE.  MAY I PROJECT IT?

6        THE COURT:  YOU MAY.

7  BY MR. GORSKI:

8  Q.   OKAY.  MR. SMITH, I'D LIKE YOU TO READ THE PARAGRAPH, OR

9  HAVE YOU HAD AN OPPORTUNITY TO READ THE PARAGRAPH THAT'S IN THE

10 LETTER?

11 A.   THE FIRST PARAGRAPH?

12 Q.   THE PARAGRAPH FOLLOWING YOUR DISPUTE?

13 A.   YES.

14 Q.   IS THERE ANYWHERE IN THAT PARAGRAPH DOES THE DEFENDANT BGC

15 APOLOGIZE FOR WHAT HAPPENED WITH THE CRIMINAL BACKGROUND CHECK?

16 A.   NO.

17 Q.   NOW, I'D LIKE YOU TO JUST TAKE A LOOK AT THE WHOLE LETTER,

18 AND DO YOU SEE AT THE BOTTOM THAT UNDER THE LETTER THAT THEY

19 WROTE TO YOU, THERE IS A SOLICITATION ABOUT GETTING RECORDS

20 EXPUNGED?

21 A.   YES.

22        MR. GORSKI:  I DON'T HAVE ANY OTHER QUESTIONS FOR THE

23 WITNESS, YOUR HONOR.  THANK YOU.

24        THE COURT:  ALL RIGHT.  MR. SMITH, YOU MAY STEP DOWN,

25 SIR.  YOU CAN LEAVE THE EXHIBITS THERE FOR NOW.  THANK YOU,

1  SIR.

2           MR. GORSKI, ARE YOU PREPARED TO READ THE STIPULATIONS

3  OF THE PARTIES AT THIS TIME?

4           MR. GORSKI:  YES, I AM, YOUR HONOR.

5           THE COURT:  MEMBERS OF THE JURY, SOMETIMES THE

6  PARTIES AGREE TO CERTAIN FACTS, AND THOSE FACTS ARE REDUCED TO

7  WHAT WE CALL A STIPULATION.  THE PARTIES AGREE THAT THOSE FACTS

8  ARE TRUE, AND YOU MAY ACCEPT THOSE AS HAVING BEEN PROVEN IN THE

9  CASE.

10           SO, MR. GORSKI, IF YOU WILL GIVE HIM YOUR ATTENTION,

11  HE'S GOING TO READ THE STIPULATED FACTS IN THIS CASE TO YOU.

12           MR. GORSKI:  MAY I READ THEM FROM COUNSEL TABLE?

13           THE COURT:  YOU MAY, YES, SIR.

14           MR. GORSKI:  FIRST STIPULATION, ON OR AROUND

15  SEPTEMBER 11TH, 2012, PLAINTIFF APPLIED FOR A JOB WITH DART

16  TRANSIT COMPANY AS A TRUCK DRIVER.

17           NUMBER 2, ON SEPTEMBER 12TH, 2012, DART ORDERED A

18  CRIMINAL BACKGROUND CHECK ABOUT PLAINTIFF FROM

19  E-BACKGROUNDCHECKS.COM.

20           NUMBER 3, BGC IS A CONSUMER REPORTING AGENCY WITHIN

21  THE MEANING OF THE FAIR CREDIT REPORTING ACT.

22           NUMBER 4, ON SEPTEMBER 20TH, 2012 DART APPROVED

23  PLAINTIFF TO BEGIN THE DART TRAINING PROGRAM WHICH HE BEGAN ON

24  SEPTEMBER 25TH.

25           THE COURT:  ALL RIGHT.  MR. GORSKI, IS THE NEXT PIECE

1    OF EVIDENCE PORTIONS OF THE DEPOSITION OF MS. PEGGY O'NEILL?

2              MR. GORSKI:  YES, IT IS, YOUR HONOR.

3              THE COURT:  ALL RIGHT.  MEMBERS OF THE JURY, AGAIN

4    LET ME GIVE YOU SOME ADDITIONAL INSTRUCTION WITH REGARD TO THIS

5    NEXT PIECE OF EVIDENCE YOU'RE GOING TO HEAR.

6              THE DEPOSITION OF PEGGY O'NEILL WAS TAKEN ON JANUARY

7    28TH, 2013, AND IT'S ABOUT TO BE PRESENTED TO YOU BY WAY OF

8    VIDEO, CERTAIN EXCERPTS FROM THAT.  THE DEPOSITION IS ENTITLED

9    TO THE SAME CONSIDERATION AS LIVE TESTIMONY, AND YOU MUST JUDGE

10   IT IN THE SAME WAY AS IF THE WITNESS WERE TESTIFYING FROM THE

11   WITNESS STAND IN THIS COURT.

12             NOW, THESE VIDEO EXCERPTS CONSTITUTE PORTIONS THAT

13   THE PLAINTIFF WISHES TO PRESENT TO YOU AND PORTIONS THAT THE

14   DEFENDANT WISHES TO PRESENT TO YOU.  SO IN SOME WAYS THIS IS

15   LIKE THOSE JOINT EXHIBITS THAT HAVE BEEN ADMITTED.  THIS IS

16   SORT OF A HYBRID EXHIBIT.  PORTIONS OF IT WILL BE OFFERED FOR

17   THE PLAINTIFF'S CASE IN CHIEF, AND OTHER PORTIONS ARE BEING

18   OFFERED FOR THE DEFENDANT'S CASE IN CHIEF.

19             A DEPOSITION IS SIMPLY A WITNESS' SWORN TESTIMONY

20   THAT'S TAKEN BEFORE TRIAL.  DURING THE DEPOSITION THE WITNESS

21   IS UNDER OATH AND SWEARS TO TELL THE TRUTH, AND THE LAWYERS FOR

22   EACH PARTY MAY ASK QUESTIONS.  A COURT REPORTER IS PRESENT TO

23   TAKE DOWN THE QUESTIONS AND ANSWERS.  IN THIS CASE IT WAS ALSO

24   VIDEO RECORDED FOR YOUR BENEFIT.

25             SO AT THIS TIME, COUNSEL, I'LL ALLOW YOU TO PLAY THE

1   PORTIONS OF THE PEGGY O'NEILL DEPOSITION THAT YOU ALL HAVE

2   AGREED TO OFFER.

3             (EXCERPTS OF THE VIDEOTAPED DEPOSITION OF PEGGY

4   O'NEILL WERE PLAYED IN OPEN COURT.)

5             THE COURT:  THOSE ARE ALL THE EXCERPTS YOU WANTED TO

6   HAVE PLAYED, MR. GORSKI?

7             MR. GORSKI:  YES, YOUR HONOR.

8             THE COURT:  AND FOR YOU ALSO, MR. ANDRE?

9             MR. ANDRE:  YES, YOUR HONOR.

10            THE COURT:  MR. GORSKI, DO YOU HAVE ANY OTHER

11  EVIDENCE TO PRESENT ON BEHALF OF THE PLAINTIFF AT THIS TIME?

12            MR. GORSKI:  PLAINTIFF RESTS, YOUR HONOR.

13            THE COURT:  LADIES AND GENTLEMEN, WE'RE AT ALMOST

14  4:25.  I'M SURE IT'S BEEN A LONG DAY FOR YOU ALL.  YOU ALL

15  ARRIVED EARLY TODAY.  WE NORMALLY WILL RUN COURT UNTIL ABOUT

16  FIVE O'CLOCK.  THERE ARE SOME MATTERS I HAVE TO TAKE UP WITH

17  THE ATTORNEYS, AND BETTER THAN TO KEEP YOU WAITING, I WOULD

18  INTEND TO RELEASE YOU AT THIS TIME.

19            I'D LIKE FOR YOU TO REPORT BACK TOMORROW MORNING AT

20  NINE A.M.  I RECOGNIZE THAT TRAFFIC AROUND ATLANTA CAN BE

21  CHALLENGING.  SO I ASK YOU TO MAKE ARRANGEMENTS TO BE HERE BY

22  NINE O'CLOCK BECAUSE WE ALL WANT TO GET STARTED ON TIME, AND

23  THE ATTORNEYS HAVE BEEN ADVISED THE SAME THING.  SO DO YOUR

24  BEST TO ARRANGE YOUR SCHEDULE SO YOU CAN BE HERE BY NINE

25  O'CLOCK.

1          I HAVE TO REMIND YOU AGAIN NOW AT THE END OF THE DAY

2    WHEN YOU GO HOME, FAMILY MEMBERS MAY WANT TO KNOW WHAT DID YOU

3    DO TODAY, WHAT KIND OF CASE ARE YOU ON.  I JUST NEED TO REMIND

4    YOU THE ADMONITION YOU CAN TELL THEM THAT YOU WERE SELECTED FOR

5    A TRIAL HERE IN FEDERAL COURT.  YOU CAN TELL THEM IT'S A CIVIL

6    CASE, BUT YOU'LL JUST HAVE TO TELL THEM THE REST OF IT AFTER

7    THE CASE IS OVER.  SO JUST ASK THEM TO PLEASE RESPECT THE

8    OBLIGATION THAT YOU HAVE AS JURORS NOT TO DISCUSS THE CASE.

9          DON'T TRY TO DO INDEPENDENT RESEARCH ABOUT THE CASE,

10   ABOUT THE LAW, OR ANYTHING THAT YOU'VE HEARD TESTIMONY ABOUT

11   TODAY BECAUSE YOU HAVE TO BASE YOUR DECISION ONLY ON THE

12   EVIDENCE THAT YOU HEAR THAT'S PRESENTED DURING THE COURSE OF

13   THE DAY.

14         DO ANY OF YOU HAVE ANY CONCERNS YOU NEED TO BRING UP

15   WITH ME AT THIS TIME?  ALL RIGHT.  THEN YOU ALL ARE EXCUSED FOR

16   THE EVENING.  WE'LL SEE YOU TOMORROW MORNING AT NINE O'CLOCK.

17   HAVE A GOOD EVENING.

18         (JURY RETIRED)

19         THE COURT:  ANY MATTERS TO BE BROUGHT UP AT THIS

20   TIME?

21         MR. GORSKI:  NONE FROM PLAINTIFF, YOUR HONOR.

22         MR. ANDRE:  YOUR HONOR, WE HAVE A MOTION.

23         THE COURT:  ALL RIGHT.

24         MR. ANDRE:  YOUR HONOR, THE DEFENDANT MOVES PURSUANT

25   TO RULE 50 OF THE FEDERAL RULES OF CIVIL PROCEDURE FOR JUDGMENT

1  AS A MATTER OF LAW.  THE PLAINTIFF HAS NOW BEEN FULLY HEARD ON

2  THE CLAIMS AT TRIAL, AND A REASONABLE JUROR WOULD NOT HAVE A

3  LEGALLY SUFFICIENT EVIDENTIARY BASIS TO FIND FOR PLAINTIFF ON

4  HIS CLAIMS.

5       I WANT TO TALK FIRST ABOUT HIS NEGLIGENCE CLAIM.  AS

6  YOUR HONOR KNOWS, THERE ARE ESSENTIALLY FOUR ELEMENTS TO A

7  NEGLIGENCE CLAIM, UNDERSTANDING THAT WE'RE STILL DISCUSSING

8  WHAT THAT JURY CHARGE WILL LOOK LIKE.  WE PRODUCED A REPORT

9  WITH INACCURATE INFORMATION, THAT IT WAS THE RESULT OF THE

10  NEGLIGENT FAILURE TO FOLLOW REASONABLE PROCEDURES, THAT MR.

11  SMITH WAS DAMAGED AND THAT THE DAMAGE WAS CAUSED BY BGC.

12       YOUR HONOR, NOW THAT THE EVIDENCE IS IN, PLAINTIFF

13  HAS FAILED TO ADDUCE SUFFICIENT EVIDENCE ON EITHER THE SECOND

14  OR THIRD ELEMENTS TO ALLOW THAT CHARGE TO GO FORWARD.  WITH

15  RESPECT TO THE SECOND ELEMENT WHICH IS THAT THE INACCURACY WAS

16  THE RESULT OF A NEGLIGENT FAILURE TO FOLLOW REASONABLE

17  PROCEDURES, THE EVIDENCE SIMPLY DOES NOT EXIST THAT BGC'S

18  PROCEDURES WERE UNREASONABLE.

19       AS YOUR HONOR KNOWS, REASONABLENESS IS JUDGED BY WHAT

20  A REASONABLY PRUDENT PERSON WOULD DO UNDER THE CIRCUMSTANCES.

21  THAT'S AN OFTEN REPEATED STANDARD IN THE ELEVENTH CIRCUIT AND

22  ELSEWHERE, AND WHILE THAT MAY SOUND LIKE SOMETHING THAT NEEDS

23  TO BE DECIDED BY A JURY, RULE 50 IS PRECISELY THE MECHANISM FOR

24  AVOIDING THAT INQUIRY WHERE THERE IS NO EVIDENCE LIKE WE HAVE

25  IN THIS CASE.

1          THERE IS NO EVIDENCE TO SUPPORT THE IDEA THAT BGC'S

2     PROCEDURES WERE SUBJECTIVELY OR OBJECTIVELY UNREASONABLE.

3     THERE'S NO COMPARISON POINT TO SAY THAT WHAT BGC DID WAS OR WAS

4     NOT REASONABLE WITH RESPECT TO WHAT IT OUGHT TO HAVE DONE.

5          ESSENTIALLY THE CONTENTION FROM THE PLAINTIFF IS THAT

6     WE SHOULD HAVE DONE WHAT WE DID IN THE DISPUTE PROCESS, I.E.,

7     CALL THE COURT AND LOOK FOR A SOCIAL ON THE FRONT END.  THIS IS

8     A QUESTION WE BRIEFED FOR YOUR HONOR AT SUMMARY JUDGMENT WHICH

9     IS THAT COURTS HAVE LOOKED AT EXACTLY THAT QUESTION AND SAID,

10    QUOTE, WHAT ARE REASONABLE PROCEDURES TO ASSURE THE MAXIMUM

11    POSSIBLE ACCURACY OF A CREDIT REPORT DIFFER FROM WHAT

12    CONSTITUTE REASONABLE PROCEDURES FOR REINVESTIGATION OF

13    DISPUTED INFORMATION.  THAT'S THE LEE VERSUS SECURITY CHECK

14    CASE OUT OF THE MIDDLE DISTRICT OF FLORIDA.

15         YOUR HONOR, ANOTHER MIDDLE DISTRICT OF FLORIDA CASE

16    SWOAGER VERSUS CREDIT BUREAU OF GREATER ST. PETERSBURG, FLORIDA

17    LIKEWISE SAID THAT THE STANDARD BETWEEN THOSE TWO PIECES OF THE

18    FCRA IS DIFFERENT.  THERE'S NEVER BEEN A CASE CITED BY THE

19    PLAINTIFF IN SUMMARY JUDGMENT OR OTHERWISE THAT SAYS

20    DIFFERENTLY.

21         ALL WE HAVE BEFORE THE COURT IS THE IDEA THAT WHAT

22    YOU DID LATER IS WHAT YOU SHOULD HAVE DONE AT THE START, AND

23    THAT IS NOT EVIDENCE THAT WHAT WE DID INITIALLY WAS

24    UNREASONABLE.  REMEMBERING THE ADMONITION THAT I KNOW YOUR

25    HONOR KNOWS WELL THAT THE MERE FACT OF AN INACCURACY, A POINT

1   REPEATED BY THE PLAINTIFF IN THEIR CASE IN CHIEF, DOES NOT

2   PROVE THAT THERE'S BEEN A VIOLATION.

3           YOUR HONOR, WITH RESPECT TO THE THIRD ELEMENT, WE

4   WOULD SUBMIT THAT THE PLAINTIFF HAS TRULY NO COMPETENT EVIDENCE

5   OF DAMAGES.  AS YOU KNOW IT'S HIS BURDEN TO SHOW THAT HE WAS

6   HARMED.  WE'RE TALKING ABOUT ONLY EMOTIONAL DAMAGES AS YOU KNOW

7   WELL.  COURTS IN THIS DISTRICT UNDERSTANDING THAT IT'S A

8   DISPUTED QUESTION HAVE SAID OVER AND OVER THAT THERE HAS TO BE

9   EVIDENCE OF AN ACTUAL INJURY, EVIDENCE OF CONDUCT AND

10  OBSERVATION FROM THIRD PARTIES TO SUPPORT AN AWARD OF MENTAL

11  ANGUISH DAMAGES.  WE HAVE NOTHING.

12          WE HAVE MR. SMITH SAYING HE WAS UPSET, AND COURTS IN

13  THIS CIRCUIT HAVE HELD THAT THAT KIND OF EVIDENTIARY PROFFER IS

14  SIMPLY NOT SUFFICIENT.  THOSE ARE THE CASES WE CITED FOR YOUR

15  HONOR AT SUMMARY JUDGMENT THAT WE STILL THINK ARE AN IMPORTANT

16  AND INSTRUCTIVE VIEW OF WHAT THE STANDARD OUGHT TO BE.

17          COURTS OUTSIDE THIS CIRCUIT HAVE REACHED THE SAME

18  CONCLUSION.  COUSIN VERSUS TRANSUNION OUT OF THE FIFTH CIRCUIT

19  WAS A COURT OF APPEALS CASE THAT SAID THAT YOU REALLY CANNOT

20  GET TO A JURY, YOU CANNOT GET TO A QUESTION OF DAMAGES BY JUST

21  SAYING I WAS UPSET UNLESS YOU'VE GOT SOMETHING TO CORROBORATE

22  IT.  MR. SMITH HAS NOTHING BUT THOSE BARE ASSERTIONS.  FOR

23  THOSE REASONS, WE THINK THOSE ELEMENTS ARE LACKING, AND

24  THAT MR. SMITH HAS NO EVIDENCE THAT CAN GET TO HIM ON

25  NEGLIGENCE.

1          WITH RESPECT TO WILLFULNESS, YOUR HONOR, EVEN IF

2    THERE IS SOME MODICUM OF EVIDENCE THAT THE COURT THINKS COULD

3    GET US TO A JURY ON NEGLIGENCE, THERE IS TRULY NOTHING THAT CAN

4    GET WILLFULNESS TO THIS JURY.  AT SUMMARY JUDGMENT IT MAY HAVE

5    BEEN A CLOSE QUESTION.  I THINK THE COURT SAID THIS IS A CLOSE

6    QUESTION.

7          NOW THE EVIDENCE IS BEFORE US, AND IT REALLY ISN'T.

8    FCRA ACTS WILLFULLY IF ITS ACTIONS WERE, AND THIS IS QUOTING

9    THE SUPREME COURT, NOT ONLY A VIOLATION UNDER A REASONABLE

10   READING OF THE STATUTE'S TERMS, BUT SHOWS THAT THE COMPANY RAN

11   A RISK OF VIOLATING THE LAW SUBSTANTIALLY GREATER THAN A RISK

12   ASSOCIATED WITH A READING OF WAS MERELY CARELESS.  THAT, OF

13   COURSE, IS THE SUPREME COURT SEMINAL SAFECO INSURANCE COMPANY

14   OF AMERICA VERSUS BIRD DECISION IN 2007.

15         IT'S MIRRORED IN THE ELEVENTH CIRCUIT IN THE LEVINE

16   VERSUS WORLD FINANCIAL NETWORK BANK WHERE THE COURT HELD THAT

17   FCRA CANNOT BE FOUND WILLFULLY LIABLE IF IT MAKES AN

18   INTERPRETATION OF A STATUTORY TERM WITH NO CLEAR DEFINITION,

19   AND AN INTERPRETATION THAT IS NOT CONTRARY TO ANY CONTROLLING

20   AUTHORITY.

21         YOUR HONOR, THERE'S NO DEFINITION ANYWHERE IN THE

22   STATUTE OF WHAT CONSTITUTES REASONABLE PROCEDURES.  IN THE FACE

23   OF THAT -- AND THERE IS LIKEWISE NO AUTHORITY FROM THE FTC,

24   FROM A COURT OF APPEALS, FROM ANYONE SAYING THAT THE TYPE OF

25   PROCEDURES BGC USED ARE UNREASONABLE.  IN THAT VACUUM BGC MADE

1   AN INTERPRETATION, CREATED ROBUST PROCEDURES, AND THOSE

2   PROCEDURES ARE SIMPLY NOT SUFFICIENT BASED ON THE EVIDENTIARY

3   PROFFER TO FIND THAT WE COULD HAVE WILLFULLY VIOLATED THE

4   STATUTE.  YOUR HONOR, ON THAT BASIS WE'D MOVE THE COURT FOR

5   JUDGMENT AS A MATTER OF LAW.

6            THE COURT:  MR. GORSKI.

7            MR. GORSKI:  YOUR HONOR, THE ARGUMENTS THAT THE

8   DEFENDANT JUST MADE ARE VIRTUALLY IDENTICAL TO THE ARGUMENTS

9   THAT IT ALREADY RAISED ON A MOTION FOR SUMMARY JUDGMENT WHICH

10  WAS DENIED IN ITS ENTIRETY WITH RESPECT TO PLAINTIFF'S (E)(B)

11  CLAIM BOTH AS TO NEGLIGENCE AND TO WILLFULNESS.

12           THE EVIDENCE THAT WAS PUT ON AT THIS TRIAL IS

13  VIRTUALLY IDENTICAL TO THE EVIDENCE THAT WAS SUBMITTED BY

14  PLAINTIFF IN OPPOSING THAT MOTION FOR SUMMARY JUDGMENT, AND WAS

15  FOUND TO BE SUFFICIENT ENOUGH IN ORDER FOR PLAINTIFF TO REACH A

16  JURY BOTH ON THE NEGLIGENCE AND ON THE WILLFULNESS CLAIM.

17           I WOULD POINT OUT, YOUR HONOR, IN YOUR HONOR'S OWN

18  OPINION, YOUR HONOR FOUND PROBATIVE INFORMATION ABOUT BGC'S

19  PROCEDURE WITH RESPECT TO THE FACT THAT THEY DO NOT USE A

20  SOCIAL SECURITY NUMBER AS A REFERENCE MARKER.  THEY ALSO HAVE

21  ACKNOWLEDGED THAT THEY DO NOT USE -- THAT THEY ARE NOT CAPABLE

22  OF COMPARING OR DISTINGUISHING BETWEEN TWO INDIVIDUALS WITH THE

23  SAME NAME AND THE SAME DATE OF BIRTH.

24           FURTHERMORE, YOUR HONOR, THOSE ARE THE ITEMS THAT

25  YOUR HONOR HAS IDENTIFIED WITH RESPECT TO WILLFULNESS.  SO

1   CERTAINLY THOSE ITEMS WOULD BE SUFFICIENT ENOUGH TO MEET A

2   NEGLIGENCE STANDARD, AS WELL.

3          THE NEGLIGENCE STANDARD THAT WE'VE ALREADY DISCUSSED

4   IN THIS CASE, YOUR HONOR, IS THAT OF INACCURACY.  INACCURACY

5   HAS ALREADY BEEN ADMITTED BY THE DEFENDANT BASED ON THE

6   EVIDENCE THAT WE'VE SEEN THUS FAR, AND AS WE'VE DISCUSSED THUS

7   FAR, BASED ON A BROADER INTERPRETATION OF WHAT THE BURDEN OF

8   PROOF IS IN THIS CASE, THE JURY MAY BE ABLE TO INFER THAT THE

9   INACCURACY LEADS TO LIABILITY HERE.

10          EVEN UNDER A MORE NARROW VIEW OF THIS WHERE THE

11   PLAINTIFF POSSESSES THE ENTIRE BURDEN OF PROOF, PLAINTIFF HERE

12   HAS COME FORWARD WITH MORE EVIDENCE THAN SIMPLY AN INACCURACY

13   TO SHOW THAT THE PROCEDURES HERE WERE UNREASONABLE.

14   SPECIFICALLY THAT IT DOES NOT USE SOCIAL SECURITY NUMBERS TO

15   CROSSCHECK ANY OF THESE RECORDS BEFORE IT SELLS IT, THAT ITS

16   PROCEDURES DO NOT ACCOUNT FOR COMMON NAMES, THAT ITS PROCEDURES

17   ARE COMPLETELY INCAPABLE OF DIFFERENTIATING BETWEEN INDIVIDUALS

18   WITH THE SAME NAME AND THE SAME DATE OF BIRTH, AND MORE SO THAT

19   ALL OF THESE PROCEDURES APPEAR TO BE IN PLACE SOLELY FOR THE

20   REASON SO THAT THE DEFENDANT CAN SELL ITS CREDIT REPORT

21   INSTANTANEOUSLY WITHOUT HAVING TO HIRE ADDITIONAL WORKERS OR DO

22   ADDITIONAL WORK IN ORDER TO GET IT RIGHT IN THAT REGARD.

23          SO WE THINK PLAINTIFF HAS SUBMITTED MORE THAN ENOUGH

24   EVIDENCE HERE FOR THE JURY TO MAKE A DECISION BOTH ON WHETHER

25   THERE IS A NEGLIGENT VIOLATION OF 1681(E)(B) ALONG WITH A

1  WILLFUL VIOLATION OF 1681(E)(B).

2          FURTHERMORE, YOUR HONOR, MR. SMITH'S TESTIMONY IS

3  SUBSTANTIALLY SIMILAR TO THE TESTIMONY THAT WAS PROFFERED TO

4  THE COURT IN CONNECTION WITH THE MOTION FOR SUMMARY JUDGMENT.

5  SPECIFICALLY HE DESCRIBED THE EXPERIENCE THAT HE WENT THROUGH

6  OVER THE COURSE OF TWO WEEKS.  HE EXPLAINED THAT BASED ON HIS

7  OWN RECOLLECTION THAT HE WAS, YOU KNOW, CALLED A LIAR OR

8  DISHONEST.  YOUR HONOR EVEN ACKNOWLEDGED THAT THERE MAY BE A

9  DISPUTE OF FACT ON THAT SUBJECT, BUT THAT DOES NOT MEAN THAT

10  THE JURY SHOULD DISCOUNT MR. SMITH'S TESTIMONY ON THAT SUBJECT,

11  OR WHAT IT MAY HAVE MADE HIM FEEL LIKE TO THE EXTENT THE JURY

12  DECIDES TO BELIEVE THAT EVIDENCE ON THAT SUBJECT.

13          ADDITIONALLY, HE DESCRIBED THE EMBARRASSMENT AND

14  HUMILIATION HE FELT AND THE AFFECT ON HIS FAMILY LIFE.

15  FURTHERMORE, HE DESCRIBED AN EFFECT ON HIS PHYSICAL AND HIS

16  MENTAL CONDITIONS, AND EVEN PROVIDED SPECIFIC EXAMPLES OF THAT

17  SUCH AS NOT BEING ABLE TO EAT, NOT BEING ABLE TO SLEEP AND

18  HAVING AN EFFECT ON HIS DAILY HABITS.

19          WE THINK THAT PLAINTIFF HERE HAS ALSO SUBMITTED A

20  SUFFICIENT AMOUNT OF EVIDENCE FOR THE JURY TO MAKE A DECISION

21  ON ACTUAL DAMAGES IN THIS CASE, YOUR HONOR, AND FOR THAT REASON

22  WE THINK THE RULE 50 MOTION SHOULD BE DENIED.

23          THE COURT:  ANY REBUTTAL ARGUMENT, MR. ANDRE?

24          MR. ANDRE:  YOUR HONOR, WITH RESPECT TO WILLFULNESS,

25  THERE IS NO EVIDENCE IN THIS RECORD TO SHOW THAT BGC'S ACTIONS

1   WERE RECKLESS.  THAT'S THE STANDARD THAT SAFECO ESTABLISHED.

2   THERE IS MERELY TESTIMONY ABOUT WHAT THOSE PROCEDURES ARE, BUT

3   NOTHING FROM WHICH A FINDER OF FACT CAN DRAW THE CONCLUSION

4   THAT THOSE ARE RECKLESS, UNREASONABLE AND WILLFULLY

5   NONCOMPLIANT WITH THE STATUTE.  THAT'S IT, YOUR HONOR.

6           THE COURT:  I THINK THE WILLFULNESS CLAIM HAS BEEN

7   THE CLOSER CLAIM THROUGHOUT THE CASE, AND I'LL START WITH IT.

8   VIEWING THE EVIDENCE FAVORABLY TO THE PLAINTIFF, I THINK THERE

9   IS ARGUMENT THAT MR. GORSKI CAN MAKE AND THAT A REASONABLE JURY

10  COULD ACCEPT IF IT CHOSE TO THAT COULD SHOW THAT THERE WAS A

11  SUBSTANTIAL RISK OF PRODUCING THE ERRONEOUS REPORT IN THIS CASE

12  DUE TO THE COMMON NAME THAT WAS AT ISSUE, THE FACT THAT THE

13  FULL NAME WAS PROVIDED TO BGC ALONG WITH A SOCIAL SECURITY

14  NUMBER, AND I RECOGNIZE MR. KESSLER'S TESTIMONY THAT IN THE

15  VAST MAJORITY OF CASES THEY DON'T GET SOCIAL SECURITY NUMBERS,

16  BUT APPARENTLY THAT INFORMATION WAS AVAILABLE.

17          IT'S THOSE COMBINATION OF THINGS THAT PERSUADED ME AT

18  THE SUMMARY JUDGMENT STAGE, AND I THINK THEY PERSUADED THE

19  DISTRICT JUDGE AS WELL UPON REVIEW OF OBJECTIONS THAT THERE IS

20  ENOUGH, AND I EMPHASIZE ENOUGH TO GET THERE.  I THINK IT'S A

21  CLOSE CALL, BUT I'M GOING TO OVERRULE THE MOTION AT THIS POINT

22  IN TIME WITH RESPECT TO THE WILLFULNESS CLAIM AND ALLOW IT TO

23  GO FORWARD.

24          WITH RESPECT TO THE NEGLIGENCE CLAIM, AS MR. ANDRE

25  NOTED THERE WE'RE STILL WORKING OUT THE PARTICULARS OF THE JURY

1  CHARGE ON THE NEGLIGENCE CLAIM IN PARTICULAR, BUT A FAVORABLE

2  VIEW OF THAT FOR PLAINTIFF I THINK HE WOULD SATISFY THE SECOND

3  PRONG, SECOND ELEMENT OF THE FOUR BASED ON THE FACT THAT THERE

4  WAS AN UNDISPUTED INACCURACY IN THE REPORT, AND IF I DO GO WITH

5  THE MINIMAL BURDEN OF PROOF ON HIM, HE WOULD SATISFY THAT.

6          AS TO THE THIRD ELEMENT, LIKEWISE I THINK HE'S

7  SATISFIES THAT SUFFICIENTLY HERE.  CLEARLY WE HAD ARGUMENT AT

8  THE SUMMARY JUDGMENT STAGE ABOUT WHAT LEVEL OF PROOF IS

9  NECESSARY FOR DAMAGES AND HIM SIMPLY TESTIFYING ALONE THAT HE

10  HAD THESE THINGS WOULD NOT BE SUFFICIENT UNDER SOME CASE LAW

11  AUTHORITY THAT THE DEFENDANT HAS CITED.

12          WHAT STRUCK ME TODAY AS MORE THAN THAT WAS LISTENING

13  TO THE TAPE RECORDED TELEPHONE CALLS, AND I THINK THOSE TAPE

14  RECORDINGS PROVIDE ENOUGH EVIDENCE FOR THE -- TO CORROBORATE

15  THE PLAINTIFF'S CLAIMS THAT HE WAS HAVING FRUSTRATION, THAT HE

16  WAS CLEARLY ANXIOUS ABOUT GETTING THIS RESOLVED QUICKLY BY THE

17  MERE FACT THAT HE CALLED MULTIPLE TIMES, THE SIGHING IN

18  RESPONSE TO THE RESPONSES THAT ARE GIVEN IS SOME INDICATION TO

19  THIS -- APART FROM HIM JUST SAYING I FELT THIS WAY, THE JURORS

20  CAN LISTEN TO THAT AND HEAR THAT, AND THAT IS SOME

21  CORROBORATION IF THAT IS THE STANDARD.

22          I THINK IN RULING ON SUMMARY JUDGMENT I WENT WITH

23  ANOTHER DECISION IN THIS COURT THAT SAID HIS TESTIMONY ALONE IS

24  SUFFICIENT TO GET PAST SUMMARY JUDGMENT, AND AS I'VE LISTENED

25  TO THE TESTIMONY TODAY, I THINK HE'S GOT A LITTLE MORE THAN

1   THAT BASED ON THE CONTENT OF THOSE CALLS, THE FACT THAT HE MADE

2   THE MULTIPLE CALLS AND HIS TESTIMONY CAN BE CONSIDERED IN

3   CONJUNCTION WITH THAT, AS WELL.  SO I'M GOING TO DENY THE RULE

4   50 MOTION AT THIS.

5           ARE YOU ALL GOING TO BE READY TO PRESENT YOUR

6   EVIDENCE TOMORROW MORNING, MR. ANDRE?

7           MR. ANDRE:  YES, YOUR HONOR.

8           THE COURT:  MR. GORSKI, DID YOU HAVE SOMETHING YOU

9   WANTED TO TAKE UP?

10          MR. GORSKI:  NO, YOUR HONOR, JUST MAYBE ASKING BASED

11  ON WHAT I UNDERSTAND THE DEFENDANT'S WITNESS POOL TO BE FOR THE

12  DEFENSE, IT SEEMS LIKE WE'LL PROBABLY BE ABLE TO DO CLOSING.  I

13  WAS JUST WONDERING IF YOUR HONOR HAD MADE ANY DECISIONS

14  REGARDING THE FINAL JURY INSTRUCTIONS?

15          THE COURT:  YEAH, I WANTED TO DISCUSS THAT WITH YOU.

16  I WANTED TO SEE IF THERE WAS ANYTHING ELSE BEFORE THAT.  DO YOU

17  THINK YOU'LL FINISH YOUR EVIDENCE TOMORROW?

18          MR. ANDRE:  YES, YOUR HONOR.

19          THE COURT:  ABOUT WHAT TIME OF DAY WOULD YOU

20  ESTIMATE?

21          MR. ANDRE:  I THINK WE'LL BE DONE BY LUNCH.

22          THE COURT:  OKAY.  AND YOU ALL WILL BE PREPARED TO DO

23  CLOSINGS TOMORROW.  SO I HAVE GOT A DRAFT, AND I WANT TO

24  EMPHASIZE DRAFT WITH ALL CAPITAL LETTERS OF THE JURY CHARGE.  I

25  HAD INTENDED TO WORK ON IT OVER LUNCH SOME MORE TODAY TO REFINE

1   THAT, BUT WE GOT SIDETRACKED WITH SOME RESEARCH ON THE ISSUE

2   THAT WE BROUGHT UP RIGHT BEFORE THE LUNCH BREAK.

3           SO I HAVEN'T BEEN ABLE TO GIVE IT THE TIME THAT I

4   WOULD LIKE TO, BUT I WANT TO GIVE IT TO YOU SO YOU ALL HAVE

5   THIS AS MY CURRENT THINKING ON THE JURY INSTRUCTIONS AS WELL AS

6   THE VERDICT FORM BECAUSE I'D LIKE FOR YOU ALL TO HAVE THE

7   BENEFIT OF REVIEWING IT, AND FOR YOU TO BE ABLE TO LET ME KNOW

8   FIRST THING IN THE MORNING WHAT CONCERNS OR OBJECTIONS YOU

9   HAVE.

10          IF YOU HAVE THOSE TONIGHT, I DON'T KNOW HOW LATE

11  YOU'RE PLANNING TO WORK TONIGHT, BUT IF YOU WANT TO GET

12  ANYTHING TO ME TONIGHT, I'LL BE GLAD TO TAKE A LOOK AT IT LATER

13  THIS EVENING.  IF NOT, I CERTAINLY RESPECT IT'S BEEN A LONG DAY

14  FOR YOU ALL AS WELL.  SO DON'T FEEL OBLIGATED TO GET ANYTHING

15  BACK TO ME TONIGHT, BUT I WOULD LIKE TO HAVE IT FIRST THING IN

16  THE MORNING BY NINE O'CLOCK SO YOU'LL BE ABLE TO GIVE ME YOUR

17  INPUT.

18          AS I SAID BECAUSE IT IS A DRAFT, IT'S NOT SOMETHING

19  I'M FILING ON THE RECORD.  I'M GIVING IT TO YOU AS A COURTESY

20  SO YOU CAN HAVE IT EARLIER AND HAVE MORE TIME BECAUSE I WANT

21  THE BENEFIT OF YOUR INPUT ON THIS IN MAKING AN INFORMED

22  JUDGMENT ABOUT WHAT THE INSTRUCTION SHOULD BE.

23          YOU WILL SEE THOSE MOMENTARILY.  WHEN WE RECESS TODAY

24  I'LL JUST REVIEW THEM REAL QUICKLY AND HAVE THEM BROUGHT OUT TO

25  YOU, SO YOU WILL EACH HAVE A COPY TO REVIEW AS WELL AS THE

1   PROPOSED JURY INSTRUCTIONS.

2           IF YOU ALL WANT TO WAIT AROUND A LITTLE WHILE AND

3   HAVE A DISCUSSION THIS EVENING, I'M HAPPY TO WAIT AROUND, BUT I

4   FIGURE IT'S BEEN LONG DAY FOR YOU ALL, AND YOU ALL WOULD PREFER

5   TO HAVE A LITTLE MORE TIME TO LOOK AT IT, AND WE CAN DISCUSS IT

6   TOMORROW MORNING.  IF YOU ALL GET HERE AT LITTLE BEFORE NINE, I

7   CAN DISCUSS IT WITH YOU EARLY, BUT WE'LL CERTAINLY BE TAKING

8   BREAKS, AND IF IT FALLS THAT YOU FINISH YOUR EVIDENCE RIGHT

9   BEFORE LUNCH, WE CAN TAKE AN EXTENDED LUNCH AND WORK THROUGH

10  WHATEVER ISSUES REMAIN.

11          ONE ISSUE I DO WANT YOU TO THINK ABOUT IS WHETHER YOU

12  WANT ME TO INSTRUCT THE JURY BEFORE YOUR CLOSING ARGUMENTS.

13  YOU'LL SEE ON THE DRAFT I'VE GIVEN YOU I PUT IN BRACKETS AN

14  OPPORTUNITY FOR ME TO INSTRUCT THE JURY.  I'LL GIVE THEM SOME

15  INSTRUCTION BRIEFLY, AND THEN LET YOU ALL CLOSE SO THEY HAVE

16  THE BENEFIT OF THE INSTRUCTIONS AHEAD OF YOUR CLOSING

17  ARGUMENTS.

18          THE MORE TRADITIONAL WAY, OF COURSE, IS SIMPLY FOR

19  YOU TO ARGUE AND I CLOSE, AND I'M GLAD TO DO THAT, AND IN FACT

20  I'LL DO THAT UNLESS BOTH PARTIES WANT ME TO INSTRUCT BEFORE

21  CLOSING, BUT WE CAN DISCUSS THAT IN THE MORNING AND DECIDE HOW

22  TO PROCEED.

23          MR. GORSKI, ANYTHING ELSE OTHER THAN ME PROVIDING THE

24  DRAFT JURY INSTRUCTIONS AT THIS TIME?

25          MR. GORSKI:  NOTHING ELSE FROM PLAINTIFF.  THANK YOU.

1          THE COURT:  MR. ANDRE, ANYTHING ELSE?

2          MR. ANDRE:  NOTHING, YOUR HONOR.  WE'LL AWAIT THE

3 INSTRUCTIONS.

4          THE COURT:  I HAVE YOUR DOCUMENTS THAT YOU LEFT WITH

5 ME AT THE BENCH DURING ONE OF OUR CONFERENCES.  YOU CAN

6 RETRIEVE THAT, AND I'LL HAVE THEM TO YOU MOMENTARILY.

7          (PROCEEDINGS ADJOURNED)

8

9

10

11                              INDEX

12

13 CRAIG KESSLER
   CROSS-EXAMINATION
14 BY MR. GORSKI: ........................................... 44
   DIRECT EXAMINATION
15 BY MR. ANDRE: ............................................ 66
   RECROSS-EXAMINATION
16 BY MR. GORSKI:........................................... 73

17 TONY W. SMITH
   DIRECT EXAMINATION
18 BY MR. GORSKI:........................................... 75
   CROSS-EXAMINATION
19 BY MR. ANDRE:............................................ 94
   REDIRECT EXAMINATION
20 BY MR. GORSKI: .......................................... 127

21

22

23

24

25

1

2                        C-E-R-T-I-F-I-C-A-T-E

3

4   UNITED STATES OF AMERICA

5   NORTHERN DISTRICT OF GEORGIA

6

7           I, ANDRE G. ASHLEY, DO HEREBY CERTIFY THAT I AM A

8   U.S. DISTRICT REPORTER FOR THE NORTHERN DISTRICT OF GEORGIA,

9   THAT I REPORTED THE FOREGOING AND THE SAME IS A TRUE AND

10  ACCURATE TRANSCRIPTION OF MY MACHINE SHORTHAND NOTES AS TAKEN

11  AFORESAID.

12          IN TESTIMONY WHEREOF I HAVE HEREUNTO SET MY HAND ON

13  THIS 13TH DAY OF OCTOBER, 2015.

14

15

16

17

18

19                              ANDRE G. ASHLEY
                                OFFICIAL COURT REPORTER
20                              NORTHERN DISTRICT OF GEORGIA

21

22

23

24

25